**Matthew S. Hale, Esq.**
**HALE & ASSOCIATES**
**Calif. State Bar No. 136690**
**45 Rivermont Drive**
**Newport News, VA 23601**

**Mailing Address:**
**P.O. Box 1951**
**Newport News, VA 23601**

**Telephone No. (757) 596-1143**
**E-Mail: matthale@verizon.net**

**Attorney for Plaintiffs, DAVID J. LEE and**
**DANIEL R. LLOYD**

## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **DAVID J. LEE and DANIEL R. LLOYD,** as individuals and, on behalf of others similarly situated,<br><br>        **Plaintiffs,**<br><br>    **vs.**<br><br>**CHASE MANHATTAN BANK U.S.A., N.A., a Delaware corporation, CHASE MANHATTAN BANK U.S.A., N.A. d.b.a. CHASE BANK U.S.A., N.A., JPMORGAN CHASE & CO., a Delaware corporation; and DOES 1, through 100, inclusive,<br><br>        **Defendants.** | **Case No.: C 07-4732 MJJ**<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES FILED IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**<br><br>**DATE:    December 4, 2007**<br>**TIME:    9:30 a.m.**<br>**PLACE    Courtroom 11**<br>**        19th Floor**<br>**        450 Golden Gate Avenue**<br>**        San Francisco, Calif. 94102** |

1

<u>David Lee, et al. vs. Chase Manhattan Bank, et al.</u>
**Memo. Points & Authorities Filed in Support of Plaintiffs' Opposition to Defendants' Motion to Dismiss**

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS ………………………………………………………………… i

ADDENDUM …………………………………………………………………………… ii

TABLE OF AUTHORITIES …………………………………………………………… iii

I.      SUMMARY OF ARGUMENT ……………………………………………… 1

II.     ARGUMENT ………………………………………………………………… 2

        A.  Standard of Review ………………………………………………….. 2

        B.  Plaintiffs Have Standing To Maintain The Action And Its Various
            Causes Of Action ………………………………………………………… 3

        C.  Plaintiffs' Claims Concerning Their Charge, Credit, Gift, And
            Dining Cards Fall Within The Coverage Of The CLRA …………………… 6

        D.  The Complaint Meets The Specificity Requirements Of
            Fed.R.Civ.P. 9(b) ………………………………………………………... 11

        E.  No Cause Of Action Is Barred By The Relevant Statute Of
            Limitations ……………………………………………………………… 12

        F.  Plaintiffs' Complaint Is Not Preempted By The National Bank Act ……………… 15

            1.  Plaintiffs' Complaint Is Not Preempted By 12 C.F.R. §§ 7.4008 (d)(2)(iv)
                Or 7.4008(d)(2)(viii) ………………………………………………… 17

            2.  The UCL, CLRA, And Common Law In The Context Of Plaintiffs'
                Complaint Have, At Most, Only An Incidental Effect On Defendants'
                Credit Operation ……………………………………………………... 23

            3.  Defendant JPMorgan Chase & Company Is Not A National Bank And
                Thus The Claims Against It May Not Be Preempted Under The National
                Bank Act Or Its Implementing Regulations …………………………… 25

III.    CONCLUSION ……………………………………………………………… 25

**David Lee, et al. vs. Chase Manhattan Bank, et al.**
**Memo.  Points & Authorities Filed in Support of Plaintiffs' Opposition to Defendants' Motion to Dismiss**

ADDENDUM

1. Paragraphs of the Complaint specifying which terms of the agreements are unconscionable and citing relevant case that establishes unconscionability as a matter of law;

2. Lozano v. AT&T Wireless Services, Inc., 2007 U.S. App. LEXIS 22430 (9th Cir. September 20, 2007);

3. Freeman v. Mattress Gallery, 2007 Cal.App.Unpub.LEXIS 9102 at * 11-13 (Cal.App. November 8, 2007);

4. "Guidance on Unfair and Deceptive or Practices Act," (OCC Advisory Letter, March 22, 2002), 2002 OCC CB LEXIS 16, 2002 WL 521380.

**David Lee, et al. vs. Chase Manhattan Bank, et al.**
**Memo. Points & Authorities Filed in Support of Plaintiffs' Opposition to Defendants' Motion to Dismiss**

## <u>TABLE OF AUTHORITIES</u>

**Page[s]**

**<u>Cases</u>**

<u>Abel v. Keybank USA, N.A.</u>, 313 F.Supp.2d 720 (N.D.Ohio 2004)......................................... 21, 22

<u>Anderson Nat'l Bank v. Luckett</u>, 321 U.S. 233, 64 S. Ct. 599, 88 L. Ed. 692 (1944) ................. 15

<u>Augustine v. FIA Card Servs., N.A.</u>, 485 F. Supp. 2d 1172 (E.D. Cal. 2007) ............................ 10

<u>Balistreri v. Pacifica Police Dept.</u>, 901 F.2d 696 (9th Cir. 1990)............................................. 2, 12

<u>Bank of America v. City and County of San Francisco</u>, 309 F.3d 551 (9th Cir. 2002)................. 15

<u>Bell Atlantic Corp. v. Twombly</u>, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)............................... 1

<u>Bernini v. Washington Mutual Bank</u>, 446 F.Supp.2d 217 (S.D.N.Y. 2006) ............................... 24

<u>Berry v. American Express Publishing Co.</u>, 147 Cal.App.4[th] 224 (2006) ........................... 8, 9, 10

<u>Bertero v. Superior Court</u>, 216 Cal.App.2d 213, 230 Cal.Rptr. 719 (1963)................................... 5

<u>Blanco v. Keybank USA, N.A.</u>, 2005 U.S.Dist.LEXIS 31768 (N.D.Ohio September 30, 2005)  22

<u>Bradford-Whitney Corp. v. Ernst & Whinney</u>, 872 F.2d 1152 (3d Cir. 1989)........................... 12

<u>Breininger v. Sheet Metal Workers Intern.</u>, 493 U.S. 67, 110 S.Ct. 424, 107 L.Ed.2d 388 (1989)
.................................................................................................................................................... 19

<u>Buckeye Check Cashing, Inc. v. Cardegna</u>, 546 U.S. 440, 126 S.Ct. 1204, 163 L.Ed.2d 1038
    (2006)...................................................................................................................................... 3

<u>Daghlian v. DeVry Univ., Inc.</u>, 461 F.Supp. 1121 (N.D.Cal. 2006) .......................................... 5

<u>Davis v. Chase Bank U.S.A., N.A., et al.</u>, Case No. CV 06-04804 DDP (PJWx) (C.D.Cal.).... 2, 4

<u>DeLeonis v. Walsh</u>, 140 Cal. 175 (1902)..................................................................................... 4

<u>Doe v. Kamehameha Schools</u>, 470 F.3d 827 (9th Cir. 2007) ..................................................... 23

<u>Douglas v. United States District Court</u>, 495 F.3d 1062 (9th Cir. 2007)...................................... 2

<u>Estate of Migliaccio v. Midland Natl. Ins. Co.</u>, 436 F.Supp.2d 1095 (N.D.Cal. 2006)................. 9

<u>First Nat'l Bank v. Missouri</u>, 263 U.S. 640, 44 S. Ct. 213, 68 L. Ed. 486 (1924) ....................... 15

<u>Flowers v. Carville</u>, 310 F.3d 1118 (9th Cir. 2002)....................................................................... 14

<u>Fox v. Ethicon Endo-Surgery, Inc.</u>, 35 Cal.4[th] 797 (2005) .................................................... 13, 14

<u>Freeman v. Mattress Gallery</u>, 2007 Cal.App.Unpub.LEXIS 9102 (Cal.App. November 8, 2007) 6

**David Lee, et al. vs. Chase Manhattan Bank, et al.**
**Memo.  Points & Authorities Filed in Support of Plaintiffs' Opposition to Defendants' Motion to Dismiss**

Glenbrook Capital limited Partnership v. Mali Kuo, 2007 U.S.Dist.LEXIS 68353 (N.D. Cal. September 16, 2007) ........................................................................................................................... 11

Harris v. Capital Growth Investors XIV, 52 Cal.3d 1142 (1991)................................................... 19

Hernandez v. Hilltop Financial Mortgage, Inc., 2007 U.S.Dist.LEXIS 808674 (N.D.Cal. October 27, 2007) ....................................................................................................................................... 10

Hitz v. First Interstate Bank, 38 Cal.App.4th 274 (1995) .............................................................. 7

Hogar Dulce Hogar v. Community Development Corp., 110 Cal.App.4th 1288 (2003) .............. 14

Howard Jarvis Taxpayers Ass'n v. City of La Habra, 25 Cal.4th 809 (2001).............................. 13

In re Ameriquest Mortgage Co., 2007 U.S.Dist.LEXIS 29641 (N.D.Ill. April 23, 2007)........... 10

Industrial Truckers Assn. v. Henry, 125 F.3d 1305 (9th Cir. 1997)............................................... 18

Industrial Truckers Assn. v. Henry, 909 F.Supp. 1368 (S.D.Cal. 1995) ...................................... 18

Jefferson v. Chase Home Finance LLC, 2007 U.S.Dist.LEXIS 36298 (N.D.Cal. May 3, 2007).. 9, 10

Jimeno v. Mobil Oil Corp., 66 F.3d 1514 (9th Cir. 1995) ............................................................. 17

Jones v. Tracy School Dist., 27 Cal.3d 99 (1980) ......................................................................... 14

Kourtis v. Cameron, 419 F.3d 989 (9th Cir. 2007)......................................................................... 14

Kroske v. US Bank Corp., 87 Empl. Prac. Dec. (CCH) P42, 260 (9th Cir. 2006) ....................... 16

Lewis & Queen v. N.M. Ball Sons, 48 Cal.2d 141 (1954) .............................................................. 4

Lewis v. BT Investment Managers, Inc., 447 U.S. 27, 100 S. Ct. 2009, 64 L. Ed. 2d 702 (1980) ...................................................................................................................................................... 15

Lien Huyunh v. Chase Manhattan Bank, 465 F.3d 992 (9th Cir. 2007)......................................... 13

Lozano v. AT&T Wireless Services, Inc., 2007 U.S.App.LEXIS 22430 (9th Cir. September 20, 2007) ........................................................................................................................... passim

McClellan v. Chipman, 164 U.S. 347, 17 S. Ct. 85, 41 L. Ed. 461 (1896); ................................ 15

Migliaccio v. Midland Natl. Ins. Co., 2007 U.S.Dist.LEXIS 8159 (N.D.Cal. January 26, 2007).. 9

Monroe Retail, Inc. v. Charter One Bank, N.A., 2007 U.S.Dist.LEXIS 68971 (N.D.Ohio September 18, 2007) ...................................................................................................................... 25

Nagrampa v. Mailcoups, Inc., 469 F.3d 1257 (9th Cir. 2006)....................................................... 3

**David Lee, et al. vs. Chase Manhattan Bank, et al.**
**Memo.  Points & Authorities Filed in Support of Plaintiffs' Opposition to Defendants' Motion to Dismiss**

National Bank v. Commonwealth, 76 U.S. (9 Wall.) 353, 19 L. Ed. 701 (1870)......................... 15

National State Bank v. Long, 630 F.2d 981 (3d Cir. 1980)...................................................... 15

Neel v. Magana, Olney, Levy, Cathcard & Gelfand, 6 Cal.3d 176 (1971) ................................ 13

Pareto v. F.D.I.C., 139 F.3d 696 (9th Cir. 1998) ...................................................................... 2

Parks Sch. of Bus., Inc. v. Symington, 51 F.3d 1480 (9th Cir. 1995) ......................................... 2

Public Service Co. v. Batt, 67 F.3d 234 (9th Cir. 1995)......................................................... 23

Rose v. Chase Manhattan Bank U.S.A., N.A., 396 F.Supp.2d 1116 (C.D.Cal. 2005) ........... 20, 21

Shroyer v. New Cingular Wireless Services, Inc., 498 F.3d 976 (9th Cir. 2007)........................ 1, 2

SPGGC, LLC v. Blumenthal, 2007 U.S.App.LEXIS 24436 (2d Cir. October 19, 2007) ........... 25

Sprewell v. Golden State Warriors, 266 F.3d 979 (9th Cir. 2001) ............................................ 1, 2

St. Agnes Medical Center v. PacifiCare of California, 31 Cal.4th 1187 (2003) ........................... 5

St. Elizabeth's Hospital v. Secretary of Health and Human Services, 746 F.2d 918 (1st CDir.

    1984) ................................................................................................................................ 18

State ex rel. Metz v. CCC Information Services, Inc., 149 Cal.App.4th 402 (2007) ..................... 14

Sunset Importers, Ltd. v. Continental Vintners, 790 F.2d 775 (9th Cir. 1991) ............................ 23

Supermail Cargo v. United States, 68 F.3d 1204 (9th Cir. 1995)................................................ 13

United States v. City of Redwood City, 640 F.2d 963 (9th Cir. 1981) ......................................... 2

United States v. Skinna, 931 F.2d 530 (9th Cir. 1990) ................................................................ 17

Van Slyke v. Capital One Bank, 503 F.Supp.2d 353 (N.D.Cal. 2007)......................................... 9

Wells Fargo Bank v. Boutris, 419 F.3d 949 (9th Cir. 2005)..................................................... 15

Wilens v. TD Waterhouse Group, Inc., 120 Cal.App.4th 746, 15 Cal.Rptr.3d 271 (Cal.Ct.App.

    2003) ................................................................................................................................. 6

Wool v. Tandem Computers, Inc., 818 F.2d 1433 (9th Cir. 1985)................................................ 12

## Statutes

12 U.S.C. § 1462 et seq............................................................................................................. 24

12 U.S.C. § 24 et seq................................................................................................................. 15

California Bus. & Prof. Code § 17200 et seq. .................................................................... passim

**David Lee, et al. vs. Chase Manhattan Bank, et al.**
**Memo.  Points & Authorities Filed in Support of Plaintiffs' Opposition to Defendants' Motion to Dismiss**

California Bus. & Prof. Code § 17283 ................................................................. 20

California Civil Code § 1670.5 ............................................................... 19, 23

California Civil Code § 1748.9 ............................................................... 20, 21

California Civil Code § 1750 et seq. .................................................... passim

California Civil Code § 1770 ...................................................................... 8

California Civil Code § 1770(a)(19) ........................................................... 5

California Civil Code § 1780(a) .............................................................. 20

California Code of Civil Proc. § 1281.4 ................................................. 19

Civil Code § 1770(a)(19) ......................................................................... 19

O.R.C. § 1317 ........................................................................................ 21

## Other Authorities

"Guidance on Unfair and Deceptive or Practices Act," (OCC Advisory Letter, March 22, 2002),

   2002 OCC CB LEXIS 16, 2002 WL 521380 ............................................. 16

United States Constitution, Article III ........................................................ 3

## Rules

Fed.R.Civ.P 12(b)(6) .............................................................................. 1, 2

Fed.R.Civ.P. 9(b) ..................................................................................... 11

## Regulations

12 C.F.R. § 560.2(d) ............................................................................... 24

12 C.F.R. § 7.4008(a) .............................................................................. 25

12 C.F.R. § 7.4008(d)(1) .......................................................................... 24

12 C.F.R. § 7.4008(d)(2)(iv) ............................................................... 17, 18

12 C.F.R. § 7.4008(d)(2)(viii) ............................................................ 17, 19

12 C.F.R. § 7.4008(d)(iv) ........................................................................ 16

12 C.F.R. § 7.4008(d)(viii) ................................................................ 16, 21

**David Lee, et al. vs. Chase Manhattan Bank, et al.**
**Memo.  Points & Authorities Filed in Support of Plaintiffs' Opposition to Defendants' Motion to Dismiss**

## I.    INTRODUCTION

Defendants have moved to dismiss the entirety of Plaintiffs' complaint.  For the reasons discussed below, the motion is without merit and should be denied.  In that way, this Court may proceed to consideration of the merits of Plaintiffs' various causes of action, all of which center on the inescapable legal conclusion (based on controlling Ninth Circuit, California Supreme Court, and lower appellate courts) that the terms contained in Defendants' credit card agreements and, particularly, its arbitration provision are unconscionable and unlawful under the laws of the State of California.[1]

## II.    ARGUMENT

### A.    Standard Of Review

A Rule 12(b)(6) motion tests the legal sufficiency of the claims asserted in a complaint.  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1964-65, 167 L. Ed. 2d 929 (2007). "[F]actual allegations must be enough to raise a right to relief above the speculative level." Id. at 1965.  In considering the motion, a court must accept as true all material allegations in the complaint, as well as all reasonable inferences to be drawn from them.[2] Pareto v. F.D.I.C.,

---

[1]    The paragraphs of the Complaint specifying which terms of the agreements are unconscionable and citing relevant cases that establish their unconscionability as a matter of law are, for the Court's convenience, reproduced and attached as Addendum 1 hereto.

[2]    It is, of course, true that a court need not accept as true unreasonable inferences or conclusory legal allegations cast in the form of factual allegations.  Sprewell, 266 F.3d at 988. However, as set forth in the Complaint, no question can exist as to the unconscionability of the various terms of, for instance, the arbitration provision.  Complaint, ¶ 55, 77.  See, e.g., Shroyer v. New Cingular Wireless Services, Inc., 498 F.3d 976 (9th Cir. 2007).  In light of this case law, it is indeed strange that Defendants, in footnote 1 of their Memorandum, [Memorandum 1::26-

**David Lee, et al. vs. Chase Manhattan Bank, et al.**
**Memo.  Points & Authorities Filed in Support of Plaintiffs' Opposition to Defendants' Motion to Dismiss**

139 F.3d 696, 699 (9th Cir. 1998). The complaint must be read in the light most favorable to the

nonmoving party. Sprewell v. Golden State Warriors, 266 F.3d 979, 988 (9th Cir. 2001); Parks

Sch. of Bus., Inc. v. Symington, 51 F.3d 1480, 1484 (9th Cir. 1995).[3]

**B.     Plaintiffs Have Standing To Maintain The Action And Its Various Causes Of Action**

The "injury in fact" that underlies Plaintiffs' causes of action and animates their

Complaint is simply stated:

1.     In paying their annual (or other) fee for their American Express cards, Plaintiffs purchased or acquired the contractual right to mandatory arbitration of all claims they had against Defendants and the merchants from whom they purchased goods or services with their American Express cards, [Complaint, ¶¶ 1, 2, 25, 26, 31-38] ;

2.     the arbitration provision in the agreement which they had imposed upon them by Defendants on a "take it or leave it" basis is, as a matter of law, unconscionable, illegal, and unenforceable, [Complaint, ¶¶ 55, 77];

3.     Plaintiffs have a claim of fraud against Defendants arising from Defendants' inclusion of unconscionable, illegal, and unenforceable terms in the

28)], would actually state that Plaintiffs claim "will nonetheless fail on the merits."  Of course, Defendants' statement was no doubt based on the untoward and completely meritless belief that California law will not control the decision on Plaintiffs' claims.  Defendants' argument concerning the applicability of Delaware law is of no moment since, as the Ninth Circuit recently held in Douglas v. United States District Court, 495 F.3d 1062 (9th Cir. 2007), and Shroyer, California law is controlling when it comes to the matters raised in the Complaint concerning the unconscionability of Defendant's cardmember agreements, including notably its arbitration provision.  In any event, Defendants are bound by the final order and unappealed order issued in Davis v. Chase Bank U.S.A., N.A., et al., Case No. CV 06-04804 DDP (PJWx) (C.D.Cal.) (in which all present defendants were defendants), that California law is controlling with regards to issues of unconscionability and that, indeed, the arbitration provision is unconscionable as a matter of law.

[3]     Dismissal pursuant to Rule 12(b)(6) is proper only where there is either a "lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." Balistreri v. Pacifica Police Dept., 901 F.2d 696, 699 (9th Cir. 1990).  For all of these reasons, it is only under extraordinary circumstances that dismissal is proper under Rule 12(b)(6). United States v. City of Redwood City, 640 F.2d 963, 966 (9th Cir. 1981).

David Lee, et al. vs. Chase Manhattan Bank, et al.
Memo.  Points & Authorities Filed in Support of Plaintiffs' Opposition to Defendants' Motion to Dismiss

cardmember agreement (excluding the arbitration provision), [Complaint, ¶¶ 40-46];

4.    Plaintiffs want to but cannot, as a matter of law, enforce the unenforceable and illegal arbitration provision in order to exercise the right to mandatory arbitration for which they paid, [ibid; Buckeye Check Cashing, Inc. v. Cardegna, 546 U.S. 440, 126 S.Ct. 1204, 163 L.Ed.2d 1038 (2006), Nagrampa v. Mailcoups, Inc., 469 F.3d 1257 (9th Cir. 2006)];

5.    Plaintiffs thus got less than that for which they paid – i.e., they did not get the full value of their contract – and, as a result, lost money (the pecuniary value of the contractual right to mandatory arbitration), [Complaint, ¶¶ 1, 2, 35-38].

Defendants forward that Plaintiffs have not suffered the requisite "concrete" redressable "injury in fact" and so do not have standing to maintain their causes of action under either United States Constitution, Article III, the CLRA , the UCL , or common law fraud.  Defendants are wrong since under controlling Ninth Circuit precedents and persuasive precedents from this District, standing does exist.

Little need be said to refute Defendants' argument other than citation to the recent dispositive opinion of the Ninth Circuit in Lozano v. AT&T Wireless Services, Inc., 2007 U.S.App.LEXIS 22430 (9th Cir. September 20, 2007).  (A copy of the decision is Addendum 2 for the Court's convenience.)  Defendants, understandably, do not cite or even allude to Lozano which involved a claim under the Consumer Legal Remedies Act ("CLRA")(California Civil Code §§ 1750 et seq.), the Unfair Competition Law ("UCL")(Bus. & Prof. Code § 17200 et seq.), and the Federal Communications Act arising from AT&T's billing practices.  Lozano's agreement with AT&T contained an arbitration provision similar to (but not nearly so onerous) as Defendants here since, among other things, it included a class action waiver as well as a no-consolidation term.

The crux of Defendants' argument and of Lozano's holding deals with the presence of an "injury in fact," the sine qua non for both Article III, UCL, CLRA, and fraud standing.  The

David Lee, et al. vs. Chase Manhattan Bank, et al.
Memo.  Points & Authorities Filed in Support of Plaintiffs' Opposition to Defendants' Motion to Dismiss

injury in <u>Lozano</u> was that the Plaintiff did not get that for which he paid under his agreement with the defendant:

> "[W]e find that Lozano has properly stated an injury that he did not receive the full value of his contract … and that his injury is redressable under the UCL."

2007 U.S.App.LEXIS at *10.  The redressability for that injury was, of course, the restitutionary relief available under the UCL.  <u>Ibid.</u>  That the same situation obtains here does not require great elaboration.

Defendants, of course, argue that no arbitration took place and "Plaintiffs nowhere allege they were forced to individually arbitrate any claim against Chase."  Defendants' Memorandum at 9:3-4.  Defendants overlook four matters that render their argument meritless.  First, Defendants overlook that the right to invoke arbitration does not reside exclusively with them but is, in fact under the card agreement, also a right paid for by Plaintiffs.  Second, Defendants are collaterally estopped from even arguing that their arbitration provision is unenforceable since they have already litigated and lost that matter in <u>Davis v. Chase Bank U.S.A., N.A., et al.,</u> <u>supra,</u> (Chases' motion to compel arbitration denied on basis that it was unconscionable and unenforceable).  Third and as is clear from the Complaint, the terms of Defendants' arbitration provision and agreement are, as a matter of law, unconscionable and unenforceable.  <u>See</u> Complaint, ¶¶ 55, 71.  They are, therefore and under California law, illegal.  Fourth, any arbitration by Plaintiffs is, as a matter of law, not legally possible. [4]  Resultantly, Plaintiffs'

---

[4]    Illegal contracts are unenforceable and it is against the public policy of California for a party to an illegal contract to even seek to enforce it.  After all, the courts (and necessarily the arbitrator) are under a duty to instigate an inquiry if it appears to them that the contract may be illegal and ought not to be enforced.  <u>See</u>, <u>e.g.</u>, <u>Lewis & Queen v. N.M. Ball Sons</u>, 48 Cal.2d 141 (1954).  If illegality appears, it is the court's duty to refuse to entertain the action.  <u>DeLeonis v. Walsh</u>, 140 Cal. 175 (1902).  It is thus futile for Plaintiffs to invoke arbitration under an unenforceable arbitration provision and, in fact, doing so would be a waste of time and money.

<u>David Lee, et al. vs. Chase Manhattan Bank, et al.</u>
**Memo.  Points & Authorities Filed in Support of Plaintiffs' Opposition to Defendants' Motion to Dismiss**

injury is neither hypothetical nor conjectural:  they want to but cannot arbitrate their claims due to the unconscionability, unenforceability, and illegality of Defendants' agreement.

However, even if it was possible to arbitrate them, it was not necessary to do so in order for Plaintiffs to suffer the claimed injury and to therefore have standing.  <u>Daghlian v. DeVry Univ., Inc.</u>, 461 F.Supp. 1121 (N.D.Cal. 2006), which was cited with approval in <u>Lozano</u>, supports this conclusion.  As Judge Morrow held:

> "Defendants emphasize that "**nowhere in the FAC does [Daghlian] allege that he actually attempted to transfer to another school that refused to accept his DeVry units, thus forcing him to repeat courses or incur additional tuition expenses." In the absence of such an allegation, defendants assert, Daghlian has failed to show that he suffered the type of "injury in fact"** necessary to maintain the third and fourth causes of action.  [¶] Daghlian counters that he has adequately pled injury in fact. He argues that he suffered injury when he "spent tens of thousands of dollars in tuition expecting that his degree would be a foundation for further education" and "did not receive what he had bargained for."
> ….
> **Although Daghlian does not allege that he attempted to transfer the credits to another educational institution, or that he was forced to begin his education anew at another institution, he does assert that he enrolled at DeVry and incurred $ 40,000 in debt "[i]n reliance on"** defendants' misrepresentations and omissions about the transferability of credits. **This sufficiently alleges that Daghlian personally suffered injury as a result of defendants' allegedly false and/or misleading advertising and unfair business practices**."

461 F.Supp.2d at 1155-56 (emphasis added).  This, of course, also holds true for Plaintiffs' standing to maintain their fraud cause of action.

It is also sufficient to establish Plaintiffs' standing to maintain their CLRA causes of action.  In <u>Lozano</u> the Plaintiff argued that the AT&T agreement violated the California Civil Code § 1770(a)(19) by having unconscionable terms included in it.  Relative to the CLRA

---

<u>Bertero v. Superior Court</u>, 216 Cal.App.2d 213, 230 Cal.Rptr. 719 (1963), disapproved on other grounds, <u>St. Agnes Medical Center v. PacifiCare of California</u>, 31 Cal.4th 1187 (2003).

**David Lee, et al. vs. Chase Manhattan Bank, et al.**
**Memo.  Points & Authorities Filed in Support of Plaintiffs' Opposition to Defendants' Motion to Dismiss**

claims, the Court of Appeal impliedly noted the requisites for standing (in the context of the class certification motion):

> "Any class certified under subsection (a)(19) necessitates a class definition that includes **individuals who sought to bring class actions in California, but were precluded from doing so because of the class action waiver in AWS's arbitration agreement, and suffered some resulting damage.** See <u>Wilens v. TD Waterhouse Group, Inc.</u>, 120 Cal.App.4th 746, 15 Cal.Rptr.3d 271, 276-77 (Cal.Ct.App. 2003) (holding a court may not presume damages based on the mere insertion of an unconscionable clause in a contract)."

2007 U.S.App.LEXIS at *8 (emphasis supplied).  The requisite damage is the "injury in fact" found to exist in <u>Lozano</u>.[5]  That disposes of Defendants' CLRA standing argument.  Just as the CLRA class members "who sought to bring class actions, but were precluded form doing so because of the class action waiver, and suffered some resulting damage" had standing so do Plaintiffs here.  Plaintiffs here could not, as a matter of law, seek (and much less obtain) mandatory arbitration under the arbitration agreement even they wanted to do so.

### C.  Plaintiffs' Claims Concerning Their Charge, Credit, Gift, And Dining Cards Fall Within The Coverage Of The CLRA

According to the explicit terms of the Defendants' cardmember agreement, Plaintiffs' Chase cards are "to be used to pay for goods and services."  Complaint, Ex.14.  As a matter of law and fact, when one pays the annual or purchase fee for these American Express cards one

---

[5]    An alternative basis for Plaintiffs' standing to maintain their CLRA causes of action also exists:  the "damage" suffered by them as a direct result of a violation of their statutory right under the CLRA to be free from the inclusion of unconscionable contract terms such as those that Defendants included in the card agreement and arbitration provision.  This was established in the just-issued <u>Freeman v. Mattress Gallery</u>, 2007 Cal.App.Unpub.LEXIS 9102 at * 11-13 (Cal.App. November 8, 2007) (a copy of the decision is Addendum 3 hereto for the Court's convenience). If one is needed, a monetary value may be placed on the violation of the Plaintiffs' just noted statutory right by Defendants since California law recognizes that "nominal damages" are required when the value of the violation of a right cannot otherwise be determined.

**David Lee, et al. vs. Chase Manhattan Bank, et al.**
**Memo.  Points & Authorities Filed in Support of Plaintiffs' Opposition to Defendants' Motion to Dismiss**

also pays for a "convenience service" rather than just a piece of rectangular shaped plastic. A credit card and its agreement allows the card holder (1) to transact purchases of goods or services quickly and efficiently, and (2) to borrow (finance) a specific purchase or service. As a result, the agreement is not just an extension of credit and, in fact, "is much more than that, encompassing *convenience services* in addition to extension of credit." Hitz v. First Interstate Bank, 38 Cal.App.4th 274, 286 (1995). As the Court explained,

> "A textbook on commercial banking explains these two discrete functions: "The popularity of credit cards is due to the many advantages they offer as a means of payment. These advantages have created two general distinct patterns of credit card use among cardholders--convenience and revolving credit. Many cardholders pay their outstanding balances in full each month; consequently, they incur no monthly finance charge. In fact, nearly half of the cardholders can be classified as convenience users. The remaining cardholders use credit cards as a source of credit and infrequently pay their entire outstanding monthly balance. Both of these uses have distinct advantages over cash, checks, and other means of payment. **Convenience use minimizes the need to carry cash, allows the user to defer payment for goods and services for a short time, and establishes a favorable payment record that is important in credit evaluations. Revolving credit users realize the same advantages plus one other,** namely, they increase their ability to purchase goods and services and in so doing avoid the red tape involved in obtaining a personal loan. Moreover, the credit card holder has considerable flexibility in the timing and amount of debt repayment." … [¶] **The convenience feature of credit cards is surely a "service" …,** wholly apart from the credit feature. Observers of the banking industry view the convenience feature as such; the publications quoted above both include references to "credit card services." A credit card user enjoys various benefits *other than borrowing*-- primarily cashless and checkless purchasing--regardless of whether the credit feature is used. Indeed, convenience use without borrowing is the "reason that some banks levy a flat charge on the use of the card." (Reed & Gill, *supra*, at p. 339.) Thus, some users even *pay* for these two features separately: their annual charge for the card is attributable to the convenience feature, while they pay for use of the credit feature through finance charges."

38 Cal.App.4th at 286-287 (italics in original, internal citations omitted). The existence and purchase of this "convenience service" by Plaintiffs is specifically alleged in the Complaint. Complaint, ¶ 18:

Ignoring the "convenience service" provided by their credit cards and paid for by Plaintiffs, Defendants seek dismissal of all CLRA-related causes of action since "the Agreements between Chase and Plaintiffs do not constitute agreements for the 'sale or lease of goods or services' as required to pursue a claim under the CLRA." Defendants' Memorandum at 16:3-4. Relying on <u>Berry v. American Express Publishing Co.</u>, 147 Cal.App.4[th] 224 (2006), Defendants forward that "credit" cannot fall within the coverage of the CLRA's definition of "goods or services" and, hence, that their cards are not subject to a cause of action under the CLRA relative to their "insert[ing] an unconscionable term" into the agreement and its arbitration provision. In forwarding that position, Defendants not only obviously ignore the explicit allegations of the Complaint but also, and more seriously, misread and misapply <u>Berry</u>.

As was explicitly stated in <u>Berry</u>, its actual holding is that credit, standing alone and without more, is not a "service" covered by the CLRA:

> "We conclude neither the express text of CLRA nor its legislative history supports the notion that credit transactions separate and apart from any sale or lease of goods or services are covered under the act"

147 Cal.App. at 233. It is <u>Berry</u>'s holding that "providing credit *separate and apart* from the sale or lease of any specific good or service falls outside the scope of section 1770," [<u>id.</u> at 232 (italics in original)], that results in <u>Berry</u> actually supporting Plaintiffs' position and, due to the presence of the above-discussed "convenience service" purchased by Plaintiffs rendering Defendants' motion meretricious.

Defendants not only misread and misapply the various precedents that have discussed and applied <u>Berry</u> but also the CLRA's overall applicability to "financial services." Defendants argue "since <u>Berry</u>, a uniform line of cases holds broadly that the CLRA does not regulate financial services." Defendants' Memorandum at 18:22-23. That, to be kind, is not only an

overstatement but is also incorrect.  For instance, Defendants cite <u>Migliaccio v. Midland Natl. Ins. Co.</u>, 2007 U.S.Dist.LEXIS 8159 (N.D.Cal. January 26, 2007), in support of this general premise because it held annuities are not covered by the CLRA.  However, Defendants apparently overlook that <u>Estate of Migliaccio v. Midland Natl. Ins. Co.</u>, 436 F.Supp.2d 1095, 1109 (N.D.Cal. 2006), **denied** a motion to dismiss CLRA claims based on "estate and financial services" while granting it as to annuities.  See  <u>Jefferson v. Chase Home Finance LLC</u>, 2007 U.S.Dist.LEXIS 36298 at *3 (N.D.Cal. May 3, 2007).

Further, precedents applying the **actual** holding of <u>Berry</u> support the Plaintiffs' position disprove Defendants' thesis.  In <u>Van Slyke v. Capital One Bank</u>, 503 F.Supp.2d 353 (N.D.Cal. 2007), a case upon which Defendants place primary reliance, Judge Alsup dismissed the CLRA claim involving allegations that that Capital One's repetitive issuance of sub-prime credit cards and a laying on of late fees involved "a predatory scheme involving the extension of multiple lines of credit and high and deceptive fees thereon" rather than an extension of credit.  <u>Id.</u> at 359.  It was, as the Court noted, hard to see the distinction between the two.  In that instance

> "plaintiffs still have not identified any good or service -- the challenge is to the extension of credit. Of course, plaintiffs bought goods and services with their credit cards. But not from defendants. **Plaintiffs do not allege that they were given or had purchased special rights or options under their agreement. They do not allege that defendants sold them any goods under the credit agreement (other than a plastic card evidencing a line of credit). And, they do not allege that defendants sold them any services. In short, this case deals only with the extension of credit, in however unseemly a manner, not with the sale or lease of goods or services. Plaintiffs still have not identified any good or service -- the challenge is to the extension of credit.**"

<u>Ibid.</u> (emphasis added). Relying on <u>Berry</u>'s **actual** holding that "issuing a line of credit, apart from providing any other good or service, was not a transaction covered by the CLRA," [<u>id.</u> at 358], the Court thus concluded that dismissal was appropriate.  However, here the absent thing that led to dismissal in <u>Van Slyke</u> is present here:  the "convenience service."

9

Other Courts that have considered the question have reached similar conclusions[6] and, in fact, hold that the CLRA does cover "financial services."  Just recently, Judge Illston in Hernandez v. Hilltop Financial Mortgage, Inc., 2007 U.S.Dist.LEXIS 808674 (N.D.Cal. October 27, 2007), adopting the "convenience service" as falling within the CLRA, held that "mortgage loans, and the activities involved in receiving and maintaining one" – a loan, of course, necessarily involves credit -- falls within the coverage of the CLRA.  Judge Henderson in Jefferson v. Chase Home Finance LLC, supra, agreed:

> "In a related context, an intermediate California appellate court concluded that credit card agreements encompass convenience services in addition to an extension of credit and that, therefore, such agreements qualify as contracts for "services" under a non-CLRA statute. Hitz v. First Interstate Bank, 38 Cal. App. 4th 274, 286-88, 44 Cal. Rptr. 2d 890 (1995). Chase did cite to one recent case where an intermediate California appellate court concluded that issuance of a credit card does not constitute a "service" under the CLRA, but this Court does not find that case persuasive here because (a) the state court relied heavily on the legislature's consideration and rejection of including "credit" as part of the CLRA's definitions and (b) the court failed to consider whether, as the *Hitz* court concluded, a credit card agreement involves other services in addition to simply an extension of credit. Berry v. Am. Express Publishing, Inc., 147 Cal. App. 4th 224, 229-33, 54 Cal. Rptr. 3d 91 (2007)."

2007 U.S.Dist.LEXIS 36298 at *3.

The bottom line on all of this is that dismissal is not appropriate. This conclusion was recently reached, under circumstances similar to those existing here, in In re Ameriquest Mortgage Co., 2007 U.S.Dist.LEXIS 29641 (N.D.Ill. April 23, 2007) (applying California law). Following a thorough analysis of the "convenience" service and the CLRA's non-coverage of credit except in the circumstances established by Berry, the District Court concluded:

> "it is not inconceivable that, consistent with the allegations of the complaint, plaintiffs could prove the existence of tangential "services" associated with their

---

[6]    The one exception to this statement is Augustine v. FIA Card Servs., N.A., 485 F. Supp. 2d 1172 (E.D. Cal. 2007), which made just a passing reference, without any analysis, to Berry.

**David Lee, et al. vs. Chase Manhattan Bank, et al.**
**Memo.  Points & Authorities Filed in Support of Plaintiffs' Opposition to Defendants' Motion to Dismiss**

residential mortgages and establish that these transactions were covered by the CLRA. See McMillan v. Collection Professionals, Inc., 455 F.3d 754, 759 (7th Cir. 2006) (dismissal inappropriate unless a court finds there is "no set of facts consistent with the pleadings under which the plaintiff could obtain relief."). Accordingly, we deny defendants' motion to dismiss plaintiffs' Twelfth Cause of Action." Id. at *5.

### D. The Complaint Meets The Specificity Requirements Of Fed.R. Civ.P. 9(b)

A fair reading of Plaintiffs' complaint, in all of its prolixity, creates a reasonable belief that, with regard to the fraud cause of action, it more than complies with the specificity requirement of Fed.R.Civ.P. 9(b). In fact, it is difficult to envision a pleading that could have greater compliance with that Rule. The standard for adjudging whether compliance with Rule 9(b) exists was described by this Court in Glenbrook Capital limited Partnership v. Mali Kuo, 2007 U.S.Dist.LEXIS 68353 at * 11 (N.D. Cal. September 16, 2007). That standard is met here if for no other than reason than it cannot be seriously argued that Defendants are not on sufficiently put on notice of their specific misconduct and surrounding facts to mount a defense.

The only lack of purported specificity identified by Defendants is that:

"Plaintiffs fail to identify with the requisite particularity any statements made by anyone at Chase upon which Plaintiffs relief at the time they obtained their credit cards. Plaintiffs allege no specific acts of wrongdoing by Chase."

Defendants' Memorandum at 20:4-6 (underlining in original). Once again Defendants have created their own straw man by emphasizing the time Plaintiffs "obtained" their cards and downplaying that the Plaintiffs' annual payment of the fee in and after 2003 as well as amendments to the agreement in, among other times, 2005 are not also accrual triggers. Even if that were not so, the Complaint abounds with specificity concerning the "statements" made by Defendants that underlay the fraud:

1. ¶ 25 (Lee, who obtained his card in the late 1990s, paid his annual fee for the card during each year to the present),

11

2. ¶ 26 (Lloyd, who obtained his card in or about 2000, paid his annual fee for the card during each year to the present),

3. ¶¶ 25, 26 (the card agreement, including the arbitration provision) received by both Lee and Lloyd accompanying the delivery of their respective cards has been amended as late as 2005);

4. ¶ 68 [Lee, after discovering the unconscionability of the agreement wrote his Civil Code § 1782 letter to Defendants on January 30, 2007concerning the unconscionability of the agreement); and,

5. ¶¶ 27-30, 38, 40-45 (listing misrepresentations and that the continuing practice of Defendants of making them).

Even had such specificity not been presented in the Complaint, the fact that each document which is implicated by and supports the cause of action and claim is attached as exhibits to the Complaint more than meets the notice and specificity requirements of Rule 9 (b). See Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1440 (9th Cir. 1985).

### E. No Cause Of Action Is Barred By The Relevant Statute Of Limitations

Defendants have forwarded that the Plaintiffs causes of action are time-barred. The purported "factual" bases underlying that argument are that Lloyd obtained his card in or about 2000, Lee obtained his card in the late 1990's, and Defendants' ipse dixit conclusion that "[t]he facts underlying Plaintiffs' fraud claim were fully known to Plaintiffs when they obtained the Chase credit cards that are the subject of the litigation." Defendants' Memorandum at 10:27 – 11:1. Defendants' argument is without merit. In determining this is so it must, of course, be noted that Plaintiffs have no burden relating to initially establishing in their Complaint the timeliness of their causes of action, [see, e.g., Bradford-Whitney Corp. v. Ernst & Whinney, 872 F.2d 1152, 1161 (3d Cir. 1989)], while the Defendants do have a burden of establishing the absence of sufficient facts to support the cause of action. See, e.g., Balistreri v. Pacifica Police Dept., 901 F.2d 696, 699 (9th Cir. 1990). That the Complaint itself avers that the actions

**David Lee, et al. vs. Chase Manhattan Bank, et al.**
**Memo. Points & Authorities Filed in Support of Plaintiffs' Opposition to Defendants' Motion to Dismiss**

complained of occurred within the past three years is, without more, sufficient to overcome Defendants' argument.  See Complaint, ¶ 76 ("Beginning at least three years prior to the filing of the Complaint … Chase made misrepresentations….").  The Complaint also specifically alleges that each Plaintiff also has made annual fee payments from the time he received the card up to and including the present time, [id., at ¶ 25-26], and that Defendants have periodically amended the card agreement (apparently most recently in 2005, a time well within the 3-year and 4-year limitations periods).  Ibid,

The Complaint, consistent with controlling California precedents dealing with accrual of causes of action, alleges sufficient facts to overcome Defendants' argument.  Indeed, Defendants' argument presents the paradigm of a statute of limitations dismissal argument that the Ninth Circuit has repeatedly held should not be granted.  See, e.g., Lien Huyunh v. Chase Manhattan Bank, 465 F.3d 992, 99-97 (9th Cir. 2007); Supermail Cargo v. United States, 68 F.3d 1204, 1206 (9th Cir. 1995). Defendants' overarching error is that Plaintiffs' causes of action did not necessarily and automatically accrue so as to trigger the running of the statute of limitations at the time they each first received ("obtained") the card.  Under California law, a cause of action accrues "upon the occurrence of the last element essential to the cause of action," [Howard Jarvis Taxpayers Ass'n v. City of La Habra, 25 Cal.4th 809, 815 (2001)], or when the cause of action is "complete with all of its elements."  Fox v. Ethicon Endo-Surgery, Inc., 35 Cal.4th 797, 807 (2005).  In other words, the statute of limitations accrues when a plaintiff has the right to sue on a cause of action.  Neel v. Magana, Olney, Levy, Cathcard & Gelfand, 6 Cal.3d 176, 187 (1971). That is usually at the time of the injury.  Id., 35 Cal.4th at 808.  Here, of course, the alleged "injury" is when Plaintiff did not "get that for which he paid."  Complaint, ¶¶ 34-37, 40.  That occurs at the time each payment of the annual fee was made, and/or at the time

**David Lee, et al. vs. Chase Manhattan Bank, et al.**
**Memo.  Points & Authorities Filed in Support of Plaintiffs' Opposition to Defendants' Motion to Dismiss**

of the 2005 (and each post-2000) amendment to the arbitration provision was made, and/or at the time at which each charge to Plaintiffs' card was made which was subject to the terms of the agreement and arbitration provision, and/or at the time of the first use of an additional or replacement card (which reactivated the agreement to the agreement).  Each of these matters could (and did) occur within the relevant limitations periods.

Even if factual accrual had not, as it did, occur within the respective limitations period, several important exceptions to the basic accrual rule exist which are applicable here and assure that accrual occurred within the 3 and 4 years preceding the filing of the action:  (1) the "discovery" rule which postpones accrual until Plaintiff discovers or has reason to discover the cause of action, [id., 35 Cal.4th at 807]: (2) the "delayed discovery" rule, [see, e.g., Jones v. Tracy School Dist., 27 Cal.3d 99, 105 (1980); Hogar Dulce Hogar v. Community Development Corp., 110 Cal.App.4th 1288, 1295-96 (2003) (""when an obligation or liability arises on a recurring basis [like the need to make the annual fee payment to Defendants for the credit card], a cause of action accrues each time a wrongful act occurs, triggering a new limitations period")]; and, (3)  the "continuing" nature of Defendants' actions rule, [see, e.g., Flowers v. Carville, 310 F.3d 1118, 1126 (9th Cir. 2002) (in the presence of "continuing wrongful conduct, the statute of limitations doesn't begin to run until that conduct ends."); State ex rel. Metz v. CCC Information Services, Inc., 149 Cal.App.4th 402, 418-19 (2007).

The bottom line on all of this was noted in Kourtis v. Cameron, 419 F.3d 989, 999-1000 (9th Cir. 2007), in reversing a dismissal on statute of limitations grounds under circumstances analogous to those present here:

> "The initial act … indeed falls outside the statute of limitations.  Nevertheless, the complaint also alleges several acts of continuing infringement ….  Because the complaint does not identify the date on which the Kourtises discovered these acts of continuing infringement, it can not be concluded that the Kourtises' claim is

**David Lee, et al. vs. Chase Manhattan Bank, et al.**
**Memo.  Points & Authorities Filed in Support of Plaintiffs' Opposition to Defendants' Motion to Dismiss**

time barred in its entirety.  … Cameron is free, of course, to pursue the statute of limitations issue on summary judgment."  (Internal citations omitted)

This Court should reach the same conclusion here and deny Defendants' motion to dismiss.

### F.  Plaintiffs' Complaint Is Not Preempted By The National Bank Act

Defendants contend that, as nationally chartered banks, all of the terms of their credit card agreements are governed solely by federal law, the National Bank Act (12 U.S.C. § 24 et seq.), and its implementing regulations.  "State law theories may not be used be used to mount a facial attack on the terms of a national bank's credit card agreement,"[7] or so they say.  That broad overstatement and conclusion is not supported by the terms of the National Bank Act, its implementing regulations, or legal precedents.  Indeed, nothing in the National Bank Act expressly preempts general deceptive practices statutes as a class.[8]  Bank of America v. City and County of San Francisco, 309 F.3d 551 (9th Cir. 2002).  Nor are they subject to conflict

---

[7]      Defendants' Memorandum at 1:16-17.

[8]      Banking is not an area in which Congress has evidenced an intent to occupy the entire field to the exclusion of the states, and thus, state legislatures may legislate in all areas not expressly or impliedly preempted by federal legislation. See, e.g., Lewis v. BT Investment Managers, Inc., 447 U.S. 27, 38, 100 S. Ct. 2009, 2016, 64 L. Ed. 2d 702 (1980); First Nat'l Bank v. Missouri, 263 U.S. 640, 656, 44 S. Ct. 213, 215, 68 L. Ed. 486 (1924); Wells Fargo Bank v. Boutris, 419 F.3d 949, 963 (9th Cir. 2005).  **In fact, federal courts have recognized that "national banks have traditionally been governed in their daily course of business far more by the laws of the State than of the Nation. All [of] their contracts are governed and construed by State laws."** National Bank v. Commonwealth, 76 U.S. (9 Wall.) 353, 362, 19 L. Ed. 701 (1870). Except for a few instances in which Congress has explicitly preempted state regulation of national banks, "regulation of banking has been one of dual control since the passage of the first National Bank Act in 1863." National State Bank v. Long, 630 F.2d 981, 985 (3d Cir. 1980). Thus, the rule is that state laws apply, "the exception being the cessation of the operation of such laws whenever they expressly conflict with the laws of the United States or frustrate the purpose for which the national banks were created, or impair their efficiency to discharge [their] duties . . . ." McClellan v. Chipman, 164 U.S. 347, 357, 17 S. Ct. 85, 87, 41 L. Ed. 461 (1896); see also Anderson Nat'l Bank v. Luckett, 321 U.S. 233, 248, 64 S. Ct. 599, 607, 88 L. Ed. 692 (1944) ("national banks are subject to state laws, unless those laws infringe the national banking laws or impose undue burden on the performance of the banks' functions").

**David Lee, et al. vs. Chase Manhattan Bank, et al.**
**Memo.  Points & Authorities Filed in Support of Plaintiffs' Opposition to Defendants' Motion to Dismiss**

preemption since, for instance, the Office of the Comptroller of the Currency, the agency charged with enforcement of the National Bank Act, itself has taken the position that the UCL is not preempted.  See "Guidance on Unfair and Deceptive or Practices Act," (OCC Advisory Letter, March 22, 2002), 2002 OCC CB LEXIS 16, 2002 WL 521380, at 3 n. 2 (citing the UCL specifically, "A number of state laws prohibit unfair or deceptive acts or practices, and such laws may be applicable to insured depository institutions.")  (A copy of the Advisory Letter is Addendum 4 hereto for the Court's convenience).  Nor are they subject to field preemption due to the absence of a pervasive consumer protection regulatory scheme.  See, e.g., Kroske v. US Bank Corp., 87 Empl. Prac. Dec. (CCH) P42, 260 (9th Cir. 2006).  If the situation was otherwise, the National Bank Act's implementing regulations would not provide an explicit preemption exception for State laws dealing with, among other things, contracts and torts and the Comptroller would not have noted that State consumer protection laws are not preempted as a class.

Defendants forward that Plaintiffs may not maintain any of their causes of action because the statutes upon which they are based are preempted by the National Bank Act's implementing regulations (specifically, 12 C.F.R. §§ 7.4008(d)(iv) and (viii)).  Defendants' argument is based upon an overbroad misrepresentation of Plaintiffs' claims and the relief which they seek:  i.e., that by this action Plaintiffs "impermissibly would have California law rewrite the terms and disclosures that Chase includes in its Agreements, implicating Chase's core power to lend money."  Defendant's Memorandum at 13:10-12.  It is also based on rather cavalier descriptions of the case holdings as well as the principles which they purportedly support.  Three initial comments in these regards should be made.  First, "rewriting" the agreement is most assuredly not what Plaintiffs seek, what the UCL/CLRA/common law authorize, or, what

this Court may order.[9]  Second, although the motion to dismiss is made on behalf of a national bank, it is also made on behalf of an entity (Defendant JPMorgan Chase & Co.) that is not a national bank and to which, accordingly, preemption does not apply. Third, Defendants have the burden of proof on their affirmative defense of preemption,[10] and, providing only numerous ipse dixits and misrepresentations of the record, they have woefully failed to meet their burden.

      **1.**     **Plaintiffs' Complaint Is Not Preempted By 12 C.F.R. §§ 7.4008((d)(2)(iv) Or 7.4008(d)(2)(viii)**

---

[9]    It is ironically interesting that Defendants take the position that the CLRA does not even cover lending (due to the credit element that must definitionally be a part of the "loan"), and indeed make that argument a centerpiece of their Motion. Defendants' Memorandum at 16-19. How is the CLRA preempted if, as Defendants forward, it has no relationship to lending and does not cover Defendant's lending operation?  The two arguments are obviously at odds with each other.  Notably, the arguments made by Defendants on the CLRA coverage issue actually supports Plaintiffs' position that the CLRA is not preempted.

[10]    See, e.g., Jimeno v. Mobil Oil Corp., 66 F.3d 1514, 1526 (9th Cir. 1995)(the burden of proof is on the party asserting an affirmative defense); United States v. Skinna, 931 F.2d 530, 533 (9th Cir. 1990)("The burden of asserting and supporting a defense of preemption is on [the defendant]").  In light of this rule, Defendants nonetheless argue that somehow Plaintiffs had what can only be characterized as a very strange burden relative to matters they should have included in the Complaint:

> "In spite of these plain statements of federal primacy, Plaintiffs identify no provision of the NBA or the OCC's regulations prohibiting class action waivers or limiting how national banks may structure their credit card agreements' arbitration clauses, because no such federal provision exists."

Defendants' Memorandum at 15:16-19 (underscoring in original).  Obviously Plaintiffs were under no duty to anticipate or plead around any possible affirmative defense in their Complaint. But what is really strange is that Defendants actually do recognize that neither the National Banking Act nor its implementing regulations either prohibit or permit the means by which an arbitration clause must be structured.  The absence of such a provision obviously negatively impacts Defendants' argument and not Plaintiffs' allegations since it clearly establishes the absence of express or conflict preemption and is, in fact, an admission by Defendants that their arguments concerning Subsections 7.4008(d)(2)(iv) and (viii) are without support.  After all, it is only with the presence of "such federal provision" that preemption can arise.

**David Lee, et al. vs. Chase Manhattan Bank, et al.**
**Memo.  Points & Authorities Filed in Support of Plaintiffs' Opposition to Defendants' Motion to Dismiss**

Addressing first the argument that the Complaint, UCL, CLRA, and common law are preempted because of their supposed relation to the "terms of credit," Defendant has failed to quote the important portion of the regulations relating to "terms of credit" (importance, in this instance, being measured by support to Plaintiffs' position):

> "The terms of credit, **including the schedule for repayment of principal and interest, amortization of loans, balance, payments due, minimum payments, or term to maturity of the loan, including the circumstances under which a loan may be called due and payable upon the passage of time or a specified even external to the loan**."

Subsection 7.4008(d)(2)(iv) (emphasis added, signifying the portions not quoted by Defendants). Defendants' argument (and, indeed, its underlying premise) would have this Court believe that "terms of credit" encompasses the various terms in their card agreements that Plaintiffs challenge as being unconscionable and, hence, in violation of the CLRA, UCL, and common law. That is wrong: Defendants' argument is based on a misreading of the regulation and, in fact, is nothing more than a blatant attempt to, by the use of ellipses, mislead this Court.

"Terms of credit," as used in this subsection, relates to various types of financial "loan" or fee information.  It most assuredly does not, for instance, consist of such things as Defendants' arbitration provision's class action waiver, injunction waiver,  consolidation of claims preclusion, and the other unconscionable provisions specified in the Complaint, ¶¶ 55 (a)-(q), 77-78.  That is borne out by, among other things, standard rules of regulatory interpretation such as *ejusdem generis* (literally, "of the same kind').[11]  When specific words follow general ones (such as exists here), the rule restricts application of the general term to

---

[11]    The rule applies equally to regulations and statutes.  <u>See</u>, <u>e.g.</u>, <u>St. Elizabeth's Hospital v. Secretary of Health and Human Services</u>, 746 F.2d 918 (1st CDir. 1984); <u>Industrial Truckers Assn. v. Henry</u>, 909 F.Supp. 1368, 1374 (S.D.Cal. 1995), revd. on other grounds, 125 F.3d 1305 (9th Cir. 1997).

<u>David Lee, et al. vs. Chase Manhattan Bank, et al.</u>
**Memo.  Points & Authorities Filed in Support of Plaintiffs' Opposition to Defendants' Motion to Dismiss**

things that are similar to those enumerated.[12]  "Terms of credit" is thus limited to things in the same class as those listed in the regulation:  i.e., payment terms and other money-related matters.   Applied here that necessarily means the contractual terms being challenged by Plaintiffs are not of the same type as those listed in the regulation and, hence, are not preempted under that subsection.

Nor does preemption arise under Subsection (d)(2)(viii) which preempts State laws dealing with

> "(viii)  Disclosure and advertising, including **laws requiring specific statements, information, or other content to be included in … credit contracts** …." (emphasis added).

Subsection 7.4008(d)(2)(viii)(emphasis added).  The Complaint does not contain any request or, by any means, even a suggestion or inference of a request that any "specific statements, information, or other content" be included in the cardmember agreement.  With regard to the contents of the cardmember agreement and/or arbitration provision, all the Complaint requests is

1.   a judicial finding that the designated terms be declared and otherwise found to be unconscionable, [Complaint, ¶¶ 89-92],

2.   that an injunction be issued enjoining the application of those unconscionable provisions, [Complaint, ¶¶ 4, 5; pp. 46:13-25],

3.   that the Court find that the inclusion of the unconscionable terms violates the CLRA (specifically Civil Code § 1770(a)(19)), [Complaint, ¶¶ 4,5, 67-71, 80-83],

4.   that the Court find that the inclusion of the unconscionable terms violates the "illegal" and "unfair" prongs of the UCL (specifically California Civil Code § 1670.5, and California Code of Civil Proc. § 1281.4), [Complaint, ¶¶ 4, 5, 50-56, 57-63, 64-66, 67-71, 72-74 84-85, 86-88], and

---

[12]    See Breininger v. Sheet Metal Workers Intern., 493 U.S. 67, 110 S.Ct. 424, 107 L.Ed.2d 388 (1989) (applying rule in a preemption context); Harris v. Capital Growth Investors XIV, 52 Cal.3d 1142 (1991).

David Lee, et al. vs. Chase Manhattan Bank, et al.
Memo.  Points & Authorities Filed in Support of Plaintiffs' Opposition to Defendants' Motion to Dismiss

5.    that Defendant committed fraud in the inducement arising from various misrepresentations, including misrepresentations contained in the agreement itself. Complaint, ¶¶ 75-79.

Nor does the CLRA, the UCL, and the common law authorize or, by any means, even suggest or infer that a remedy for their violation is that "specific statements, information, or other content" be included in the cardmember agreement.  In fact, the UCL specifically limits the relief available under it to restitution and injunctive relief.  See California Bus. & Prof. Code § 17283; Lozano v. AT&T Wireless Servs., supra, 2007 U.S.App.LEXIS 22430 at *9 (9th Cir. 2007) ("The only types of relief available under the UCL actions are injunctive and restorative.")  The CLRA also specifies the relief that a court may give for its violation and does not admit as a remedy the rewriting of the unconscionable terms of the cardmember agreement.  See California Civil Code § 1780(a) (limiting remedies to "(1) Actual damages… (2) An order enjoining such methods, acts, or practices. (3) Restitution of property. (4) Punitive damages…").

These are all a far cry from the preempted statutes or statutory regimes forwarded by Defendants as being so-called persuasive examples of why Plaintiffs' claims are preempted. Primary amongst these is Rose v. Chase Manhattan Bank U.S.A., N.A., 396 F.Supp.2d 1116 (C.D.Cal. 2005), in which the issue was whether California Civil Code § 1748.9, in the context of a UCL cause of action, was preempted.  The Court held it was.  However, Defendants' version of Rose's holding and application here is so off-base that it warrants examination and exposure.  Defendants state, citing Rose as support,

"[T]he courts have concluded that OCC regulations flatly preempt state law from dictating credit card agreements' terms and disclosures."

Defendants' Memorandum at 14:8-9.  A review of Rose lays false such a characterization and establishes that Rose is inapposite to preemption of Plaintiffs' causes of action.

20

In Rose and unlike the CLRA/UCL/common law, the statute at issue – California Civil Code § 1748.9 -- affirmatively required the following disclosures be contained in offers made by National Bank/credit card issuers of "convenience check loans":

> "**(a)** A credit card issuer that extends credit to a cardholder through the use of a preprinted check or draft shall disclose on the front of an attachment that is affixed by perforation or other means to the preprinted check or draft, in clear and conspicuous language, all of the following information:
>
> **(1)** That "use of the attached check or draft will constitute a charge against your credit account." …
>
> **(3)** Whether the finance charges are triggered immediately upon the use of the check or draft."

Cal. Civil Code § 1748.9. Obviously that fell within the preemption of 12 C.F.R. § 7.4008(d)(viii) because the statute directly imposed "a state-imposed requirement that Chase *affirmatively* include certain disclosures in its convenience check offers."  396 F.Supp.2d at 1123 (italics in original).  However, as noted, no such "affirmative" requirement exists relative to the terms which Plaintiffs here challenge.

So too is Defendants' reliance on Abel v. Keybank USA, N.A., 313 F.Supp.2d 720 (N.D.Ohio 2004), misplaced.  The statute at issue there was an Ohio statute (the Real Estate Installment Sales Act, O.R.C. § 1317) which, as characterized by the court

> "read into each promissory note (arising from a consumer transaction) a requirement that any holder, including a national bank, assume the liability of the seller under certain circumstances."

313 F.Supp.2d at 727.  The Court found it to be preempted on the basis that

> "this type of state imposed liability significantly interferes with a national bank's ability to negotiate promissory notes and lend money. **As defendants point out, the RISA provision essentially requires national banks to become insurers for sellers vis a vis consumers.** This will undoubtedly have a significant impact on the value of promissory notes issued in Ohio because such notes will likely be worth less than similar notes issued in states that do not impose RISA type liability. Moreover, RISA will significantly impair the ability of the national bank to collect money on promissory notes that qualify for RISA protection."

Ibid. (emphasis added). Defendants' reliance on Abel is thus inapposite. Even if this were not

so, Defendants' use of Abel is highly suspect for two reasons. First, Abel was flatly rejected by

its sister Court in a much more insightful and studied opinion: Blanco v. Keybank USA, N.A.,

2005 U.S.Dist.LEXIS 31768 (N.D.Ohio September 30, 2005), where the Court expressly found,

in terms applicable to the present dispute that case law relied upon in Abel (and which not

coincidentally were relied upon by Defendants here) were inapposite. See Defendants'

Memorandum at 15:7-9, 15:11-13. The Court stated:

> "In the instant case, the state law does not directly control the federal bank
> activity. No party suggests that RISA *prohibits* banks from negotiating
> promissory notes. Rather, it would have the incidental effect of encouraging all
> lenders -- national or otherwise -- to engage in a closer risk analysis in purchasing
> consumer promissory notes. While the statute could impose additional liability on
> national banks, altering the terms of liability does not constitute "obstructing,
> impairing, or conditioning a national bank's ability to fully exercise its powers" to
> negotiate promissory notes. If, as Defendant seems to urge, the National Bank Act
> preemption were interpreted to include any action that merely burdens the bank's
> business operations, it would also make invalid other state and local regulations
> (such as state laws prohibiting discrimination in lending) that encumber banks'
> ability to negotiate commercial transactions. Likely, Congress did not intend to
> preempt these laws. Moreover, RISA affects other institutions, not just national
> banks. Rather national banks are merely caught up in the RISA's regulatory net
> with numerous other types of banks and commercial entities.

Ibid. This holds true of the present case.

Obviously and as noted, the unconscionable terms in the cardmember agreement here are

not required by any law to be included in a cardmember agreement, and, importantly, Plaintiffs

here do not seek to insert any statement into the cardmember agreement. Again, the decision of

whether certain terms such as the arbitration provision are to be included in the cardmember

David Lee, et al. vs. Chase Manhattan Bank, et al.
Memo. Points & Authorities Filed in Support of Plaintiffs' Opposition to Defendants' Motion to Dismiss

agreement and the language that is to be used therein is not subject to any compulsory California or Federal law:  it is a decision that is solely up to the Defendant.[13]

Finally, this Court lacks the authority to add anything to the cardmember agreement by rewriting it or otherwise.  That a Court may not rewrite an agreement is too well-known and settled to require much elaboration.  See, e.g., Public Service Co. v. Batt, 67 F.3d 234 (9th Cir. 1995) ("Courts are not permitted … in any manner to rewrite agreements reached by parties.").  This lack of authority, of course, also extends to rewriting statutes to allow for non-authorized remedies or relief.[14]  In this context, the extent of the Court's authority upon its finding one or more of the challenged terms is unconscionable is the determination of whether that term can be severed or, as will be the case for instance, the entire arbitration or other agreement is rendered unenforceable.  See, e.g., California Civil Code § 1670.5.

### 2.    The UCL, CLRA, And Common Law In The Context Of Plaintiffs' Complaint Have, At Most, Only An Incidental Effect On Defendants' Credit Operation

Having thus established that no Section 7.4008(d)(2) preemption obtains here, the question becomes whether or not preemption exists under Section 7.4008(d)(1)[15] or Section

---

[13]    In light of this, it is indeed strange that Defendants would argue that "numerous authorities uphold national banks' right to include such terms in their agreements."  Defendants' Memorandum at 15:19-20.  Defendants apparently miss the point:  a national bank (like any other bank or business) can include an arbitration provision in its agreements with third parties, but when it does so that arbitration provision cannot be unconscionable or contain unconscionable terms.  That some courts – and Defendants have cited 3 of them – have found what under California law (which controls in this case) to be an unconscionable and unenforceable arbitration provision to be conscionable under Delaware law is of no moment.  As noted earlier (ante at 1-2 n. 2) , the choice of law applicable to Defendants' card agreement in a conflict of law analysis is California's rather than Delaware.  Defendant knows this but obviously is unwilling to accept that which is now a controlling law on this Court.

[14]    See, e.g., Doe v. Kamehameha Schools, 470 F.3d 827 (9th Cir. 2007); Sunset Importers, Ltd. v. Continental Vintners, 790 F.2d 775 (9th Cir. 1991).

7.4008(e): i.e., whether the effect of the UCL/CLRA/common law on Defendant's credit card lending operation is more than "incidental." The parameters of what constitutes "incidental" is essentially "whether any impact on lending operations is incidental to the *statute's* primary purpose – not whether the impact of the statue on a bank's lending operation is 'incidental.'"[16] Such an analysis produces only one reasoned response: the affect, if any, that the UCL/CLRA/common law have is at most minimally "incidental" to Defendants' lending operation.

These laws are designed to and do nothing more than to preserve the traditional infrastructure of basic state laws that undergird commercial transactions. They do not open the door to State regulation of lending by National Banks. The CLRA/UCL/common law prohibit only specified acts and representation in all consumer transactions without regard to whether the transaction involves an extension of credit. Although not directly aimed at national bank lenders, these may affect lending to the extent that they prohibit misleading statements or unconscionable contract terms (not dealing with fees or financial disclosures, and practices in loan transaction by a national bank). That, however, is only incidental to their primary purpose: the regulation of ethical practices on all businesses engaged in commerce in California. There is no indication that these laws facially or in their application are aimed at any state objective in conflict with the safe and sound regulation of national banks, the best practices of lending by

---

[15]     Section 7.4008(d)(1) provides: "Except where made applicable by Federal law, state laws that obstruct, impair, or condition a national bank's ability to fully exercise its Federally authorized non-real estate lending powers are not applicable to national banks."

[16]     Cf. Bernini v. Washington Mutual Bank, 446 F.Supp.2d 217, 221 (S.D.N.Y. 2006)(Office of Thrift Supervision standard in cases arising under the Home Owners Loan Act, 12 U.S.C. § 1462 et seq., and implementing regulations at 12 C.F.R. § 560.2(d) which deal with federal savings banks).

**David Lee, et al. vs. Chase Manhattan Bank, et al.**
**Memo. Points & Authorities Filed in Support of Plaintiffs' Opposition to Defendants' Motion to Dismiss**

national banks or any other federal objective identified in Section 7.4008(a). In fact, national banks are presumed to interact with their borrowers in a truthful manner. Thus, the CLRA/UCL/common law will have any measurable impact on Defendants' lending operations in the context of Plaintiffs' Complaint, and Defendants have completely failed to establish otherwise.

### 3. Defendant JPMorgan Chase & Company Is Not A National Bank And Thus The Claims Against It May Not Be Preempted Under The National Bank Act Or Its Implementing Regulations

It is not alleged and Defendants have not established that Defendant JPMorgan Chase & Company is a national bank. Complaint, ¶ 9. That precludes application of the previously discussed preemption to Defendant J.P.Morgan Chase & Company. See, e.g., SPGGC, LLC v. Blumenthal, 2007 U.S.App.LEXIS 24436 (2d Cir. October 19, 2007); Monroe Retail, Inc. v. Charter One Bank, N.A., 2007 U.S.Dist.LEXIS 68971 (N.D.Ohio September 18, 2007).

## III.    CONCLUSION

For the reasons stated above and on the record as a whole, Defendants' motion to dismiss is without merit and should be denied.

Dated: November 13, 2007

Respectfully submitted,



Matthew S. Hale
Attorney for Plaintiffs
David J. Lee and Daniel R. Lloyd

25

David Lee, et al. vs. Chase Manhattan Bank, et al.
Memo. Points & Authorities Filed in Support of Plaintiffs' Opposition to Defendants' Motion to Dismiss

# Addendum

55.     The arbitration clause, which was inserted into the contract between Chase and Plaintiffs (and other similarly situated persons), is unconscionable, illegal and thereby violates California Civil Code § 1670.5 and the common law relating to unconscionability of contracts and contractual provision in that, among other reasons, it

(a)     was imposed on all card holders on a "take it or leave it" basis with no opportunity by the card holder to negotiate any term thereof (see Discover Bank v. Superior Court, 36 Cal.App.4[th] 148, 159-160, 40 Cal.Rtpr.3d 76 (2005); Armanderiz v. Foundation Health Psychcare Services, Inc., 24 Cal.4[th] 83, 113-114, 99 Cal.Rptr.2d 745, 6 P.3d 669 (2000); Shroyer v. New Cingular Wireless Services, Inc., 2007 U.S.App.LEXIS 19560 (9th Cir. 2007));

(b)     was contained in an adhesive form agreement prepared by Chase and concerning which Chase was in a much stronger bargaining position than the card holder (ibid.; Gentry v. Superior Court, 2007 Cal.LEXIS 9376 (2007));

(c)     provides that "ANY DISPUTE WILL BE RESOLVED BY BINDING ARBITRATION" and "YOU WILL NOT BE ABLE TO BRING A CLASS ACTION OR OTHER REPRESENTATIVE CLAIM IN COURT SUCH AS THAT IN THE FORM OF A PRIVATE ATTORNEY GENERAL ACTION; NOR WILL YOU BE ALLOWED TO BRING ANY CLASS IN ARBITRATION AS A CLASS ACTION OR OTHER REPRESWENTAIVE ACTION …." in a situation, as here, involving a class action waiver in the context where predictably only

"small" amounts of money are involved (the annual fee) and as part of a scheme to deliberately cheat large numbers of its card holders out of the individually "small" amounts represented by the fees paid for the card and the diminution in value of that which Plaintiffs and similarly situated card holders received (Gentry v. Superior Court, supra Discover Bank, supra; Schroyer, supra (adopting Discover Bank as the law of the Ninth Circuit); Ting v. AT&T, 319 F.3d 1126, 1150 (9th Cir. 2003); Ingle v. Circuit City Stores, Inc., 328 F.3d 1165, 1176 (9th Cir. 2003));

(d)      provides "neither you nor we agree to any arbitration on a class or representative basis, and the arbitrator shall have no authority to proceed on such basis.  That means that even if a class action lawsuit or other representative action, such as that in the form of a private attorney general action, is filed, any Claim between us related to the issues raised in such lawsuits will be subject to an individual arbitration claim if either you or we so select" in a context where predictably only "small" amounts of money are involved (the fee) and as part of a scheme to deliberately cheat large numbers of its card holders out of the individually "small" amounts represented by the fees paid for the card (see, ibid.);

(e)      provides that even in the event of the certification of a class by some other card holder, all other card holders cannot become members of that class, a complete derogation of Fed.R.Civ.P. 23;

(f)      provides that "Claims subject to the Arbitration Agreement include Claims regarding the applicability of this Arbitration Agreement or the

validity of the entire Cardmember Agreement or any prior Cardmember Agreement" in direct contravention of <u>Buckeye Check Cashing, Inc. v. Cardegna</u>, 546 U.S. 440, 126 S.Ct. 1204, 163 L.Ed.2d 1038 (2006), <u>Nagrampa v. Mailcoups, Inc.</u>, 469 F.3d 1257 (9th Cir. 2006), <u>Prima Paint Corp. v. Flood & Conklin Mfg. Co.</u>, 388 U.S. 395, 405-404, 87 S.Ct. 1801, 103 L.Ed.2d 1038 (1967), <u>Flores v. TransAmerica Home First, Inc.</u>, Cal.App.4[th] 846, 113 Cal.Rptr.2d 376 (2001), and <u>Stirlin v. Supercuts, Inc.</u>, 51 Cal.App.4[th] 1519, 60 Cal.Rptr.2d 138 (1997) ;

(g)      provides that the arbitrator "will not have the power to award relief to, against, or for the benefit of any person who is not a party to this proceeding" thereby forbidding the entry of any injunctive relief in the arbitration even though statutory injunctive relief under the UCL and CLRA are unwaiveable (<u>Broughton v. Cigna Healthplans</u>, 21 Cal.4[th] 1066, 90 Cal.Rptr.2d 334, 988 P.2d 334 (1999); <u>Cruz v. PacificCare Health Systems, Inc.</u>, 30 Cal.4[th] 303, 133 Cal.Rptr.2d 58, 66 P.3d 1157 (2003); <u>Davis v. O'Melveny & Meyers</u>, 485 F.3d 1066, 1080 (9th Cir. 2007); <u>Nagrampa v. Mailcoups, Inc.</u>, <u>supra</u>, 469 F.3d at 1289-1293;

(h)      provides "No arbitration will be consolidated with any other arbitration proceeding without the consent of all parties" in a context where, as here, predictably only "small" amounts of money (the fees) are involved and as part of a scheme to deliberately cheat large numbers of its card holders out of the individually "small" amounts represented by the fees paid for the card (<u>see</u> <u>Discover Bank v. Superior Court</u>, <u>supra</u>, 36

Cal.App.4[th] at 153; <u>Szetla v. Discover Bank</u>, 97 Cal.App.4[th] 1094, 118 Cal.Rptr. 862 (2002); <u>Comb v. PayPal, Inc.</u>, 218 F.Supp.2d 1165, 175 (N.D.Cal. 2002));

(i)    provides that all "Claims, whether such Claims are based on law, statute, contract, regulation, ordinance, tort, common law, constitutional provision, or any legal theory of law such as respondeat superior, or any other legal or equitable ground and whether such Claims seek as remedies money damages, penalties, injunctions, or declaratory or equitable relief" even though, for instance, injunction requests under the CLRA and UCL are never arbitrable (<u>Broughton v. Cigna Healthplans</u>, <u>supra</u>; <u>Cruz v. PacificCare Health Systems, Inc.</u>, <u>supra</u>);

(j)    provides that in arbitration all claims shall be resolved by "one of two arbitration administrators:   American Arbitration Association, or National Arbitration Forum";

(k)    provides no alternative means by which some other arbiter or arbitral organization may be chosen by the card holder;

(l)    provides that arbitration "will be conducted under the applicable procedures and rules of the arbitration administrator that are in effect on the date the arbitration is filed unless those procedures or regulations are inconsistent with the Arbitration Agreement, in which case this Arbitration Agreement will prevail…" but fails to advise of any specific inconsistency those codes may have with the Arbitration Provision and, further, does not provide the card holder with copies of the rules of those arbitration

organizations or specify which of several codes of procedure applies to the arbitration (see Ultimo v. Harper, 113 Cal.App.4[th] 1402, 7 Cal.Rptr.2d 418 (2003); Fitz v. NCR Corp., 118 Cal.App.4[th] 702, 721, 13 Cal.Rptr.2d 88 (2004); Dunham v. Envtl. Chem. Corp. 2006 U.S.Dist.LEXIS 61068 (N.D.Cal. 2006));

(m)    provides no way for the card holder to know at the time he/she initially agreed to arbitrate what the rules would be at the time of the arbitration as well as what inconsistencies existed between the agreement and the Code because Chase has given itself the unilateral right to amend the arbitration provision at any time (including before, during, or after any arbitration) and the arbitration provision otherwise makes the applicable arbitration rules those in effect when the arbitration is filed (see Net Global Marketing, Inc. v. Dialtone, Inc., 217 Fed.Appx. 598, 2007 U.S.App.LEXIS 674 (9th Cir. 2007); Ingle v. Circuit City Stores, Inc., 328 F.3d at 1179; Geoffrey v. Washington Mutual Bank, 484 F.Supp.2d 1115, 1123 (S.D.Cal. 2007); Bragg v. Linder Research, Inc., 487 F.Supp.2d 593, 609 (E.D.Pa. 2007)(applying California law); Conglamur v. Circuit City Stores, Inc., 2004 Cal.App.Unpub.LEXIS 8140 at *13-14 (2004));

(n)    provides that "[i]f any portion of this Arbitration Agreement is deemed invalid or unenforceable, the remaining portions nevertheless remain in force" even though all determinations as to severability of the provision is a matter exclusively reserved for the Courts (see California

Civil Code § 1670.5 (a); <u>Armanderiz</u>, <u>supra</u>, 24 Cal.4[th] at 1121-24; <u>Stirlin</u>, <u>supra</u>; <u>Flores</u>, <u>supra</u>);

(o)    provides, relative to the costs of arbitration, that Chase "will reimburse you for the initial arbitration filing fee paid by you up to the amount of $500 upon receipt of proof of payment.  Additionally, if there is a hearing, we will pay any fee of the arbitrator and arbitration administrator for the first two days of that hearing…   All other fees will be allocated in keeping with the rules of the arbitration administrator and applicable law" in violation of <u>Nagrampa</u> and <u>Armanderiz</u>;

(p)    provides that "Each party will bear their own fees, costs and expenses for any appeal, but a party may recover any or all fees, costs and expenses from another party, if the majority of the panel of arbitrators, applying applicable law, so determines" (<u>ibid.</u>); and,

(q)    provides only a vague and overbroad statement of what effect arbitration will have on the legal rights of card holders.

77.    These representations made by Chase were in fact false and made with the intention to deceive and defraud the Plaintiffs and similarly situated persons to induce them to act in reliance on these misrepresentations by agreeing to the terms of the agreement and paying fees thereunder.   The true facts are that the identified provisions and the agreement as a whole are unconscionable and illegal under California law (including precedents of the Ninth Circuit Court of Appeals and district courts interpreting and applying California law) on the basis that, for instance, they

(a)    were imposed on all card holders on a "take it or leave it" basis with no opportunity by the card holder to negotiate any term thereof (see Gentry v. Superior Court, supra; Discover Bank v. Superior Court, 36 Cal.App.4[th] 148, 159-160, 40 Cal.Rtpr.3d 76 (2005); Armanderiz v. Foundation Health Psychcare Services, Inc., 24 Cal.4[th] 83, 113-114, 99 Cal.Rptr.2d 745, 6 P.3d 669 (2000); Shroyer v. New Cingular Wireless Services, Inc., 2007 U.S.App.LEXIS 19560 (9th Cir. 2007));

(b)    were contained in an adhesive form agreement prepared by Chase and concerning which Chase was in a much stronger bargaining position than the card holder (Discover Bank v. Superior Court, supra, 36 Cal.App.4[th] at 159-160; Armanderiz v. Foundation Health Psychcare Services, Inc., supra, 24 Cal.4[th] at 113-114; Shroyer v. New Cingular Wireless Services, Inc., 2007 U.S.App.LEXIS 19560;

(c)    provide Chase with a "right" to make any unilateral modification, including adding new terms to the agreement but provide no such right to the card holder, which makes that provision unconscionable and illegal pursuant to Net Global Marketing, Inc. v. Dialtone, Inc., 217 Fed.Appx. 598, 2007 U.S.App.LEXIS 674 (9th Cir. 2007); Ingle v. Circuit City Stores, Inc., supra, 328 F.3d at 1179; Geoffrey v. Washington Mutual Bank, 484 F.Supp.2d 1115, 1123 (S.D.Cal. 2007); Bragg v. Linder Research, Inc., 487 F.Supp.2d 593, 609 (E.D.Pa. 2007)(applying California law); Conglamur v. Circuit City Stores, Inc., 2004 Cal.App.Unpub.LEXIS 8140 at *13-14 (2004).

(d)    provide Chase, but not the cardholder, with the ability to take any action without waiving any rights that it might have under the agreement or under the law; and,

(e)    Chase has been long been on notice not only that its arbitration provision is unconscionable and unenforceable but, importantly, that in spite of its statements to the contrary, the agreement is controlled by California law.

**PAUL LOZANO, on behalf of himself and all others similarly situated and as a private attorney general on behalf of the members of the general public residing within the State of California, Plaintiff-Appellee-Cross Appellant, v. AT&T WIRELESS SERVICES, INC., a Delaware Corporation, Defendant-Appellant-Cross Appellee.**

**Nos. 05-56466, 05-56511**

**UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

*2007 U.S. App. LEXIS 22430*

**June 4, 2007, Argued and Submitted, Pasadena, California
September 20, 2007, Filed**

**PRIOR HISTORY:** [*1]

Appeal from the United States District Court for the Central District of California William J. Rea, District Judge, Presiding. [*] D.C. No. CV-02-00090-AHS.

> [*]   After this appeal was filed, the Honorable Alicemarie H. Stotler replaced the late Honorable William J. Rea as presiding judge in this case.

> .

*Lozano v. At&T Wireless, 2003 U.S. Dist. LEXIS 21780 (C.D. Cal., Oct. 28, 2003)*

**DISPOSITION:**    AFFIRMED in part, REVERSED in part.

**COUNSEL:** J. Paul Gignac (argued) and Katherine Donoven, Arias, Ozzello & Gignac, LLP, Santa Barbara, California, and Peter Bezek and Robert A. Curtis, Foley Bezek Behle & Curtis, LLP, Santa Barbara, California, for the plaintiff-appellee-cross appellant.

James C. Grant (argued) and Kelly Twiss Noonan, Stokes Lawrence, P.S., Seattle, Washington, and Mark E. Weber and Gabriel J. Pasette, Gibson, Dunn & Crutcher, LLP, Los Angeles, California, for the defendant-appellant-cross appellee.

**JUDGES:** Before: Cynthia Holcomb Hall and Consuelo M. Callahan, Circuit Judges, and James L. Robart, [**] District Judge.

> [**]    The Honorable James L. Robart, United States District Judge for the Western District of Washington, sitting by designation.

**OPINION BY:** ROBART

**OPINION**

ROBART, District Judge:

This opinion addresses cross-appeals of the district court's order denying in part, and granting in part, Paul Lozano's class certification [*2] motion. Lozano appeals the district court's denial of a nationwide class for his Federal Communications Act ("FCA") and declaratory relief claims. Lozano also appeals the court's denial of a California subclass on these claims, as well as his breach of contract claim. AT&T Wireless Services, Inc. ("AWS") appeals the district court's certification of a California subclass for Lozano's state law claims. We have jurisdiction to hear this appeal pursuant to *Rule 23(f) of the Federal Rules of Civil Procedure*

and *28 U.S.C. § 1292(e)*. For the reasons stated, we affirm in part and reverse in part.

## I. Background

Lozano is a customer of AWS and brought this putative class action based on AWS's disclosures relating to its billing practices for cellular services. [1] On October 4, 2004, Lozano filed a Second Amended Complaint in the district court. In his complaint, Lozano asserts claims under the FCA, the Declaratory Judgment Act ("DJA"), California contract law, the California Consumer Legal Remedies Act ("CLRA"), and California Unfair Competition Law ("UCL"). Lozano bases these claims on allegations that AWS billed its customers for cellular telephone calls during a billing period other than the [*3] billing period in which the calls were made, a practice termed "out-of-cycle billing." Lozano contends that by doing this, AWS assessed charges for cellular telephone calls that would not have been assessed if the calls had been billed during the billing period in which the calls were made. AWS, according to Lozano, did not fully and adequately disclose its billing practice to its customers at the time they entered into contracts with AWS.

> 1   Lozano brought this suit against AWS, AT&T Wireless Services of California, and Santa Barbara Cellular Systems. Only AWS sought a petition for interlocutory review of the district court's order on class certification.

## A. Out-of-Cycle Billing

Out-of-cycle billing occurs when the local calling area for a customer's plan includes areas that are not covered by AWS's cellular network. When a customer places or receives a call in an area not covered by AWS's network, the call is routed through another wireless carrier, and the call is termed a "roaming call." Due to the nature of the routing process, AWS does not immediately learn of the roaming call,

and consequently, does not immediately charge the call against the customer's allotted minutes. Occasionally, [*4] AWS will learn of the roaming call only after the customer's monthly billing cycle has ended. When this occurs, AWS bills the customer for the roaming call in the next billing cycle, which may put the customer over the allotted minutes for that cycle. For example, a roaming call made in the August billing cycle may be billed in the September invoice because of the late receipt of information from the other carrier. Assuming the customer had already reached his or her allowable minutes for September, and had not for August, the August roaming call could result in an overage fee on the September invoice. According to AWS, out-of-cycle billing occurs infrequently, and when it does occur, it is just as likely to result in a reduction in fees as opposed to an increase. That is, under the above scenario, the customer could benefit from out-of-cycle billing by avoiding an overage fee in August if she used all her minutes in August, but not September.

In or about May 2001, Lozano contracted with AWS to receive cellular telephone service for one year. Lozano's cellular plan with AWS provided him with a minimum of 400 "free anytime minutes" and 1,000 "night and week-end minutes" per month. As [*5] part of a promotional offer, AWS gave Lozano an additional 200 free anytime minutes. Based on the information AWS provided, Lozano believed that he would not be charged for cellular calls unless he exceeded 600 anytime minutes or 1,000 night and weekend minutes in one billing cycle.

When Lozano received his September 18, 2001 invoice from AWS, however, he was surprised to discover that his September invoice included calls that were made during the previous billing cycle. The addition of these extra minutes caused his September usage to exceed the "free" minutes set forth in his contract with AWS. Because he exceeded his allotted usage,

AWS charged Lozano an overage fee for the calls that it billed from the previous cycle.

Lozano called AWS to inquire as to why there were calls from the previous billing cycle on his current invoice. An AWS representative explained to him that roaming cellular telephone calls are billed to its customers based on the date that AWS receives the information regarding the call, not on the date the call was actually made. The AWS representative offered to reimburse Lozano for the overage charges, but would not do so unless he agreed to sign-up for another year [*6] of service with AWS. Lozano declined the offer. On October 25, 2001, after Lozano lodged additional complaints with AWS, it issued him a credit for the charges he incurred as a result of out-of-cycle billing. The AWS representative who issued the credit wrote in the customer notes that it "was a ONE TIME COURTESY CR[EDIT] for delayed billing . . . ." The representative informed Lozano that out-of-cycle billing could happen again. Lozano filed the instant suit a few weeks later, and the credit appeared on Lozano's November invoice from AWS. [2]

> 2   In its preceding order on summary judgment, the district court found that AWS reimbursed Lozano only after realizing that Lozano was instigating legal proceedings against it.

AWS contends it fully discloses the implications of out-of-cycle billing in its Welcome Guide, which customers receive when they sign-up for service. Lozano does not dispute that he received a copy of the Welcome Guide when he purchased his service from AWS. Indeed, Lozano admits that the AWS salesperson "paged through" the Welcome Guide with Lozano, and gave him the opportunity to ask any questions. Lozano instead contends that these disclosures are not adequate to inform [*7] the consumer of AWS's out-of-cycle billing practices.

## B. Arbitration Agreement

The Welcome Guide Lozano received also contains an arbitration agreement that prohibits class actions:

> Any dispute or claim arising out of or relating to this Agreement or to any product or service provided in connection with this Agreement (whether based in contract, tort, statute, fraud, misrepresentation or any other legal theory) will be resolved by binding arbitration . . . . [Y]ou and we both waive any claims for punitive damages and any right to pursue claims on a class or representative basis.

Shortly after Lozano filed this putative class action lawsuit, AWS moved to compel arbitration.

The district court initially granted AWS's motion to compel arbitration. AWS then filed for a writ of mandamus with this court. We denied the writ, but instructed the district court to reconsider its ruling in light of *Ting v. AT&T*, decided after the district court's order compelling arbitration. *319 F.3d 1126, 1150 (9th Cir. 2003)* (finding class action waivers in arbitration agreements to be unconscionable when contained in adhesion contracts). On August 18, 2003, after reconsidering its order in light of *Ting*, the district [*8] court vacated the order compelling arbitration. In so doing, the district court relied both on *Ting*, and the subsequent case of *Ingle v. Circuit City Stores, Inc., 328 F.3d 1165, 1176 n.15 (9th Cir. 2003)* (holding that "an essentially unilateral bar on class-wide arbitration is substantively unconscionable"). The district court held that the limitation on class action relief contained in AWS's Welcome Guide was both procedurally and substantively unconscionable and therefore unenforceable under California law. [3]

3    AWS appealed the district court's order denying arbitration, but voluntarily dismissed this appeal when we accepted the parties' petitions for interlocutory review of the district court's class certification order.

## C. Lozano's Injury

The district court considered AWS's motion for summary judgment before Lozano sought class certification. In its summary judgment order, the district court addressed whether Lozano had any legally cognizable injuries, in order to determine whether he had standing to bring his claims. AWS argued that because it had reimbursed Lozano for the out-of-cycle overage fees in October 2001, and he did not bring suit until November 2001, he could not show [*9] injury. The district court disagreed. While recognizing that AWS's reimbursement to Lozano before suit raised concerns regarding Lozano's ability to meet an essential element of his claims, i.e., damages, the district court nevertheless concluded that (1) AWS could not avoid a class action by reimbursing the potential representative prior to filing suit; and (2) Lozano suffered damages based on a so-called "reservation" injury, and that AWS's use of out-of-cycle billing continued to injure Lozano. The "reservation" injury, as described by the district court, relates to those AWS customers who are aware of out-of-cycle billing, and in turn, reserve a certain percentage of minutes each month to compensate for any late-charged roaming calls from the previous billing cycle. The customer is thereby denied the full use of his or her allotted minutes each month. On these bases, the district court found that Lozano sufficiently alleged the presence of an injury, and had standing to bring these claims. [4]

4    Lozano does not attack the actual practice of out-of-cycle billing, presumably because *section 332 of the FCA* would preempt such a claim. *See 47*

*U.S.C. § 332(c)(3)(A)* (prohibiting states from [*10] regulating the entry of or the rates charged by any commercial mobile service or any private mobile service). Here, in order for Lozano to maintain his UCL claim, while avoiding FCA preemption, his claim must be tied to the unfairness of AWS's disclosures regarding its billing practices, and not to the practices themselves.

## D. Class Certification

The district court next considered Lozano's motion for class certification. In his motion, Lozano requested that the court certify two classes: (a) one national class for claims based on FCA violations, declaratory relief, and breach of contract; and (b) another California subclass based on Lozano's state-law claims brought pursuant to the CLRA and UCL. Lozano termed the first class as "the Class" and the subclass as "the California Subclass."

Lozano's proposed definition for the Class included:

> all residents of the United States of America who initiated cellular telephone service with AT&T Wireless on or after March 1, 1999 and who at any time between March 1, 1999 and the date of filing the Second Amended Complaint in this action have been charged by AT&T Wireless for cellular telephone calls during a billing period other than the billing period [*11] in which the calls were made.

Lozano proposed an identical subclass for his state claims, except that this definition only included residents of the State of California.

The district court declined to certify a national class for Lozano's FCA and derivative

DJA claims because to do so would require a state-by-state analysis of conscionability jurisprudence with respect to the enforceability of class action waivers. The court also denied Lozano's request for class action status for his breach of contract claim. The district court certified a California class action for Lozano's CLRA claim, based on AWS's inclusion of an unconscionable term in its agreement, i.e., the class action waiver; the district court declined to certify a class for Lozano's other theories of liability pursuant to the CLRA. Finally, the district court certified a class action on two theories of liability under the UCL; one claim based on a violation of the CLRA (the "derivative UCL claim") and a second claim based on the "unfairness" prong of the UCL.

## II. Standards of Review

Class certifications are governed by *Federal Rule of Civil Procedure 23*. As the party seeking class certification, Lozano bears the burden of [*12] demonstrating that he has met each of the four requirements of *Rule 23(a)* and at least one of the requirements of *Rule 23(b)*. [5] *See Zinser v. Accufix Research Inst., Inc., 253 F.3d 1180, 1186 (9th Cir. 2001)*. We review the district court's decision regarding class certification for abuse of discretion. *See Valentino v. Carter-Wallace, Inc., 97 F.3d 1227, 1234 (9th Cir. 1996)*. The district court abuses its discretion if its certification order is premised on impermissible legal criteria. *See Moore v. Hughes Helicopters, Inc., 708 F.2d 475, 479 (9th Cir. 1983)*. Finally, while we review the district court's factual findings under the clearly erroneous standard, *Husain v. Olympic Airways, 316 F.3d 829, 835 (9th Cir. 2002)*, we review the district court's determination of standing and mootness *de novo. See Kootenai Tribe of Idaho v. Veneman, 313 F.3d 1094, 1111 n.11 (9th Cir. 2002)* (standing); *Nat'l Audubon Soc'y, Inc. v. Davis, 307 F.3d 835, 850 (9th Cir. 2002)* (mootness).

5   The Federal Rules of Civil Procedure allow class certification if the proponent shows: (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, [*13] (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class. *Fed. R. Civ. P. 23(a)*. Additionally, the class action proponent must meet one of the requirements set forth in *Rule 23(b)*. Here, the district court's class certification order is based primarily on its analysis of the additional requirement found in *Rule 23(b)(3)*; that is, whether questions of law or fact "common to the members of the class predominate over any questions affecting only individual members and that class action is superior to other available methods." *Fed. R. Civ. P. 23(b)(3)*.

## III. Discussion

## A. Arbitration of FCA Claims

Lozano first contends that the district court erred by finding predominance of individual claims based on differing state laws on whether class action waivers are unconscionable. The district court, according to Lozano, should not have considered the variances in state law on this issue because, as a matter of federal law, no claim can be subject to arbitration under the FCA. Lozano contends that the FCA's plain language precludes adjudication by arbitration. [*14] Whether the FCA permits adjudication by binding arbitration is a question of law that we review *de novo. See S.E.C. v. Gemstar-TV Guide Intern., Inc., 401 F.3d 1031, 1044 (9th Cir. 2005)*.

The Federal Arbitration Act ("FAA") provides that a written agreement to arbitrate a

controversy shall be "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." *9 U.S.C. § 2.* The FAA sets forth a liberal federal policy favoring arbitration and reverses years of hostility by the courts towards arbitration agreements. *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24, 103 S. Ct. 927, 74 L. Ed. 2d 765 (1983).* Contractual arbitration agreements are equally applicable to statutory claims as to other types of common law claims. *See Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 627, 105 S. Ct. 3346, 87 L. Ed. 2d 444 (1985).* Indeed, the *Mitsubishi* Court went so far as to state that, absent the sort of "fraud or overwhelming economic power that would provide grounds for the revocation of any contract," the FAA "provides no basis for disfavoring agreements to arbitrate statutory claims by skewing the otherwise hospitable inquiry into arbitrability." *Id.* (citations [*15] and internal quotation marks omitted).

This does not mean that all statutory rights are suitable for arbitration. There are some statutes where Congress has evinced an intent to preclude arbitration of claims. The burden is on the party opposing arbitration, however, to show that Congress intended to preclude arbitration of the statutory claims involved. *See Shearson/Am. Express Inc. v. McMahon, 482 U.S. 220, 227, 107 S. Ct. 2332, 96 L. Ed. 2d 185 (1987)*; *Nghiem v. NEC Elec., 25 F.3d 1437, 1441 (9th Cir. 1994).* Lozano attempts to meet this burden by arguing that Congress, by limiting fora to the Federal Communications Commission ("FCC") and federal district courts, evidenced an intent to preclude other fora, including arbitration. As additional support, Lozano points to this court's decision in *AT&T Corp. v. Coeur D'Alene Tribe, 295 F.3d 899 (9th Cir. 2002)*, as controlling authority on the issue.

The district court rejected both of Lozano's arguments. Relying on the standard set forth in *Mitsubishi*, the district court found no evidence of a congressional intent to prohibit arbitration of FCA claims. [6] The district court also found our holding in *Coeur d'Alene Tribe* to be confined to the adjudication of claims in [*16] the tribal forum. We agree.

> 6  At least two other federal courts have implicitly recognized the right of parties to agree to arbitrate their FCA claims. *See Penberthy v. AT&T Wireless Servs., 354 F. Supp. 2d 1323, 1328 (M.D. Fla. 2005)*; *In re Universal Serv. Fund Tel. Billing Practices Litig., 300 F. Supp. 2d 1107, 1134 (D. Kan. 2003).*

1. Congressional Intent

If congressional intent to bar arbitration exists in the FCA, it must be found in the text of the statute, its legislative history, or "an inherent" conflict between arbitration and the FCA's underlying purpose. *Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 26, 111 S. Ct. 1647, 114 L. Ed. 2d 26 (1991).* Lozano argues that because important public policy considerations are litigated in FCA claims, Congress intended to limit the adjudication of these claims to the FCC and the federal district courts, and to the exclusion of an arbitral forum. Lozano also argues that, due to the inherent inequality in unequal bargaining power between telecommunications providers and consumers, Congress intended to preclude providers from keeping consumers out of a judicial forum. While we recognize these as important public policy considerations, the United States Supreme Court has rejected [*17] these same arguments in other statutory contexts, in light of the strong public policy favoring arbitration.

For example, the Supreme Court in *McMahon* evinced a strong desire to permit arbitration of statutory claims by upholding an arbitration agreement that encompassed federal claims arising under the Securities Exchange Act of 1934, and the Racketeer Influenced and Corrupt Organizations ("RICO") statutes. *482 U.S.*

*at 242*. The Court found RICO claims arbitrable even in the face of RICO's strong public policy considerations. *See id.* ("The special incentives necessary to encourage civil enforcement actions against organized crime do not support nonarbitrability of run-of-the-mill civil RICO claims brought against legitimate enterprises."); *see also Mitsubishi, 473 U.S. at 632* (reasoning that arbitral tribunals are readily capable of handling the factual and legal complexities of antitrust claims); *Gilmer, 500 U.S. at 35* (holding that employment claims brought pursuant to the Age Discrimination in Employment Act of 1967 are subject to mandatory arbitration); *Green Tree Fin'l Corp.-Alabama v. Randolph, 531 U.S. 79, 90, 121 S. Ct. 513, 148 L. Ed. 2d 373 (2000)* (holding claims brought under the Truth in Lending Act, a statute [*18] designed to "further important social policies," are arbitrable). Accordingly, we conclude that, even considering the important public policy concerns associated with FCA claims, these claims are arbitrable absent evidence of congressional intent to the contrary.

Lozano also argues that, based on the inequality in bargaining power between consumers and communications companies, FCA claims should not be arbitrable. The Supreme Court has likewise rejected this argument. In *Gilmer*, the Court held that "[m]ere inequality in bargaining power . . . is not sufficient reason to hold that arbitration agreements are never enforceable in the employment context. Relationships between securities dealers and investors, for example, may involve unequal bargaining power, but we nevertheless held in *Rodriguez de Quijas* and *McMahon* that agreements to arbitrate in that context are enforceable." *500 U.S. at 33* (citing *Rodriguez de Quijas v. Shearson/Am. Express, Inc., 490 U.S. 477, 484, 109 S. Ct. 1917, 104 L. Ed. 2d 526 (1989)* and *McMahon, 482 U.S. at 230*)). Neither the public policy considerations in the FCA, nor the inequality of bargaining power between the parties, is sufficient to show congressional intent to preclude arbitration.

## 2. [*19] *Coeur d'Alene Tribe*

Lozano next argues that, pursuant to our decision in *Coeur d'Alene Tribe*, FCA claims are not subject to mandatory arbitration. Although, in *Coeur d'Alene Tribe*, we discussed the limited fora for adjudication of FCA claims, we did not consider the appropriateness of arbitration as a possible forum.

The issue in *Coeur d'Alene Tribe* was whether tribal courts had jurisdiction to adjudicate claims brought pursuant to the FCA. *295 F.3d at 904*. Relying on *section 207 of the FCA*, we determined that the tribal court did not have jurisdiction to adjudicate these claims based on the plain language of *section 207*:

> Any person claiming to be damaged by any common carrier subject to the provisions of this chapter may either make complaint to the Commission as hereinafter provided for, or may bring suit for the recovery of the damages for which such common carrier may be liable under the provisions of this chapter, in any district court of the United States of competent jurisdiction; but such person shall not have the right to pursue both such remedies.

*47 U.S.C. § 207*. In *Coeur d'Alene Tribe*, we held that, by restricting jurisdiction to the FCC and the federal district court, Congress [*20] intended to leave no room for "adjudication in any other forum -- be it state, tribal, or otherwise." *295 F.3d at 905*. Lozano argues that the arbitral forum is therefore precluded.

In *Coeur d'Alene Tribe,* this court did not determine whether the same statutory language barred the arbitral forum, which as stated above, requires that we find a strong showing of congressional intent. We do not. The fact

that Congress drafted the amendments to the FCA to include the designation of fora for the adjudication of its claims, without more, does not establish congressional intent. For example, the jurisdictional language for suits pursuant to the Sherman Act, *15 U.S.C. § 1, et seq.*, has similar language to the FCA. *Compare 47 U.S.C. § 207 (FCA)* ("may bring suit . . . in any district court of the United States of competent jurisdiction") *with 15 U.S.C. § 15(a)* (Sherman Act) ("may sue therefor in any district court of the United States"). Faced with this similar language, the Court in *Mitsubishi* held that claims under the Sherman Act are subject to arbitration. *473 U.S. at 640.* We likewise hold that FCA claims may be subject to agreements to arbitrate.

## B. [*21] Differing State Laws on Class Action Waivers

Lozano next contends that the district court abused its discretion by going beyond the factors enumerated in *Rule 23(b)(3)* and seizing on AWS's premature argument that if a class is certified, and it seeks to compel arbitration, predominance is defeated. Lozano argues that the district court erred in resting its finding of predominance of individual issues on speculation as to AWS's future litigation strategy. In the alternative, Lozano contends that determining whether the class action waiver in this case is unconscionable for all fifty states is not impractical and should not destroy predominance.

The district court properly considered the effect of AWS's intent to seek to arbitrate the class action claims. As discussed above, while the district court found the class action waiver to be unconscionable under California law, it also recognized that the waiver may not be unconscionable under other states' laws. The district court therefore determined that predominance was defeated because AWS's intent to seek arbitration of the class would necessitate a state-by-state review of contract conscionability jurisprudence. While Lozano argues that

[*22] the district court's analysis of AWS's future intent was an abuse of discretion, we find the district court's practical consideration of future events reasonable. In fact, in *In re Hotel Telephone Charges*, this court expressed dissatisfaction over the district court's unwillingness to address the impact of future individual questions in its analysis of predominance. *500 F.2d 86, 90 (9th Cir. 1974)* ("However difficult it may have been for the District Court to decide whether common questions predominate over individual questions, it should not have sidestepped this preliminary requirement of the Rule by merely stating that the problem of individual questions 'lies far beyond the horizon in the realm of speculation.'"). Moreover, the law on predominance requires the district court to consider variations in state law when a class action involves multiple jurisdictions. *Id.* In *Blackie v. Barrack*, for example, we held that the trial court properly considered the "future course of the litigation" in determining whether class certification was appropriate. *524 F.2d 891, 900-01 (9th Cir. 1975)* ("[T]he district judge is necessarily bound to some degree of speculation by the uncertain state [*23] of the record on which he must rule.") (citations and quotations omitted).

Furthermore, the fact that AWS intended to compel arbitration was not speculative. By the time the district court decided Lozano's class certification motion, AWS had already moved to compel arbitration of Lozano's claims, and appealed the district court's denial of that motion. Finally, with respect to his second claim of error, that the district court should have determined whether the class action waiver in this case would be enforceable for each state, we note that Lozano offers no explanation of how the district court was to conduct this analysis and how practical such analysis would be in this context. Thus, although he suggests that the district court should be required to engage in this analysis, he makes no attempt to do so himself. Nevertheless, we reject the notion that the district court was obligated to conduct a

comprehensive survey of every state's law on this issue.

Based on our conclusion that the district court did not abuse its discretion in considering AWS's intent to move to compel arbitration of the class, and that it was not required to conduct a state-by-state analysis of this issue, we [*24] find that the district court did not abuse its discretion by declining to certify a class on this basis.

## C. DJA Claim

Lozano also claims the district court erred when it held that Lozano's DJA claim could not be certified as a class because it was "parasitic" of Lozano's FCA claim. Although the district court did not specifically articulate its decision regarding class certification of the DJA claim, its ultimate conclusion is sound. If the certification of a potential nationwide class would require a state-by-state legal analysis of the arbitration agreement, and its accompanying class action waiver, then the same predominance analysis applies with equal force to preclude Lozano's DJA claim. Lozano does not contend that his DJA claim is exempt from the arbitration agreement, or that his DJA claim requires a separate analysis. Lozano simply, and unconvincingly, contends that the district court failed to articulate its reasoning for denying class certification of the DJA claim. Counsel for Lozano conceded as much at oral argument, agreeing that the DJA claim is "parasitic" of the FCA claim, but requested a separate analysis of the claim under *Rule 23(b)(2)*. As discussed *infra*, however, [*25] we find that the district court did not abuse its discretion in declining to certify a class under *Rule 23(b)(2)* for Lozano's FCA claims.

### 1. *Rule 23(b)(2)* Injunctive Relief

Lozano argues that the district court failed to address his request for *Rule 23(b)(2)* injunctive relief. This is incorrect. The district court addressed Lozano's request for injunctive relief

pursuant to *Rule 23(b)(2)* and held that, based on the type of relief requested by Lozano in his Second Amended Complaint, Lozano was seeking primarily monetary damages, which defeats class certification under *Rule 23(b)(2)*. *See In re Paxil Litig., 218 F.R.D. 242, 247 (C.D. Cal. 2003)* (finding a proposed class that is aimed at obtaining monetary relief to be inappropriate for certification under *Rule 23(b)(2)*); *see also Molski v. Gleich, 318 F.3d 937, 950 (9th Cir. 2003)* (focusing on the intent of the plaintiffs in bringing the suit). Here, the district court determined that Lozano sought primarily monetary damages, and thus, *Rule 23(b)(2)* certification was not appropriate. Indeed, even on appeal, Lozano does not contend that he is seeking primarily injunctive relief. Because the district court did not abuse its discretion in [*26] declining to certify a class pursuant to this provision, we affirm.

### 2. California Subclass for FCA and DJA Claims

At a minimum, Lozano claims that the district court should have considered certifying a California subclass for his FCA and DJA claims. Lozano contends that a smaller California class would not be barred by issues of predominance. Lozano never requested that the district court consider a California subclass for these claims. Importantly, in requesting certification, Lozano distinguished his breach of contract claim by requesting that a nationwide Class, or alternatively, a California Subclass, be certified on this claim. Lozano did not make a similar, alternative request with respect to the FCA and DJA claim.

The district court did not err in failing to consider whether Lozano could bring his FCA and DJA claims as part of the California Subclass because Lozano never requested it. *See Mpoyo v. Litton Electro-Optical Sys., 430 F.3d 985, 988 (9th Cir. 2005)*; *Cruz v. Am. Airlines, Inc., 360 U.S. App. D.C. 25, 356 F.3d 320, 329 (D.C. Cir. 2004)* (holding that its decision rests on its "well-established discretion not to con-

sider claims that litigants fail to raise sufficiently below and on which district [*27] courts do not pass"); *see also Hawkins v. Comparet-Cassani, 251 F.3d 1230, 1238 (9th Cir. 2001)* (holding that plaintiff bears the burden of constructing and proposing subclass, not the district court) (quotations and citations omitted). We therefore reject Lozano's appeal on this issue.

## D. CLRA Claim

The CLRA makes it unlawful to use "unfair methods of competition and unfair or deceptive acts or practices" in the sale of goods or services to a consumer. *Cal. Civ. Code § 1770.* The district court certified a class action based on AWS's inclusion of an unconscionable class action waiver in an arbitration agreement pursuant to *section 1770(a)(19) of the CLRA* ("*subsection (a)(19)*"). *Id.* at *§ 1770(a)(19)* (stating that the inclusion of an unconscionable provision in a contract is an unlawful business practice). The district court certified this class pursuant to a theory that was neither pled, nor properly considered by the district court when granting class certification. Accordingly, we reverse this district court's order certifying a California class for Lozano's CLRA claim.

In his complaint, Lozano asserts allegations under *subsection (a)(19)*, but none relate to class action waivers. Instead, [*28] Lozano alleges that "[b]y engaging in the practice of out-of-cycle billing while making inadequate and incomplete disclosures to consumers . . . Defendants have violated, and continue to violate, the CLRA in at least the following respects: . . . (d) in violation of *section 1770(a)(19)* of the CLRA, Defendants have inserted an unconscionable provision in a contract." Thus, there is little doubt that Lozano's *subsection (a)(19)* claim, as originally pled, was tied entirely to AWS's failure to adequately disclose its *billing practices* and not the class action waivers. After the district court held AWS's class action waiver to be unconscionable pursuant to *Ting* and *Ingle*, however, Lozano argued that his *subsection (a)(19)* claim included the unconscionable class action waiver.

The district court rigorously analyzed the *Rule 23(a)* factors in considering whether to certify a class based on AWS's practice of out-of-cycle billing and its disclosures relating to this practice. The district court did not analyze Lozano's CLRA claim based on the unconscionability of the class action waiver against any of the four prerequisites for class action litigation: numerosity, commonality, typicality, and [*29] adequacy of representation. *See Staton v. Boeing Co., 327 F.3d 938, 953 (9th Cir. 2003).* The only class action factor the court considered was whether *Rule 23(b)(3)*'s predominance of class issues was satisfied. Because a class may be certified only if the district court is satisfied "after a rigorous analysis" that the prerequisites of *Rule 23(a)* have been met, we reverse the district court's decision to certify a class action based on the unconscionability of AWS's class action waiver. *See Chamberlan v. Ford Motor Co., 402 F.3d 952, 961 (9th Cir. 2005)* (citing *Gen. Tel. Co. of the S.W. v. Falcon, 457 U.S. 147, 161, 102 S. Ct. 2364, 72 L. Ed. 2d 740 (1982)).*

The district court's failure to analyze the *Rule 23(a)* factors in determining whether to grant class certification based on Lozano's unconscionability claim also resulted in its certifying a theory with no definable class. As stated above, the district court adopted a class definition for the California Subclass based solely on out-of-cycle billing.

The class the district court certified under *subsection (a)(19)* is wholly unrelated to this definition. Any class certified under *subsection (a)(19)* necessitates a class definition that includes individuals who sought [*30] to bring class actions in California, but were precluded from doing so because of the class action waiver in AWS's arbitration agreement, and suffered some resulting damage. *See Wilens v.*

*TD Waterhouse Group, Inc., 120 Cal. App. 4th 746, 15 Cal.Rptr. 3d 271, 276-77 (Cal. Ct. App. 2003)* (holding a court may not presume damages based on the mere insertion of an unconscionable clause in a contract). The new class would be unrecognizable from the class definition adopted by the district court. The district court's failure to analyze Lozano's *section (a)(19)* claim, and resulting failure to identify a class based on a violation of this section, was manifest error. Accordingly, based on all the above reasons, we reverse the district court on this issue. [7]

> 7   The district court also certified a class pursuant to the UCL based solely on Lozano's claim that AWS violated the CLRA. The above analysis applies with equal force to the district court's certification of the derivative UCL claim.

**E. UCL Claim**

The district court granted class certification for Lozano's UCL claim based on his theory that AWS's written disclosures were inadequate to inform AWS customers about the possibility of out-of-cycle billing. AWS claims the [*31] district court erred by granting Lozano's motion for class certification for his UCL claim because (1) Lozano has no damages and therefore lacks standing; (2) Lozano's damages, if any, are not typical of the class; and (3) individual issues predominate over class issues.

The UCL is a broad remedial statute that permits an individual to challenge wrongful business conduct "in whatever context such activity might occur." *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tele. Co., 20 Cal. 4th 163, 83 Cal.Rptr.2d 548, 561, 973 P.2d 527 (1999)* (citation omitted). It prohibits "unfair competition," which it broadly defined as including "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising . . . ." *Cal. Bus. & Prof. Code § 17200*. Because the statute

is written in the disjunctive, it is violated where a defendant's act or practice is (1) unlawful, (2) unfair, (3) fraudulent, or (4) in violation of *section 17500* (false or misleading advertisements). *Cel-Tech, 83 Cal.Rptr.2d at 565*. Each prong of the UCL is a separate and distinct theory of liability; thus, the "unfair" practices prong offers an independent basis for relief. *South Bay Chevrolet v. Gen. Motors Acceptance Corp., 72 Cal. App. 4th 861, 85 Cal.Rptr.2d 301, 316-317 (Cal. Ct. App. 1999)* [*32] (citation and quotation omitted). Lozano asserts that AWS's conduct was "unfair" because it did not fully and adequately disclose its billing practices at the time customers contracted with it to obtain cellular services.

1. Standing

AWS argues that Lozano lacks standing under the UCL because he suffered no damages from out-of-cycle billing. When Lozano filed this action, any person could assert a UCL claim on behalf of the general public regardless of whether they suffered an actual injury. *Cal. Bus. & Prof. Code § 17204 (2003)*. Thus, as originally drafted, the UCL gave any person authority to assert a UCL claim on behalf of the public as a private attorney general. In 2001, Lozano filed this putative class action both as a private attorney general and as an injured plaintiff.

After filing this lawsuit, but before the district court granted class certification, the voters of California enacted Proposition 64, which eliminated private attorney general standing for UCL claims. *Cal. Bus. & Prof. Code § 17204*. After Proposition 64, a person asserting an unfair competition claim must allege that (1) he or she "suffered injury in fact," and (2) "lost money or property as a result of such unfair [*33] competition." *Id.* While Proposition 64 did not expressly declare that the new standing requirements applied to cases pending at the time of its enactment, in July 2006, the California Supreme Court answered the question in the affirmative. *See Californians for Disability*

*Rights v. Mervyn's, LLC, 39 Cal. 4th 223, 46 Cal.Rptr. 3d 57, 64, 138 P.3d 207 (Cal. 2006)* ("For a lawsuit properly to be allowed to continue standing must exist at all times until judgment is entered and not just on the date the complaint is filed.").

The district court did not consider Lozano's standing as a private attorney general, but focused instead on whether his claimed injuries were such that he had standing to bring a UCL claim as an injured plaintiff. The district court, incorporating its findings from its summary judgment order, found that Lozano had sufficient evidence of actual injury as a result of AWS's inadequate disclosures -- the reimbursement of which the district found to be an attempt to avoid suit -- together with an injury it termed the "reservation" injury. Thus, we must determine whether the type of injury articulated by the district court is sufficient to establish Lozano's standing pursuant to *section 17204*, as amended [*34] by Proposition 64.

The parties do not dispute that Lozano suffered pecuniary loss as a result of his alleged unawareness of AWS's out-ofcycle billing practices. Shortly after contracting with AWS for cellular service, Lozano received an invoice stating that he had been charged fees as a result of out-of-cycle minutes from his previous invoice. The record also supports a finding that, during the course of his contract with AWS, AWS would occasionally charge Lozano an overage fee based on out-of-cycle billing. AWS contends, however, that these charges were offset by the benefits Lozano received from out-of-cycle billing. In considering these claims of error, we must address the effect of AWS's reimbursement to Lozano for his out-of-cycle charges prior to his filing suit, and the effect of the claimed offset of benefits Lozano received during the same time.

With respect to the former issue regarding the effect of AWS's reimbursement prior to suit, the district court found that AWS reimbursed Lozano only after realizing that Lozano "was instigating legal proceedings" against it. Based on this factual finding, which we review for clear error, the district court concluded that it was not divested [*35] of its power to hear the case. In so concluding, the district court relied on *United States v. W.T. Grant*, where the Supreme Court held that "the voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case," unless there is no reasonable expectation that the wrong will be repeated; otherwise, the "defendant is free to return to his old ways." *345 U.S. 629, 632, 73 S. Ct. 894, 97 L. Ed. 1303 (1953)* (citations and quotations omitted); *see also DeFunis v. Odegaard, 416 U.S. 312, 318, 94 S. Ct. 1704, 40 L. Ed. 2d 164 (1974)*. The district court found that it did not need to speculate as to whether AWS would return "to its old ways" because AWS's position was that its practice of out-of-cycle billing was legal and adequately disclosed to its customers.

While we agree with the district court's ultimate decision regarding the justiciability of Lozano's claim, we analyze the claim differently to address issue of both standing and mootness. As stated above, the district court relied on *W.T. Grant* and *DeFunis* to support its finding that Lozano's injuries, capable of being repeated, were justiciable. Both cases are based on mootness, i.e., plaintiff had standing when he or she filed suit but due to a [*36] changed circumstance his or her claim became moot. Here, AWS argues that Lozano did not have standing to bring this action in the first instance. While some courts have characterized mootness simply as "the doctrine of standing set in a time frame," *see Arizonans for Official English v. Arizona, 520 U.S. 43, 68 n.22, 117 S. Ct. 1055, 137 L. Ed. 2d 170 (1997)*, a careful analysis should distinguish the two doctrines.

In determining mootness, the *defendant* bears the burden of showing that its voluntary compliance moots a case by convincing the court that "it is absolutely clear the allegedly wrongful behavior could not reasonably be ex-

pected to recur." *Friends of the Earth, 528 U.S. 167, 190* (citation omitted). By contrast, in determining standing issues the court considers whether the *plaintiff* has demonstrated that, "if unchecked by the litigation, the defendant's allegedly wrongful behavior will likely occur or continue, and that the threatened injury is certainly impending." *Id.* (internal quotation marks and citations omitted). Thus, Lozano bears the initial affirmative burden of showing that AWS's conduct is likely to continue and that the threatened injury is certainly impending. Conversely, to establish mootness, AWS [*37] must convince the court that its conduct is not reasonably expected to recur.

Based on the facts before us, we find that Lozano, when faced with the realistic threat that AWS would continue to charge him for out-of-cycle calls, had standing to bring this claim. Likewise, there is nothing in the record that supports a finding that Lozano's claim is now moot. We base our decision on the following: (1) Lozano continues to be a customer of AWS's cellular service, subject to AWS's out-of-cycle billing practices; (2) after this suit was filed, Lozano suffered another overage charge as a result of out-of-cycle billing; [8] and (3) if the disclosures were inadequate, then Lozano may show that as a result of the inadequacies of the disclosures, he did not receive the full benefit of his contract with AWS. This latter injury is what the district court defined as the "reservation" injury. That is, Lozano contracted for 400 free "anytime" minutes. Yet, due to out-cycle-billing, he reserved, and therefore lost, a certain number of those minutes each billing period to account for the late-billed roaming calls.

---

8   Whether this overage charge was offset by benefits Lozano received as a result of out-of-cycle [*38] billing is a determination better left to a fact-finder during the merits portion of the lawsuit.

The next question we address is whether these injuries are recoverable under the UCL. The only types of relief available under the UCL actions are injunctive and restorative. *Cal. Bus. & Prof. Code § 17203*; *see also Cel-Tech, 83 Cal.Rptr.2d at 560*. While restoring Lozano's overage payments, if any, fits squarely within the restorative context of the UCL, we question whether restoring Lozano's "reserved" minutes falls into this category. Restitution in the UCL context, however, includes restoring money or property that was not necessarily in the plaintiff's possession. The California Supreme Court has "stated that the concept of restoration or restitution, as used in the UCL, is not limited only to the return of money or property that was once in the possession of that person. Instead, restitution is broad enough to allow a plaintiff to recover money or property in which he or she has a vested interest." *See Juarez v. Arcadia Fin., Ltd., 152 Cal. App. 4th 889, 61 Cal.Rptr. 3d 382, 400 (Cal. Ct. App. 2007)* (citing *Korea Supply Co. v. Lockheed Martin Corp., 29 Cal. 4th 1134, 131 Cal.Rptr.2d 29, 42, 63 P.3d 937 (2003))*. Here, Lozano has a vested [*39] interest in 400 free anytime minutes. Due to out-of-cycle billing, however, Lozano found it necessary to reserve, and therefore lose, a certain number of those minutes each billing period. Accordingly, we find that Lozano has properly stated an injury that he did not receive the full value of his contract with AWS due to its alleged failure to disclose out-of-cycle billing, and that this injury is redressable under the UCL. *See Daghlian v. DeVry Univ., Inc., 461 F. Supp. 2d 1121, 1155 (C.D. Cal. 2006)* (accepting plaintiff's theory that he suffered injury under the UCL because he paid thousands of dollars of tuition to defendant university and "did not receive what he had bargained for" due to its alleged unfair business practices).

2. Typicality

AWS next contends that, even if Lozano could show injury, his injury is not typical of

the class, and he therefore is an inadequate class representative. AWS bases its contentions on the fact that Lozano was reimbursed for his out-of-cycle billing charges, he benefitted overall from out-of-cycle billing over the course of his contract with AWS, and his claimed damages for "reserving" minutes is unique to him.

Under *Rule 23(a)(3)*, it is not necessary [*40] that all class members suffer the same injury as the class representative. *See Negrete v. Allianz Life Ins. Co. of N. Am., 238 F.R.D. 482, 488 n.8 (C.D. Cal. 2006)* (citing *Rosario v. Livaditis, 963 F.2d 1013, 1017 (7th Cir. 1992)* (further citations omitted)); *see also Simpson v. Fireman's Fund Ins. Co., 231 F.R.D. 391, 396 (N.D. Cal. 2005)* ("In determining whether typicality is met, the focus should be 'on the defendants' conduct and plaintiff's legal theory,' not the injury caused to the plaintiff.") (quoting *Rosario, 963 F.2d at 1018*).

We agree with the district court that Lozano's injuries are typical of the class. The class definition includes all California customers that AWS charged for calls made during a billing period other than the billing period in which the calls were made. Given AWS's policy of offering a one-time reimbursement to customers who complain when they receive an invoice containing charges for out-of-cycle calls, along with an explanation of out-of-cycle billing, it does not strain the parameters of typicality to presume that many of these customers will thereafter reserve minutes to account for AWS's billing practice. Thus, the class is likely to include customers [*41] who were charged for overage fees, as well as customers who, after learning of out-of-cycle billing, reserved their minutes. We therefore do not find that the district court erred in holding Lozano's claims typical of the class.

3. Predominance of Common Issues

AWS argues that because all of Lozano's claims involve some proof of individual knowledge and expectations, all should fail under *Rule 23(b)(3)* because individual issues would necessarily predominate over common issues. The district court itself found that individual issues predominated in Lozano's breach of contract and CLRA claims, but found that common issues predominated in the UCL claim.

In its order on class certification, the district court found that Lozano's breach of contract and CLRA claims required an individualized analysis of awareness and knowledge of AWS's out-of-cycle billing practices, such that the predominance prong of *Rule 23(b)(3)* was not met. AWS now argues that the district court's finding, that predominance was not fatal to class certification of Lozano's UCL claim, is inconsistent with its findings with respect to the breach of contract and CLRA claims. First, we examine the basis of the district court's [*42] decisions not to certify on those claims and then turn to considering how the UCL claim does, or does not, differ.

Though Lozano requested certification on four separate theories under the CLRA, the district court denied certification on the first three theories, which were based on fraudulent or misleading representations, and granted certification on the fourth, relating to insertion of an unconscionable arbitration clause. In denying certification on the first three theories, the district court relied on the analysis of "materiality" in *Caro v. Procter & Gamble Co., 18 Cal. App. 4th 644, 22 Cal. Rptr. 2d 419 (Cal. Ct. App. 1993)*. There, the California Court of Appeals concluded that individual issues predominated in the plaintiff's CLRA class action based on orange juice labeling. *Id. at 432-33*. Because the CLRA requires that any misrepresentations be material, the court found that it would have to determine whether each customer in the class thought the orange juice was "fresh" as advertised, or whether the customer had read the side

of the carton disclosing that the juice came from concentrate. *Id.* Similarly, the district court in this case found that it would have to conduct an individualized review as to [*43] each class member's awareness and knowledge of out-of-cycle billing and AWS's disclosures to determine whether its representations were material under the CLRA.

With respect to Lozano's breach of contract claim, the district court held that it would have to ascertain each individual's expectations about the contract, and determine whether those expectations were reasonable. Thus, the district court found that individual issues predominated over the class issues with respect to Lozano's breach of contract claim. The district court specifically noted, however, that its decision would be different had Lozano based his contract claim on a theory about the uniformity of AWS's disclosures about out-of-cycle billing, rather than about reasonable expectations.

The legal analysis required under the UCL resembles, but remains distinct from, both the CLRA's materiality inquiry and the common law's emphasis on reasonable expectations. Construing Lozano's theory to be based on AWS's uniform written disclosures to its customers, the district court considered the weight individualized proof would play under the test prescribed by *South Bay* . This test involves balancing the harm to the consumer against [*44] the utility of the defendant's practice. *See South Bay, 85 Cal.Rptr.2d at 315.* The district court held that "the possibility of some slightly different individual circumstances" would not destroy the predominance of common issues in light of the legal standard. AWS argues that the district court erred because the UCL in fact does require consideration of individual issues.

California's unfair competition law, as it applies to consumer suits, is currently in flux. In 1999, the California Supreme Court rejected the balancing test in *South Bay* in suits involving unfairness to the defendant's competitors. *See Cel-Tech, 20 Cal. 4th 163, 83 Cal.Rptr.2d 548, 973 P.2d 527.* The court held that this balancing test was "too amorphous" and "provide[d] too little guidance to courts and businesses." *Id. at 567.* The court then held that unfairness must "be tethered to some legislatively declared policy or proof of some actual or threatened impact on competition." *Id. at 565.* This holding, however, was limited to actions based on unfairness to competitors. *Id.* at n.12.

The California courts have not yet determined how to define "unfair" in the *consumer* action context after *Cel-Tech.* In the First District Court of Appeals, the court [*45] extended the *Cel-Tech* definition to consumer cases. *See Gregory v. Albertson's, Inc., 104 Cal. App. 4th 845, 128 Cal.Rptr.2d 389 (Cal. Ct. App. 2002).* The Fourth District Court of Appeals initially proposed a test along the lines of *Cel-Tech* but later avoided the question by dismissing the claim under both the old and the new standard. *See Bardin v. Daimlerchrysler Corp., 136 Cal. App. 4th 1255, 39 Cal.Rptr. 3d 634, 636 (Cal. Ct. App. 2006)*; *Scripps Clinic v. Superior Court, 108 Cal. App. 4th 917, 134 Cal.Rptr.2d 101 (Cal. Ct. App. 2003).* The Second District Court of Appeals has issued two conflicting decisions, one applying the old balancing test, *see McKell v. Washington Mut., Inc., 142 Cal. App. 4th 1457, 49 Cal.Rptr. 3d 227, 238 (Cal. Ct. App. 2006)*, and another, issued during the same week, holding that *Cel-Tech* overruled all prior definitions of unfairness and created a new test, *see Camacho v. Automobile Club of Southern California, 142 Cal. App. 4th 1394, 48 Cal.Rptr. 3d 770, 776 (Cal. Ct. App. 2006).* In *Camacho*, the court chose to apply the three-pronged test contained in the Federal Trade Commission Act, *15 U.S.C. § 45(a). See id. at 776.*

While we agree with the Fourth District that *Cel-Tech* effectively rejects the balancing approach, we do not agree that the FTC test is appropriate in this [*46] circumstance. Though the California Supreme Court did reference FTC's *section 5* as a source of "guidance," that

discussion clearly revolves around anti-competitive conduct, rather than anti-consumer conduct. *See Cel-Tech, 83 Cal.Rptr.2d at 565* ("As the issue before us in this case arises out of a claim of unfair competition between direct competitors, the relevant jurisprudence would be that arising under *section 5*'s prohibition against "unfair methods of competition."). Accordingly, we decline to apply the FTC standard in the absence of a clear holding from the California Supreme Court.

The remaining options, then, are to apply *Cel-Tech* directly to this case and require that the unfairness be tied to a "legislatively declared" policy, *see Scripps Clinic, 108 Cal. App. 4th 917, 134 Cal.Rptr.2d 101*, or to adhere to the former balancing test under *South Bay*. These options, however, are not mutually exclusive. In *Schnall v. Hertz Corp., 78 Cal. App. 4th 1144, 93 Cal.Rptr.2d 439 (Cal. Ct. App. 2000)*, the appellate court in the First District reversed the dismissal of a complaint in an unfair competition case where the alleged unfairness was *both* tethered to a legislatively declared policy *and* the plaintiff could prove facts showing  [*47] that the harm was not outweighed by the utility. Because adopting one standard does not necessitate rejection of the other, we hold that, no matter the status of *Cel-Tech*, the district court did not apply the wrong legal standard by relying on the balancing test from *South Bay*. In the absence of further clarification by the California Supreme Court, we endorse the district court's approach to the law as if it still contained a balancing test.

AWS argues that, under *South Bay*, though, individualized circumstances matter in the determination of whether a practice is unfair. We agree that evidence about individual knowledge and expectations may help the court determine the extent of the harm for the purposes of the UCL's balancing test. In *South Bay*, the appellate court rejected a car dealership's claim that the manufacturer's financing arm used an unfair method of calculating interest. The court found

that "substantial evidence indicated South Bay entered into the disputed loan agreements knowing, understanding, agreeing and expecting that GMAC would use the [allegedly unfair] method to calculate interest." *See South Bay, 85 Cal.Rptr. at 316*. Based on this record, and in light of the  [*48] fact that this method was widely used and even expected in contracts with other dealerships, the court found that practice was not unfair as to South Bay Chevrolet itself.

The district court in this case took individual circumstances into account but ultimately determined that *South Bay* was distinguishable. The district court found that Lozano's claim was based on uniform disclosures made by AWS to all its consumers, whereas the disclosures in *South Bay* varied from dealer to dealer. Therefore, the individual circumstances regarding how these disclosures were read or received would not destroy predominance, in the district court's view. Though we might have decided the issue differently, our review is "limited to assuring that the district court's determination has a basis in reason." *Gonzales v. Free Speech Coalition, 408 F.3d 613, 618 (9th Cir. 2005)* (citation omitted). The district court gave full consideration to AWS's argument and did not abuse its discretion in determining that individual circumstances would not defeat the predominance of common issues. We accordingly affirm its certification of the class.

Finally, we find no basis for AWS's contention that the district court failed  [*49] to consider the effect of affirmative defenses on class treatment. Our review of the district court's order reveals that it properly considered each of AWS's defenses in determining whether to certify a class.

## CONCLUSION

We reverse the district court's order granting class certification of Lozano's CLRA claim based on the inclusion of an unconscionable clause in the agreement. Similarly, we reverse

2007 U.S. App. LEXIS 22430, *

the district court's certification of Lozano's UCL claim based on unlawful conduct, as it is dependent on Lozano's CLRA claim. We otherwise affirm the district court's order on class certification. Each party shall bear its own costs on appeal. *See Fed. R. App. P. 39(a)(4)*

**AFFIRMED in part, REVERSED in part.**

MICHAEL FREEMAN, Plaintiff and Appellant, v. MATTRESS GALLERY, Defendant and Respondent. MICHAEL FREEMAN, Plaintiff and Appellant, v. GALLERY CORP. et al., Defendants and Respondents.

E039614, E039615

COURT OF APPEAL OF CALIFORNIA, FOURTH APPELLATE DISTRICT, DIVISION TWO

2007 Cal. App. Unpub. LEXIS 9102

November 8, 2007, Filed

**NOTICE:** NOT TO BE PUBLISHED IN OFFICIAL REPORTS. CALIFORNIA RULES OF COURT, RULE 8.1115(a), PROHIBITS COURTS AND PARTIES FROM CITING OR RELYING ON OPINIONS NOT CERTIFIED FOR PUBLICATION OR ORDERED PUBLISHED, EXCEPT AS SPECIFIED BY RULE 8.1115(b). THIS OPINION HAS NOT BEEN CERTIFIED FOR PUBLICATION OR ORDERED PUBLISHED FOR THE PURPOSES OF RULE 8.1115.

**PRIOR HISTORY:** [*1]
APPEAL from the Superior Court of Riverside County, No. RIC 394369, RIC 415560. Craig G. Riemer, Judge.

**DISPOSITION:** The judgment in Freeman I (Super. Ct. No. RIC 394369) is affirmed in part and reversed in part. The judgment in Freeman II (Super. Ct. No. RIC 415560) is also affirmed inpart and reversed in part.

**COUNSEL:** Geller, Stewart & Foley, Michael S. Geller and Richard A. Stewart for Plaintiff and Appellant.

Dorsey & Whitney, Steven D. Allison and Chris Humphreys for Defendants and Respondents.

**JUDGES:** RAMIREZ, P.J.; RICHLI, J., HOLLENHORST, J. concurred.

**OPINION**

Plaintiff Michael Freeman (Freeman) filed two actions asserting violations of the Consumer Legal Remedies Act (CLRA), Civil Code section 1750 et seq. and the unfair competition law (UCL), Business and Professions Code section 17200 et seq. He appeals from separate judgments of dismissal after the trial court sustained defendants' motion for judgment on the pleadings and demurrer without leave to amend.

**FACTS AND PROCEDURAL HISTORY**

On June 12, 2003, Freeman filed a complaint (Freeman I) against defendant Mattress Gallery alleging a cause of action for violation of the CLRA, and a cause of action for unfair business practices in violation of the UCL. He alleged that [*2] on February 16, 2003, he read a Mattress Gallery advertisement that indicated that Mattress Gallery was offering special pricing on mattresses because the factory had "goofed" and made thousands of mattresses with the wrong cover. He further alleged that the claim that the factory had "goofed" was untrue and that the statement was part of a "bait and switch" scheme wherein customers who

sought to purchase those mattresses were told that they were not healthy to sleep on every night and that they should purchase a mattress at two-to-three times the advertised price. In addition, Freeman asserted that on February 18, 2003, he drove to a Mattress Gallery store to purchase the advertised mattress for his daughter's house. Freeman sought injunctive relief, disgorgement of profits, exemplary damages and attorney fees.

Mattress Gallery demurred to the CLRA cause of action based upon Freeman's failure to allege proper venue, compliance with the requirement of a written notice to Mattress Gallery at least 30 days prior to filing suit, and elements of class action relief. On August 11, 2003, prior to the hearing date on the demurrer, Freeman filed a first amended complaint adding class action [*3] allegations defining the class as "all California consumers who responded to the Mattress Gallery advertisement headed 'OOPS! The factory Goofed' published during February, 2003." However, he later asked for restitution in favor of all California consumers who responded to deceptive advertisements "during the preceding four years." Freeman also added venue allegations and asserted that he sent a letter to Mattress Gallery on February 24, 2003, in order to comply with the notice requirement of Civil Code section 1782, subdivision (a). Mattress Gallery answered the first amended complaint and later filed an amended answer.

On April 26, 2004, Freeman sought leave to file an amended complaint in order to add additional defendants, to add allegations of additional deceptive advertisements by those defendants, and to add a third cause of action for violation of Business and Professions Code section 17500 et seq. (specifically addressing false advertisement). On June 15, 2004, the trial court denied Freeman's motion. In response, on July 20, 2004, Freeman filed a second action (Freeman II) using a complaint nearly identical in all major respects, to that which he sought to file as a second [*4] amended complaint in the existing action.

Defendants Mattress Gallery, James Ristas and Simmons Manufacturing Co., LLC (collectively Defendants) filed a demurrer to the complaint in Freeman II. The trial court sustained the demurrer as to the first cause of action for violation of the CLRA, with leave to amend. Freeman filed a first amended complaint on November 12, 2004. Defendants concurrently filed a demurrer to, a motion to strike portions of the prayer for damages in, and a motion to dismiss the CLRA cause of action in, the first amended complaint. On August 17, 2005, the trial court sustained the demurrer to the entire complaint without leave to amend on the grounds (1) that Freeman had failed to allege that he suffered any damages and therefore had no standing, (2) that Freeman had already filed an action seeking the same remedy alleged, (3) that the class that Freeman defined was unascertainable, and (4) that Freeman failed to allege proper notice was provided as required by Civil Code section 1782, subdivision (a). It thereafter found that both the motion to strike and the motion for dismissal were moot and dismissed the complaint. However, it also entered an order granting [*5] Defendants' motion to strike the cause of action for violation of the CLRA on the ground that Freeman failed to allege that he had sustained any actual damage and therefore lacked standing.

Freeman filed a motion for reconsideration based upon the fact that a notice under Civil Code section 1782, subdivision (a) had been sent to Defendants on September 24, 2004. However, that motion was taken off calendar.

In the meantime, on August 17, 2004, Mattress Gallery filed a motion to dismiss the CLRA cause of action in Freeman I on the grounds that the claim lacked merit as a matter of law, that the statements in the advertisements were nonactionable puffery and were all true, that Freeman did not suffer any actual damages as a result of Mattress Gallery's con-

duct, that the purported class was not ascertainable, that the action was not appropriate for class action status and that Freeman was not an appropriate class representative. The following day, Mattress Gallery filed a motion for summary adjudication of the second cause of action for violation of the UCL in Freeman I on the grounds that the UCL cause of action was based entirely upon the existence of a CLRA claim, which was subject to [*6] dismissal for the reasons indicated in the earlier motion and that there was no triable issue of material fact that Mattress Gallery's advertisement was unfair, unjust, unlawful, deceptive or fraudulent.

On November 3, 2004, the trial court granted the motion to dismiss the CLRA claim on the ground that Freeman did not suffer any damage as required by Civil Code section 1780, subdivision (a) but denied the motion for summary adjudication of the second cause of action.

On September 2, 2005, Mattress Gallery filed a motion for judgment on the pleadings based on the fact that Proposition 64 changed the UCL to require that a plaintiff have been damaged in fact and have lost money or property in order to have standing and to require the identification of an ascertainable class. On October 20, 2005, the trial court granted the motion on the ground that Freeman failed to allege that he had sustained any injury in fact as a result of Mattress Gallery's advertisement and dismissed the entire first amended complaint in Freeman I. Freeman appealed from the judgments in both cases. [1]

    1    Defendants argue in each case that Freeman's notice of appeal is not sufficient to include the causes of action for violation [*7] of the CLRA. On the contrary, both notices of appeal state that they are from the judgments, which necessarily include the orders at issue. (Code Civ. Proc., § 906.)

## DISCUSSION

### A. *Standard of Review*

There are three separate types of motions that we are called on to review, giving rise to two standards of review. Freeman appeals from the trial court's order granting Mattress Gallery's motion to dismiss his cause of action for violation of the CLRA. "Although a CLRA cause of action cannot be summarily disposed of by means of a motion for summary adjudication or summary judgment (Civ. Code, § 1781, subd. (c)), it can be dismissed before trial on a motion for a determination that it is without merit (i.e., a no-merit determination). [Citations.] In practice, courts nevertheless have applied the standards applicable to motions for summary judgment and summary adjudication in deciding motions for no-merit determinations. [Citations.]" (*Smith v. Wells Fargo Bank, N.A.* (2005) 135 Cal.App.4th 1463, 1474.) Our de novo review under the summary judgment standard is governed by Code of Civil Procedure section 437c, which provides in subdivision (c) that a motion for summary judgment may only be granted [*8] when, considering all of the evidence set forth in the papers and all inferences reasonably deducible therefrom, it has been demonstrated that there is no triable issue as to any material fact and the cause of action has no merit. The pleadings govern the issues to be addressed. (*City of Morgan Hill v. Brown* (1999) 71 Cal.App.4th 1114, 1121 (*City of Morgan Hill*).) A defendant moving for summary judgment bears the burden of persuasion that there is no triable issue. This burden is met by producing evidence that demonstrates that a cause of action has no merit because one or more of its elements cannot be established to the degree of proof that would be required at trial, or that there is a complete defense to it. Once that has been accomplished, the burden shifts to the plaintiff to show, by producing evidence of specific facts, that a triable issue of material fact exists as to the cause of action or

the defense. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 849-851, 854-855.)

Freeman also appeals from an order granting a motion for judgment on the pleadings. "The standard of review for a motion for judgment on the pleadings is the same as that for a general demurrer." (*Dunn v. County of Santa Barbara* (2006) 135 Cal.App.4th 1281, 1298.) [*9] Thus, both the motion for judgment on the pleadings in Freeman I and the demurrer in Freeman II are reviewed under the following standard.

"On appeal from a judgment dismissing an action after sustaining a demurrer without leave to amend, we give the complaint a reasonable interpretation, and treat the demurrer as admitting all material facts properly pleaded, but do not assume the truth of contentions, deductions or conclusions of law. A trial court errs in sustaining a demurrer when the plaintiff has stated a cause of action under any possible legal theory, and abuses its discretion in sustaining a demurrer without leave to amend if the plaintiff shows there is a reasonable possibility any defect identified by the defendant can be cured by amendment. [Citation.]" (*Palm Springs Tennis Club v. Rangel* (1999) 73 Cal.App.4th 1, 4-5 (*Palm Springs Tennis Club*).) Still the burden is on the appellant to demonstrate the existence of reversible error. (*San Joaquin Raptor/Wildlife Rescue Center v. County of Stanislaus* (1996) 42 Cal.App.4th 608, 626.) Therefore we need only discuss whether a cause of action was stated under the theories raised on appeal. (*Ibid*.)

Further, "[w]hile a plaintiff need [*10] not request leave to amend in order to preserve on appeal the issue of whether the court abused its discretion in sustaining a demurrer without leave to amend (Code Civ. Proc., § 472c), on appeal the plaintiff does bear the burden of proving there is a reasonable possibility the defect in the pleading can be cured by amendment. [Citation.] "' . . . Plaintiff must show in what manner he can amend his complaint and

how that amendment will change the legal effect of his pleading. . . ." [Citation.]' [Citation.]" (*Palm Springs Tennis Club*, *supra*, 73 Cal.App.4th at pp. 7-8.)

B. *Freeman I*

1. *CLRA*

As indicated above, the first cause of action in the initial complaint was disposed of by means of a dismissal for lack of merit because Freeman had not suffered any damage as required by Civil Code section 1780, subdivision (a), which states, in part, that "[a]ny consumer who suffers any damage as a result of the use or employment by any person of a method, act, or practice declared to be unlawful by Section 1770 may bring an action against that person . . . ." As part of its motion, Mattress Gallery argued that Freeman did not allege that he was damaged as a result of its allegedly deceptive advertising. [*11] Freeman alleged that he traveled to a Mattress Gallery store but not that he purchased a mattress. In fact, Freeman admitted that he never purchased a mattress from Mattress Gallery. Thus, Mattress Gallery argued, there is no basis for his claim that it made illicit profits as a result of its allegedly false advertising. The damage for which Freeman sought a remedy was not a damage that he had suffered. As the pleadings govern the issues to be addressed in a summary adjudication (*City of Morgan Hill*, *supra*, 71 Cal.App.4th at p. 1121), this showing on the part of Mattress Gallery was sufficient to shift the burden to Freeman to demonstrate the existence of a triable issue of material fact.

In response Freeman asserted that the damage requirement was to be interpreted so broadly that the mere infringement of a legal right provided by Civil Code section 1770 is sufficient to meet the damage requirement of Civil Code section 1780. (*Kagan v. Gibraltar Savings and Loan Assoc.* (1984) 35 Cal.3d 582, 593 (*Kagan*).)

Mattress Gallery cites *Wilens v. TD Waterhouse Group, Inc.*, (2003) 120 Cal.App.4th 746, 754-755 in an attempt to distinguish *Kagan*. However, the issue in *Wilens* was not what *Kagan* stated [*12] about the requirement for "any damage" in order for an individual to have standing, but whether *Kagan* stated that each member of a purported class need not have suffered actual damages. (*Ibid*.) *Wilens* was simply not a standing case and did not distinguish the statement in *Kagan* that "the requirement of section 1780 that a consumer 'suffer[] any damage' . . . include[s] the infringement of any legal right as defined by section 1770." (*Kagan*, *supra*, 35 Cal.3d at p. 593; *Wilens*, *supra*, 120 Cal.App.4th at p. 750.) Thus, our Supreme Court has interpreted Civil Code section 1780 to state that the infringement of a legal right provided by Civil Code section 1770 that results from the violation of Civil Code section 1770 is damage enough to provide standing. In other words, in order to have standing to bring an action for violation of the CLRA, all a plaintiff need allege is that the defendant violated a provision of Civil Code section 1770.

While the issue before the Supreme Court in *Kagan* was whether the plaintiff had standing to bring a class action as its representative, the fact that Civil Code section 1783 requires individual standing under Civil Code section 1780 as a prerequisite to [*13] standing as a class representative means that the Supreme Court's determination on the individual standing issue was necessary to its determination. Much as we might disagree with the Supreme Court's unsupported and ill-reasoned interpretation of the standing requirement within Civil Code section 1770, [2] we are bound by it. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

2    The Supreme Court's determination appears to violate basic rules of statutory interpretation by refusing to give meaning to and therefore rendering the words "suffers any damage as a result of" un-

necessary and mere surplusage. (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 95.) Further, the federal statute cited in support of the decision (15 U.S.C. § 1640) differs significantly from California's law in that it has no requirement that a plaintiff have suffered "any damage." The *Kagan* court's reference to it therefore merely begs the question.

However, this conclusion does not end our inquiry. It is not clear from the record that the trial court erroneously interpreted or ignored the Supreme Court's ruling in *Kagan*. As indicated above, *Kagan* still requires that a plaintiff demonstrate that his or [*14] her rights under Civil Code section 1770 have been infringed in order to have standing. Mattress Gallery's motion to dismiss the CLRA cause of action was based upon several grounds that included several challenges to Freeman's ability to demonstrate that his rights under Civil Code section 1770 had been infringed. Based upon the record before us, it is quite possible that the trial court credited at least one of these arguments, and, finding that Freeman could not demonstrate that his rights under Civil Code section 1770 had been infringed, concluded that he therefore could not demonstrate the existence of any damages sufficient to confer standing. It is the appellant's burden to provide an adequate record to affirmatively demonstrate error or no relief is merited. (*Gee v. American Realty & Construction, Inc.* (2002) 99 Cal.App.4th 1412, 1416.) Under the circumstances here present we cannot conclude that Freeman has affirmatively demonstrated that the trial court's ruling on Mattress Gallery's motion to dismiss was erroneous.

2. *UCL*

The second cause of action, for violation of the UCL, was resolved by way of a motion for judgment on the pleadings which is reviewed as if it were a demurrer. [*15] Business and Professions Code section 17204 states that actions

for relief as a result of unfair competition may be brought by any person "who has suffered an injury in fact and has lost money or property as a result" of such unfair competition. Business and Professions Code section 17203 requires any person seeking to represent a class in an action for violation of the UCL to meet the standing requirement just cited and also to comply with Code of Civil Procedure section 382. [3]

> 3    While this appeal was pending the Supreme Court determined that the changes to the UCL effected by Proposition 64 were applicable to cases pending when the changes went into effect. (*Californians For Disability Rights v. Mervyn's* (2006) 39 Cal.4th 223, 227.) Appellant concedes that the statutes as cited above apply in this case.

Mattress Gallery argued that Freeman failed to plead that he had suffered any injury in fact or that he had lost money or property as a result of its allegedly false advertising and therefore had no standing to bring his claim. CTI 575, 580 It also asserted that Freeman could not identify an ascertainable class and therefore could not maintain a class action under the UCL. CT 575, 580-582

In  [*16] order to have standing an individual plaintiff must plead facts supporting each of the three elements of Business and Professions Code section 17204: (1) injury in fact, (2) loss of money or property, and (3) causation. (*Aron v. U-Haul Co. of California* (2006) 143 Cal.App.4th 796, 799 (*Aron*); *R & B Auto Center, Inc v. Farmers Group, Inc.* (2006) 140 Cal.App.4th 327, 359-360.) Freeman's second cause of action for violation of the UCL simply incorporated his prior allegations and added the conclusion that Mattress Gallery's conduct violated the UCL so he should obtain an injunction and restitution. CTI 16-17 As noted above, Freeman alleged only that he traveled to a Mattress Gallery store, not that he purchased a mat-

tress. CTI 15-16 Further, the only reference that he makes to damages are alleged illicit profits made by Mattress Gallery as a result of its "bait and switch" advertising, and the restitution that he sought was of money Mattress Gallery collected from consumers. CTI 16-17 The first amended complaint simply does not contain any allegation that Freeman suffered an injury in fact or that he personally lost money or property as a result of Mattress Gallery's alleged wrongful  [*17] conduct.

This conclusion does not end our inquiry however. In his opposition to Mattress Gallery's motion, Freeman requested leave to amend his complaint to allege that he suffered injury in fact and lost money in the nature of "the cost per mile to [him], including gasoline and wear and tear on his vehicle" resulting from responding to the allegedly false advertisement. CTI 616-617

At the time that this appeal was filed no published case by California state courts had yet directly addressed what was meant by the requirement that a plaintiff plead and prove the existence of an "injury in fact" and a "loss" of money or property in order to have standing under the recently amended version of Business and Professions Code sections 17204 and 17535. [4] In determining what the phrases "injury in fact" and "lost money or property" are intended to mean, we are bound to take the statute as enacted and may not cause its meaning to conform to a presumed intent that is not expressed. (*Knight v. Superior Court* (2005) 128 Cal.App.4th 14, 23 (*Knight*); Code Civ. Proc., § 1858.)

> 4    While this appeal was pending, the Fourth District Court of Appeal, Division Three published a case directly that addressed  [*18] the question what constitutes an "injury in fact" for standing purposes under the UCL. However, the California Supreme Court has granted review of that opinion. (*Meyer v. Sprint Spec-*

*trum L.P.* (2007) 150 Cal.App.4th 1136, review granted Aug. 15, 2007, No. S153846, 2007 Cal. LEXIS 8720.)

In prior cases requiring interpretation of new statutory language, the California Supreme Court has determined that an "examination of various dictionary definitions of a word will no doubt be useful" in determining its ordinary meaning, (*MacKinnon v. Truck Ins. Exchange* (2003) 31 Cal.4th 635, 649) so long as the court undertakes that examination from the viewpoint of the electorate in enacting a statute that contains the word. (See, *Ibid.*; *Knight*, *supra*, 128 Cal.App.4th at p. 23.) Injury is defined as "an act that damages, harms or hurts: . . . a violation of another's rights for which the law allows an action to recover damages or specific property or both: an actionable wrong." (Webster's 3d New Internat. Dict. (1993) p. 1164.) To lose is to "suffer deprivation of." (*Id.* at p. 1338.) Loss is the undesirable outcome of a risk; the disappearance or diminution in value, usu. in an unexpected or relatively [*19] unpredictable way." (Black's Law Dict. (8th ed. 2004) p. 963.)

In addition to these considerations, the California Supreme Court has, in other circumstances, recognized the federal rule for standing that requires an "injury in fact." The federal courts define "injury in fact" as requiring a party to "'prove by a preponderance of the evidence that it has suffered "an invasion of a legally protected interest that is [both] '(a) concrete and particularized, and (b) actual or imminent . . . .'"' [Citation.]" as opposed to conjectural or hypothetical. (*People ex rel. Dept. of Conservation v. El Dorado County* (2005) 36 Cal.4th 971, 986.) In her dissent in *Stop Youth Addiction, Inc. v. Lucky Stores, Inc.* (1998) 17 Cal.4th 553, 591-592, Justice Brown likened "injury in fact" to the existence of some concrete harm as opposed to a common grievance shared by the public in general. This view of "injury in fact" has been implicitly adopted by at least one court in a recent opinion interpret-

ing Business and Professions Code section 17200 et seq. (*State of California ex rel Grayson v. Pacific Bell Telephone Co.* (2006) 142 Cal.App.4th 741, 757-758.) It also comports with the definition of "injury in [*20] fact" contained in Black's Law Dictionary, which refers to the Federal Rules of Civil Procedure as support. (Black's Law Dict. (8th ed. 2004) p. 801.)

Finally, cases published since the most recent amendments to Business and Professions Code sections 17204 and 17535 have concluded, either directly or through implication, that in order to have standing under those sections a plaintiff must allege either (1) that money was expended by the plaintiff due to the defendant's acts of unfair competition (*Aron*, *supra*, 143 Cal.App.4th at pp. 802-803; *R & B Auto Center, Inc v. Farmers Group, Inc.*, supra, 140 Cal.App.4th at p. 360; *Monarch Plumbing Co. v. Ranger Ins. Co.* (E.D.Cal., Sept. 25, 2006, No. Civ. S-06-1357) 2006 U.S.Dist. LEXIS 68850, [p. 20]; *Witriol v. LexisNexis Group* (N.D.Cal., Feb. 10, 2006, No. C05-02392) 2006 U.S.Dist. LEXIS 26670, [pp. 18-19]; *Southern Cal. Housing v. Los Feliz Towers Homeow.* (C.D.Cal. 2005) 426 F. Supp. 2d 1061, 1069; *Laster v. T-Mobile USA, Inc.* (S.D.Cal. 2005) 407 F. Supp. 2d 1181, 1194), (2) that money or property was lost or suffered a diminution in value (*Overstock.com, Inc. v. Gradient Analytics, Inc.* (2007) 151 Cal.App.4th 688, 716 (*Overstock.com, Inc.*); [*21] *Huntingdon Life Sciences, Inc. v. Stop Huntingdon Animal Cruelty USA, Inc.* (2005) 129 Cal.App.4th 1228, 1240, 1262), or (3) that plaintiff was denied money to which plaintiff had a cognizable claim (*Progressive West Ins. Co. v. Superior Court* (2005) 135 Cal.App.4th 263, 269-270, 285, fn. 5; *Filiti v. USAA Casualty Ins. Co.* (E.D.Cal., June 20, 2007, No. Civ. S-06-2694) 2007 U.S.Dist. LEXIS 44691, [p. 6]; *Starr-Gordon v. Mass. Mut. Life Ins. Co.* (E.D.Cal., Nov. 7, 2006, No. Civ. S-03-68) 2006 U.S.Dist. LEXIS 83110, [pp.1, 18-19]).

Freeman proposes to allege that he lost money as a result of his mileage and costs associated with driving to the Mattress Gallery and therefore suffered injury in fact as a result of its conduct. CTI 616-617 The loss of the cost of gasoline and accompanying wear and tear on his vehicle to drive to the Mattress Gallery in order to purchase an item that was not for sale as advertised is a concrete and actual monetary loss. (Compare *Aron*, *supra*, 143 Cal.App.4th at pp. 802-803 where the loss sufficient to support standing under the UCL was the value of less than one tank full of gasoline and *Overstock.com, Inc.*, *supra*, 151 Cal.App.4th at p. 716 where the loss was [*22] a diminution in value of assets and decline in market capitalization.) The loss alleged is specific to Freeman and does not pertain to the public in general, a fact that distinguishes him from the plaintiff in *State of California ex rel Grayson v. Pacific Bell Telephone Co*., *supra*, 142 Cal.App.4th 741 (judgment based upon a sustained demurrer without leave to amend upheld because plaintiff could not allege individual injury apart from that suffered by the public at large). While many members of the general public may have seen the advertisement, not all of them incurred the cost of traveling to a Mattress Gallery store with the intent to purchase the item that was allegedly not for sale as advertised. Therefore, we must conclude that Freeman has demonstrated that he could properly amend his complaint to allege both an injury in fact, and that he suffered a monetary loss as a result of Mattress Gallery's allegedly false or misleading advertisement. For this reason we must reverse the judgment in Freeman I (Super.Ct.No. RIC 394369). The trial court is directed to allow Freeman to file an amended complaint to state a cause of action for violation of the UCL.

## C. *Freeman II*

Freeman's first [*23] amended complaint asserted causes of action for violation of the CLRA, for unfair business practices in violation of the UCL and for false advertising in vio-lation of the UCL. The entire complaint was disposed of by way of Defendants' demurrer. The trial court ruled that the entire complaint failed as it was in violation of the rule against splitting a cause of action. It further ruled that the cause of action for violation of the CLRA did not state a cause of action both because Freeman failed to allege that he gave prior notice as required by Civil Code section 1782, subdivision (a) and because he failed to allege that he suffered any damage as required by Civil Code section 1780, subdivision (a). In addition, the trial court ruled that the causes of action for violation of the UCL did not state a cause of action because Freeman did not allege that he suffered an injury in fact and lost money or property as required by Business and Professions Code sections 17204 and 17535. [*24] Finally, it ruled that Freeman's class action failed because the class that he defined in the complaint was not ascertainable. On appeal Freeman challenges each of these issues. Thus, we will review them in order.

## 1. *Splitting a Cause of Action*

A primary right cannot be pursued by means of more than a single cause of action. (Code of Civ. Proc., § 430.10, subd. (c); *Crowley v. Katleman* (1994) 8 Cal.4th 666, 681-682 (*Crowley*).) A primary right is based upon a duty owed to a plaintiff and the wrongful act of the defendant that breaches that duty. While a plaintiff may seek recovery under different legal theories for violation of a primary right and the violation of that right may entitle the plaintiff to any number of forms of relief, the plaintiff may not allege the violation of the same primary right in different actions. (*Crowley*, *supra*, 8 Cal.4th at pp. 681-682.) If a plaintiff seeks to enforce the same primary right in two actions proceeding simultaneously, the second action must be abated. (*Id*. at p. 682; *People ex rel. Garamendi v. American Autoplan, Inc*. (1993) 20 Cal.App.4th 760, 770-771.) However, abatement requires that the two actions not only concern the same primary right, [*25]

but that they concern the same parties. (*Id.* at p. 770.) Thus, Freeman II cannot be abated insofar as James Ristas and Simmons Manufacturing Co., LLC are concerned. Further, "[w]here abatement is required, the second action should be stayed, not dismissed. [Citation.]" (*Id.* at p. 771.) Thus, even if Mattress Gallery was correct in asserting that Freeman impermissibly sought recovery for the same primary right in two separate actions against it, a matter that we need not here decide, the trial court erred in dismissing the action in its entirety for impermissible splitting of a cause.

## 2. *CLRA*

Civil Code section 1782 requires that prior to filing a complaint for violation of the CLRA a consumer must send a written notice, certified or registered mail, return receipt requested, to a person alleged to have violated the CLRA indicating the particular violations alleged and demanding correction or rectification of the violation. (Civ. Code, § 1782, subd. (a).) Actions for injunction do not require such notice. (Civ. Code, § 1782, subd. (d).) Adherence to this notice requirement is strict and literal, such that the failure to comply merits a dismissal of the action. (*Outboard Marine Corp. v. Superior Court* (1975) 52 Cal. App. 3d 30, 40-41; [*26] see also *Laster v. T-Mobile United States, Inc., supra*, 407 F. Supp. 2d at pp. 1181, 1195-1196.)

In his opposition to the Defendants' motions, Freeman conceded that the first amended complaint failed to plead that the required notice was sent. However, he also asserted that the notice had been sent and that the omission was simply an oversight that could be rectified. At the hearing, Freeman's attorney again confirmed "[c]learly the letter wasn't sent." He nevertheless requested leave to amend. The trial court observed that it did not appear from the documents filed that Freeman could successfully amend regarding the required notice, to which counsel responded, "[t]hat's true."

Under such circumstances we cannot conclude that the trial court erred in sustaining the demurrer without leave to amend as to the portion of the CLRA action seeking damages.

On appeal, Freeman has not asserted that he should be allowed to amend his complaint nor has he stated how any proposed amendment would change the legal effect of his pleading. Rather, he concludes, without any argument, citation to the record, or to legal authority, that the trial court should have granted his motion for reconsideration, [*27] which sought to introduce a purported notice. In light of the fact that the record reveals that he withdrew his motion for reconsideration pursuant to a declaration filed with the trial court prior to the hearing on the motion, Freeman's assertion is utterly without merit. Thus, we must conclude that Freeman has failed to demonstrate that the trial court erred in dismissing his CLRA cause of action insofar as it requested damages as a remedy. However, because a request for injunctive relief does not require prior notice (Civ. Code, § 1782, subd. (d)) we cannot conclude that the CLRA action was properly dismissed on this ground insofar as it sought an injunction.

The trial court also sustained the demurrer to the CLRA cause of action based upon the failure of the complaint to allege that Freeman suffered any damage as required by Civil Code section 1780, subdivision (a). As indicated above, our Supreme Court has interpreted Civil Code section 1780 to state that in order to have standing to bring an action for violation of the CLRA, all a plaintiff need allege is that the defendant violated a provision of Civil Code section 1770. (*Kagan*, *supra*, 35 Cal.3d at p. 593.) The first amended [*28] complaint alleges that Defendants violated Civil Code section 1770, subdivision (a)(3), (5), (7), (9), (10), and (13). Hence, for the reasons stated above, the allegations of the complaint are sufficient to establish Freeman's standing to pursue injunctive relief for violation of the CLRA.

3. *UCL*

The Defendants argued and the trial court ruled that neither cause of action for violation of the UCL stated a cause of action because Freeman did not allege that he suffered an injury in fact and lost money or property as required by Business and Professions Code sections 17204 and 17535.

In his first amended complaint, Freeman alleged that in response to a Mattress Gallery advertisement that he read on February 16, 2003, he drove to two different Mattress Gallery stores intending to purchase a mattress for his daughter's home. In both stores the salesperson explained that the advertised mattress would not be suitable to sleep on every night and would result in a sore back. A more suitable and expensive mattress was suggested. Freeman became disappointed in both instances and left the stores. Freeman alleged that he was damaged in the amount of $ 759.75 as the result of being induced to drive [*29] a long distance to the Mattress Gallery stores and that he was damaged in the amount of $ 310.00 by not being able to receive that amount in savings on a mattress as advertised.

As stated above in conjunction with our discussion of this cause of action in Freeman I, allegations that Freeman personally saw the allegedly false advertisement and responded to it, incurring a concrete and actual loss, as opposed to mere conjecture or hypothesis, or one sustained by the public in general are sufficient to allege standing under the concepts of injury in fact and actual damages as those terms are used in Business and Professions Code sections 17204 and 17535. Consequently, we must conclude that the trial court erred in sustaining the Defendants' demurrers on the ground that Freeman had failed to adequately plead facts supporting his standing to bring his causes of action under the UCL.

4. *Class Action Status*

Finally, the Defendants challenged, and the trial court ruled, that Freeman's class action failed because the class that he defined in the complaint was not ascertainable as required by each of his three causes of action. (*Richmond v. Dart Industries, Inc*. (1981) 29 Cal.3d 462, 469-470; *Caro v. Procter & Gamble Co*. (1993) 18 Cal.App.4th 644, 654; [*30] Bus. & Prof. Code, §§ 17203, 17535; Code Civ. Proc., § 382.) Freeman proposed to represent a class of "all California consumers who responded to any Mattress Gallery advertisement offering mattresses for sale published in the State of California during the period from January 1, 2002, through the time of trial." The Defendants argued that it is impossible to determine the members of a class that "responded to" a Mattress Gallery advertisement and that innumerable separate factual inquiries would be required to determine whether a consumer belonged to the class. Therefore, they urged, the class was not ascertainable.

In response, Freeman asserted that the class requirements under the CLRA were less stringent than those in Code of Civil Procedure section 382. However, he cited no authority for the proposition that the CLRA class requirements do not include that a class be ascertainable. Freeman's sole remaining contention was that the question of the adequacy of the class allegations was not appropriate for consideration by way of a demurrer. On the contrary, "trial courts properly and 'routinely decide[] the issue of class certification on demurrer, sustaining demurrers without leave [*31] to amend where it is clear that there is no reasonable possibility that the plaintiffs could establish a community of interest among the potential class members and that individual issues predominate over common questions of law and fact. [Citations.]' [Citation.]" (*Silva v. Black* (1996) 49 Cal.App.4th 345, 349.) Freeman did not elaborate on or expand his position at oral argument below. Thus, we cannot conclude that the trial court erred in determining that Freeman's grounds for opposition to the demurrer to the

class action were not persuasive. Nor are we persuaded that the trial court's determination that the class as defined in the first amended complaint is impermissibly vague is erroneous.

In his opening brief on appeal Freeman cited *Global Minerals & Metals Corp. v. Superior Court* (2003) 113 Cal.App.4th 836, for the proposition that the requirement of an ascertainable class demands only that such terminology be used to allow persons to determine whether they are members of the class. The case actually indicates that "'[w]hether a class is ascertainable is determined by examining (1) the class definition, (2) the size of the class, and (3) the means available for identifying [*32] class members. [Citations.]' [Citation.]" (*Id.* at p. 849.) Rather than discuss how the first amended complaint addresses these criteria, Freeman merely concludes that the class members of the class described in his first amended complaint would "clearly" know if they are members of the class. We disagree.

The only other point that he raises (other than one that begs the question whether the first amended complaint defines an ascertainable class) is that if the trial court found the class to be uncertain, it should have redefined it in order to preserve the class action. (*Hicks v. Kaufman & Broad Home Corp.* (2001) 89 Cal.App.4th 908, 916.) What the *Hicks* court stated was that a trial court "can and should redefine the class where the evidence before it shows such a redefined class would be ascertainable." (*Ibid.*, footnote omitted.) In the first place, Freeman did not make this argument to the trial court, which therefore cannot be faulted for failing to comply with it. Further, Freeman does not refer to any portion of the record on appeal that might indicate that the evidence before the trial court demonstrated that a redefined class would be ascertainable. Finally, the case cited by [*33] *Hicks* for the proposition stated does not indicate that a trial court should redefine a class in order to save a

class action. (*Woosley v. State of California* (1992) 3 Cal.4th 758, 794-795.) Freeman provides no further support for this proposition. Thus, Freeman has not demonstrated that the trial court erred in sustaining the Defendants' demurrer to the class action portions of the first amended complaint.

For the first time in his reply brief on appeal Freeman proposes to amend his complaint to redefine the purported class as including only those consumers who responded to a Mattress Gallery advertisement by going to a Mattress Gallery store. As a matter of fairness, it has been repeatedly observed that matters raised for the first time in a reply brief are deemed waived and will not be considered by the appellate court. (*Reed v. Mutual Service Corp.* (2003) 106 Cal.App.4th 1359, 1372, fn. 11.) While Freeman attempts to excuse his delay by referring to the Supreme Court's recent holding in *Californians For Disability Rights v. Mervyn's*, *supra*, 39 Cal.4th at p. 227, that resulted in the application to this case of the Proposition 64 amendments to the UCL, we are not convinced that any [*34] excuse is thereby merited. Neither in his opposition below, nor in his opening brief on appeal did Freeman assert that the application of Proposition 64 was a relevant question as to the Defendants' demurrer to the class action claims. Freeman was on notice that the trial court viewed his class allegations as being too vague to proceed in all three of his causes of action (including that under the CLRA, which was not affected by Proposition 64). Despite knowing that the trial court viewed his class definition as unacceptably vague, Freeman chose not to address amendment until the Defendants' had no opportunity to respond to his proposals. We see no reason why such tactics should work to his advantage.

Even if we were to overlook the fact that issues raised for the first time in a reply brief are waived, while Freeman has proposed how he might amend his complaint, he does not at-

tempt to explain how this proposed amendment would change the legal effect of his pleading. Rather, Freeman again merely concludes that narrowing the definition of "responded to" a Mattress Gallery advertisement to only those consumers that traveled to a Mattress Gallery store, comports with the CLRA and UCL requirements  [*35] for stating a class action, and recites those requirements without explaining how his proposed amendment better fits them. It is not the function of this court to act in counsel's stead. Rather, it is the appellant's burden to demonstrate a right to the relief requested. (*Paterno v. State of California* (1999) 74 Cal.App.4th 68, 105; *Palm Springs Tennis Club*, *supra*, 73 Cal.App.4th at pp. 7-8; Cal. Const., art. VI, § 13.) On this issue he has not done so.

D. *Summary*

With respect to Freeman I (Super.Ct.No. RIC 394369), Freeman has not demonstrated that the trial court erred in granting judgment against him on his first cause of action for violation of the CLRA. While the cause of action for violation of the UCL did not state a cause of action, Freeman has demonstrated that he can amend his complaint to allege facts sufficient to provide him with standing to make that claim. He is therefore entitled to the opportunity to do so.

With respect to Freeman II (Super.Ct.No. RIC 415560), if the trial court determines that Freeman is seeking recovery of the same primary right asserted against defendant Mattress Gallery in Freeman I, the trial court must stay the action in abatement as to defendant  [*36] Mattress Gallery. In addition, Freeman may not pursue any of his claims as the representative of a class action. Only his individual claims survive. While Freeman has demonstrated that his first amended complaint contained sufficient allegations to provide him standing to bring a cause of action for violation of the CLRA, he may only pursue injunctive relief as a remedy. Finally, Freeman has demonstrated

that the trial court erred in sustaining the demurrer to his individual causes of action for violation of the UCL on the ground that he failed to allege sufficient facts to demonstrate standing. Therefore, he is entitled to pursue those causes of action.

**DISPOSITION**

The judgment in Freeman I (Super.Ct.No. RIC 394369) is reversed for the purpose of allowing Freeman to file an amended complaint to state a cause of action for violation of the UCL. In all other respects the judgment in Freeman I is affirmed. The judgment in Freeman II (Super.Ct.No. RIC 415560) is reversed as to Freeman's individual claims, with the exception of his claim for damages under the CLRA. As to that claim the judgment is affirmed. The judgment is also affirmed as to Freeman's class action claims. Freeman to recover  [*37] his costs on appeal.

RAMIREZ

P.J.

I concur:

RICHLI

J.

**DISSENT BY:** HOLLENHORST

**DISSENT**

HOLLENHORST, J., Dissenting.

While I agree with the majority that Freeman has standing to bring his claims for injunctive relief under the Consumer Legal Remedies Act (CLRA), Civil Code section 1750 et seq., I respectfully disagree that he could amend his complaint to allege an injury sufficient to confer standing under the Unfair Competition Law (UCL), Business and Professions Code [5] section 17200 et seq.

5    All further references are to the Business and Professions Code unless otherwise specified.

## 1. Freeman Has Not Alleged an "Injury in Fact" Sufficient to Confer Standing to Pursue His UCL Claims.

Whether Freeman has suffered injury sufficient to allow him to pursue his UCL claims depends on whether the wear and tear on his vehicle and money spent on gasoline while driving to and from defendant's business qualifies as an "injury in fact" within the meaning of section 17204 of the UCL.

Before the passage of Proposition 64 (as enacted at Gen. Elec. Nov. 2, 2004) former section 17204 provided standing to "any person acting for the interests of itself, its members or the general public." (Former § 17204.) The UCL did not require a [*38] private plaintiff to have personally suffered an ascertainable amount of injury before he or she could bring a claim. However, in the absence of any personal injury, a private plaintiff's claims were necessarily limited to injunctive relief. Proposition 64 amended section 17204 to require that a private plaintiff establish that he or she has suffered an "injury in fact" and "lost money or property as a result of such unfair competition," in order to assert a claim under the UCL. (§ 17204.) An important purpose for this revision was to "prohibit private attorneys from filing lawsuits for unfair competition where they have no client who has been injured in fact under the standing requirements of the United States Constitution." (See Prop. 64, § 1, subd. (e) ["Findings and Declarations of Purpose"].)

Freeman alleges that he was damaged in the amount of the cost per mile, including gasoline and wear and tear on his vehicle, incurred while driving to defendant's business. Concededly, the cost per mile and wear and tear on Freeman's vehicle amount to a loss of money and property. However, even assuming Freeman did travel to defendant's store because of the alleged false advertisement, I find [*39] that such costs of travel are not enough to establish standing. It is clear from the plain language of the statute that a private person has standing to sue under section 17204 only if that person has (1) suffered an "injury in fact," *and* (2) lost money or property as a result of such unfair competition. (§ 17204.) Since "[c]ourts should give meaning to every word of a statute if possible, and should avoid a construction making any word surplusage" (*Arnett v. Dal Cielo* (1996) 14 Cal.4th 4, 22), Freeman cannot satisfy the standing requirement unless he can demonstrate that, in addition to losing money, he suffered an "injury in fact." The damages alleged by Freeman do not rise to the level of an "injury in fact." Therefore, he cannot amend his complaint to allege damages sufficient to confer standing and he is not entitled to pursue his UCL claims.

Since the passage of Proposition 64, few cases have addressed what constitutes injury sufficient to confer standing, and no published case has definitively determined what is required to satisfy the "injury in fact" component of the standing requirement. As the majority points out, the California Supreme Court, in other circumstances, has [*40] recognized the federal rule for standing that also requires an "injury in fact." The federal courts define "injury in fact" as requiring a party to "prove by a preponderance of the evidence that it has suffered 'an *invasion* of a legally protected interest that is [both] "(a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical."'" (*Associated Builders & Contractors, Inc. v. San Francisco Airports Com.* (1999) 21 Cal.4th 352, 362, italics added, citing *Northeastern Fla. Chapter, Associated Gen. Contractors of America v. Jacksonville* (1993) 508 U.S. 656, 663.) An "invasion" is defined as "[a] hostile or forcible encroachment on the rights of another." (See Black's Law Dict. (8th ed. 2004) p. 843.)

The federal courts chose a strong word in crafting the "injury in fact" definition. Freeman simply drove to defendant's store, engaged in brief interactions with a salesperson, and left without making a purchase. The advertisement in the newspaper to which Freeman responded was not invasive, and it targeted customers willing to purchase imperfect mattresses. Freeman chose to respond to the advertisement as much as he chose not to buy the product after traveling [*41] to the store. At no point in this series of voluntary choices were Freeman's interests *forcibly* encroached upon by defendant. Under these circumstances, I cannot agree that Freeman's alleged loss rises to the level of "invasion," as contemplated by the federal courts in defining an "injury in fact."

The majority finds that Freeman's loss of gasoline and wear and tear on his vehicle is an "injury in fact," since it is specific to him and a direct result of the allegedly unfair business practice. I agree that Freeman's injury may be particularized in the sense that it is distinguished from the injury suffered by the general public. Freeman not only saw the advertisement, but he also incurred the cost of traveling to the store in response to it. However, I find that such a distinction merely characterizes the loss suffered and is not dispositive of the issue whether this loss was an "injury in fact."

In addition to *Southern Cal. Housing v. Los Feliz Towers Homeow.* (C.D.Cal. 2005) 426 F. Supp. 2d 1061, the majority cites to several cases which have been decided since Proposition 64 changed the language of section 17204 and which have concluded a plaintiff suffers an injury in fact for purposes [*42] of standing under the UCL when he or she has (1) expended money due to the defendant's acts of unfair competition (*Aron v. U-Haul Co. of California* (2006) 143 Cal.App.4th 796, 802-803 (*Aron*) [plaintiff alleged he was required to purchase excess fuel when returning rental truck]; *Monarch Plumbing Co. v. Ranger Ins. Co.* (E.D.Cal. Sept. 23, 2006, No. Civ. S-06-

1357) 2006 U.S.Dist. LEXIS 68850, *20 (*Monarch*) [plaintiff alleged he paid higher insurance premiums because of defendant insurer's settlement policies]; *Witriol v. LexisNexis Group* (N.D.Cal. Feb. 10, 2006, No. C05-02392) 2006 U.S.Dist. LEXIS 26670, *18-19] [plaintiff incurred costs to monitor and repair damage to his credit caused by defendants' unauthorized release of private information]; *Laster v. T-Mobile USA, Inc.* (S.D.Cal. 2005) 407 F. Supp. 2d 1181, 1194 (*Laster*) [defendants advertised cellular phones as free or substantially discounted when purchased with cellular telephone service, but plaintiffs were required to pay sales tax on the full retail value of the phones]); (2) lost money or property (*Overstock.com, Inc. v. Gradient Analytics, Inc.* (2007) 151 Cal.App.4th 688, 716 [plaintiff alleged diminution in value of its [*43] assets and decline in its market capitalization and other vested interests]; *Huntingdon Life Sciences, Inc. v. Stop Huntingdon Animal Cruelty USA, Inc.* (2005) 129 Cal.App.4th 1228, 1240, 1262 (*Huntingdon*) [plaintiff's home and car were vandalized by animal rights protestors]); or (3) been denied money to which he or she has a cognizable claim (*Progressive West Ins. Co. v. Superior Court* (2005) 135 Cal.App.4th 263, 269-270, 285, fn.5 (*Progressive West*) [insurance company paid insured's medical bills, then sued to recover that money when insured collected damages from the third party who caused his injuries; insured had standing to bring UCL claim against insurance company]; *Filiti v. USAA Cas. Ins. Co.* (E.D.Cal. June 19, 2007, No. Civ. S-06-2694) 2007 U.S.Dist. LEXIS 44691, *6 [plaintiff alleged that she lost insurance benefits due under her policy which defendant failed to pay when it denied her claim in part]; *Starr-Gordon v. Mass. Mut. Life Ins. Co.* (E.D.Cal., Nov. 6, 2006, No. Civ.S-03-68) 2006 U.S.Dist. LEXIS 83110, *1, *18-19] [plaintiff challenged the process by which defendant terminated her disability benefits]).

Unlike the plaintiffs in the foregoing cases, here, Freeman has [*44] not suffered any in-

jury in fact. He has not been required to pay any money out of his own pocket (other than the cost of driving to the store), he has not lost money or property, and he has not been denied any money that he can alleged is rightfully his.

In reaching my decision, I have taken a basic approach of using the dictionary definitions of "injury," "loss," and "injury in fact." (*MacKinnon v. Truck Ins. Exchange* (2003) 31 Cal.4th 635, 649 [while not binding, dictionary definitions can be useful in an analysis].) An "injury" is "an act that damages, harms, or hurts[;] . . . a violation of another's rights for which the law allows an action to recover damages or specific property or both[;] an actionable wrong." (Webster's 3d New Internat. Dict. (1993) p. 1164.) An "injury in fact" is "[a]n actual or imminent invasion of a legally protected interest, in contrast to an invasion that is conjectural or hypothetical." (Black's Law Dict. (8th ed. 2004) p. 801.) To "lose" is "to suffer deprivation of." (Webster's 3d New Internat. Dict., *supra*, at p. 1338.) A "loss" is "[a]n undesirable outcome of a risk; the disappearance or diminution of value, usu. in an unexpected or relatively unpredictable [*45] way." (Black's Law Dict., *supra*, at p. 963.)

Freeman's expenditures do not conform to this definition. Instead, they represent expectancy costs incurred in the normal course of shopping for a desired product. Whether or not such costs are characterized as a "loss" of money and time, as opposed to money and time well spent, is contingent upon whether a consumer actually buys the product being sought. When a consumer enters a store in response to an advertisement, irrespective of whether the advertisement is misleading, there is no guarantee that the advertised product will be purchased. The fact that Freeman left defendant's store empty handed, when the advertised product was available for purchase, is not a sufficient reason to translate the costs incurred while responding to an advertisement into actionable injuries. Moreover, Freeman's costs

were not expended in an "unexpected or relatively unpredictable way," as "loss" is defined in Black's Law Dictionary, *supra*, at page 963.) Rather, they are contingent costs that any consumer must expect to spend in the course of shopping for a product.

Notwithstanding the above, as the majority points out, money expended on gas has qualified as [*46] sufficient injury for purposes of standing in other contexts. (*Aron*, *supra*, 143 Cal.App.4th at pp. 802-803 [plaintiff alleged he was damaged in the amount of excess fuel he was required to purchase when returning a rental truck].) However, the *Aron* case is distinguished from Freeman's because not only did the plaintiff in *Aron* suffer an ascertainable loss, but the defendant also gained an allegedly unfair benefit from the business practice. In *Aron*, the money the plaintiff spent on gas was paid directly to the defendant. In other words, U-Haul gained the excess gas the plaintiff was required to purchase in order to avoid a penalty pursuant to the terms of U-Haul's rental contract. (*Aron*, *supra*, at p. 801.) The holding in *Aron* was not intended to suggest that nominal loss, such as a partial tank of gas, was enough in itself to confer standing. Rather, the minimal losses suffered by the plaintiff in *Aron* also represented a quantifiable sum owed by the defendant to the plaintiff.

Similarly, in cases decided since Proposition 64, irrespective of whether plaintiffs sought restitution or injunctive relief (the two available remedies under section 17203), plaintiffs have established an "injury [*47] in fact" when they alleged not only loss, but also that the defendants had gained something from the act of unfair competition. (*Laster*, *supra*, 407 F. Supp. 2d at p. 1194 [in applying the UCL, the court found sufficient injury in fact alleged by the plaintiffs who were required to pay sales tax on the full retail value of cellular phones which the defendants advertised as free or substantially discounted when purchased with cellular service]; *Monarch*, *supra*, 2006 U.S. Dist.

LEXIS 68850, *1, *2 [UCL standing satisfied by a plaintiff who alleged he paid higher insurance premiums because of the defendant insurer's settlement policies]; *Progressive West*, *supra*, 135 Cal.App.4th at pp. 284-285 [UCL standing satisfied by an insured plaintiff who alleged the defendant asserted its rights to 100 percent recovery of all moneys it pays to its insureds regardless of whether that reimbursement should be denied altogether or partially due to the made-whole rule and the common fund doctrine].) These cases support the proposition that the value of Freeman's standing claim should be measured by defendant's gain and not simply by Freeman's loss. Unlike the defendants in the foregoing cases, defendant [*48] in this case did not make any corresponding gain. In turn, although Freeman may have suffered the same type of loss as the plaintiff in *Aron*, *supra*, 143 Cal.App.4th 796, his personal expenditures for gasoline are not sufficient to establish that he suffered an "injury in fact" absent a showing of any corresponding gain on the part of defendant.

Given the UCL's relaxed liability standards, were this court to read the standing requirements of section 17204 so liberally as to allow Freeman's personal expenditures to qualify as an "injury in fact," private plaintiffs could claim any negligible amount of loss to secure standing. Injuries such as the cost of cellular phone minutes used while calling to inquire about an advertised product or shoe tread lost while walking to a business would be sufficient. This result would render businesses completely vulnerable to frivolous private plaintiff suits by undercutting the very purpose of the Proposition 64 amendment. Clearly, in passing Proposition 64 and enacting changes to the standing rules in section 17204, the electorate intended to *narrow* the category of persons who could sue businesses under the UCL.

In order to effectuate the statute's [*49] purpose, I conclude that a mere loss, monetary or otherwise, is not enough to confer standing.

When a court orders restitution, it orders the defendant to give up his gains to the claimant, as opposed to compensating the claimant for his or her loss. To satisfy the section 17204 "injury in fact" standing requirement, regardless of whether the relief sought is court-ordered restitution or an injunction, the loss suffered must be recoverable. Damages are not recoverable under the UCL (*Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1148) and they should not be sufficient to confer standing. This requirement, without going so far as to imply a transaction is necessary, prescribes that there be at minimum an interaction between the parties in which not only a loss but a gain results.

Under this prescript, a private plaintiff could not seek injunctive relief unless he or she could also recover restitution. However, this is not to say a court is required to order both. Indeed, section 17203 gives the court discretion to make such orders or judgments as may be necessary to prevent unfair competition *or* to restore to any person in interest money or property that has been acquired [*50] by unfair business practices. Furthermore, this rule would not limit the regulation of false or misleading advertising only to circumstances where a consumer has actually been duped, and the business has gained by virtue of the customer's purchase of the advertised product. Such an undesirable consequence would be avoided because the rule is necessarily restricted to actions brought by private plaintiffs, who must satisfy the "injury in fact" requirement under section 17204. It does not impact the power of the Attorney General or any other authorized counsel under section 17204 to bring false advertising suits on behalf of consumers.

Accordingly, in my opinion Freeman I, holding that the complaint for violation of the UCL did not state a cause of action, should be affirmed. Freeman has not demonstrated that he could properly amend his complaint to allege an "injury in fact" as a result of Mattress Gal-

2007 Cal. App. Unpub. LEXIS 9102, *

lery's alleged false or misleading advertisement. For this reason, Freeman cannot amend his complaint to allege facts sufficient to provide him with standing to state a cause of action for violation of the UCL.

Likewise, I find that Freeman II (Super. Ct. No. RIC 415560) should be affirmed. [*51] The trial court did not err in sustaining defendant's demurrer on the ground that Freeman failed to plead adequately the facts supporting his standing to bring his causes of action under the UCL.

## 2. Relaxed Standing Requirements and Broad Relief Options of the CLRA Set a Dangerous Precedent.

While I concur with the majority in regard to the CLRA causes of action, it is important to highlight a potential problem created by this decision. The CLRA provides that, "[a]ny consumer who suffers any damage as a result of the use or employment by any person of a method, act, or practice declared to be unlawful by [Civil Code] Section 1770 may bring an action against that person to recover or obtain [relief] . . . ." (Civ. Code, § 1780, subd. (a).) A cursory reading of Civil Code section 1780 suggests that a plaintiff must allege that the defendant violated the terms of the CLRA, that the plaintiff suffered damage, and that the violation caused the damage. However, as the majority points out, alleging a violation of the CLRA and alleging that a plaintiff suffered "any damage" are one and the same, according to the California Supreme Court. (*Kagan v. Gibraltar Sav. & Loan Assn.* (1984) 35 Cal.3d 582, 593 [*52] (*Kagan*) [holding that plaintiffs who were reimbursed for pecuniary loss could still bring CLRA claims on behalf of a class by merely alleging a violation of their rights under Civil Code section 1770].)

Although the California Supreme Court in *Kagan* stated that suffering "any damage" includes the infringement of any legal right as defined by Civil Code section 1770 (*Kagan,*

*supra,* 35 Cal.3d at p. 593), I would find that there is still room for debate as to what type of damage is sufficient to confer standing. While plaintiffs do not have to allege monetary loss to have standing under the CLRA, they must suffer *some damage as a result of* defendant's conduct. In other words, despite the fact that a plaintiff has alleged a violation of the CLRA, which, according to *Kagan*, would be sufficient to confer standing, the fact that he or she did not sustain any tangible loss precludes him or her from bringing claims. Thus, in my opinion, damage requires something more than a mere allegation of an infringement upon a right protected by Civil Code section 1770.

In addition to the relaxed standing requirements of the CLRA, the relief available under the statute is practically unbounded. Actual damages, [*53] injunctive relief, restitution, punitive damages, and "[a]ny other relief that the court deems proper" are all recoverable under the CLRA. (Civ. Code, § 1780, subd. (a).) Although I advocate my opinion, I recognize that this court is bound by *Kagan*. Therefore, I agree with the majority's determination that Freeman has standing to bring his claim for compensatory damages under the CLRA. Nonetheless, he is prevented from doing so because of his procedural failings.

The implications of this decision set a dangerous precedent. Freeman's procedural errors (failure to give proper notice) have limited him to injunctive relief under the CLRA. However, had he followed the procedural steps correctly, the CLRA provides no parameters on the type of damage that must be suffered to confer standing or on the type of relief that can be sought. Given the majority's interpretation of the CLRA, a plaintiff need only allege a violation of any of the 23 provisions of Civil Code section 1770 to attain standing. Once a plaintiff satisfies this low standing threshold, he is then entitled to seek a wide array of available relief. Judges or juries may eventually dismiss merit-

less claims, but not before wasting [*54] precious judicial resources.

By allowing a plaintiff who alleges unfair business practices to secure standing under the CLRA, we begin down a slippery slope. The California Supreme Court in *Kagan* seems to have obliterated the meaning of the phrase "suffers any damage as a result of" in the CLRA standing requirements. (*Kagan*, *supra*, 35 Cal.3d at pp. 590, 593; Civ. Code, § 1780, subd. (a).) In so doing, our high court has inhibited the judiciary from applying a meaningful limit on the damage and causation requirements of the CLRA. Because alleging a violation, suffering damage, and alleging causation have all been rolled into one requirement (*Kagan*, *supra*, 35 Cal.3d at p. 593*)*, courts are left asking, "Is there any limit on the damages that are sufficient to confer standing under the CLRA?" If gas money is sufficient, then why not wear and tear on one's tires? What about loss of time? Why not something as intangible as an alleged violation of Civil Code section 1770? The term "any damage" admittedly sounds limitless. However, if a court is forced to allow a mere allegation of unfair business practices to satisfy the "any damage" standing requirement of the CLRA, the judiciary of this [*55] state should brace itself for the imminent flood of litigation. At some point, the maxim of "the law disregards trifles" must be applied to limit the "any damage" requirement of the CLRA. (*Harris v. Time, Inc.* (1987) 191 Cal.App. 3d 449, 458 [holding that a suit for damages based on being forced to open junk mail is frivolous litigation and not a sufficient cause of action].)

The majority's view of the CLRA makes it difficult to maintain the necessary balance between insulating consumers from unfair business practices and protecting businesses against frivolous suits. A minimal standing requirement (a mere allegation of a violation of Civil Code section 1770), vast relief options, and a huge pool of potential litigants create a recipe for judicial disaster.

### 3. Several Issues Remain Unsolved to Date.

If Freeman's surviving claims move forward, several unresolved issues remain. First, it is yet to be determined whether the advertisements used by Mattress Gallery were false in any way. A determination of this question would impact both the UCL and the CLRA claims. Mattress Gallery's advertisements claimed that "goofed" mattresses were for sale at heavily reduced prices. The record does not [*56] indicate that the store was "[a]dvertising goods or services with intent not to sell them as advertised" or "[m]aking false or misleading statements of fact concerning reasons for, existence of, or amounts of price reductions." (Civ. Code, § 1770, subds. (a)(9) & (13).) In fact, the store seemed willing to sell the "goofed" mattresses and simply warned that the imperfections made the bed an unhealthy choice for daily use. The admitted flaws, Mattress Gallery asserted, would lead to back problems if the mattresses were used for more than a few nights at a time. For this reason, the discounted mattresses were to be used by hotels or in guest rooms, and not for continual nightly use as Freeman desired. The advertisements were clearly meant to draw customers into the store. The store promoted a product that was admittedly imperfect and had a limited use. Whether Mattress Gallery's failure to state that limited use in the advertisements rises to the level of false or misleading advertising under the UCL or CLRA is a question for a finder of fact. "Whether a particular inference can be drawn from certain evidence is a question of law, but whether the inference shall be drawn, in any given [*57] case, is a question of fact for the jury." (*Black v. Coffin* (1942) 20 Cal.2d 457, 461.)

Another issue that is yet to be determined is whether the alleged harm to Freeman could have been reasonably avoided. A determination

2007 Cal. App. Unpub. LEXIS 9102, *

of this question would affect the UCL claims in particular. An injury that can be reasonably avoided by the harmed individual is not recoverable under the UCL. (See *Camacho v. Automobile Club of Southern California* (2006) 142 Cal.App.4th 1394, 1403.) Whether a phone call or the application of common sense could reasonably have avoided the unnecessary sojourns that required nearly $800 worth of gas is another question for the fact finder. This Court has already concluded that Freeman cannot collect for these damages under the UCL or CLRA. If there were an additional finding that Freeman could have reasonably avoided the alleged harm, he would be stripped of his UCL standing. (*Ibid.*)

Finally, the possibility that the California Supreme Court will require a transaction for standing under the UCL is another unresolved issue that could affect this case. (See *Pfizer Inc. v. Superior Court* (2006) 141 Cal.App.4th 290, review granted November 1, 2006, S145775.) Should the Supreme  [*58] Court decide to interpret Proposition 64 as adding such a requirement, Freeman's UCL claims would lack standing on grounds other than those already cited in my dissent. In other words, aside from the contention that Freeman did not suffer an "injury in fact," his UCL claims could be dismissed for lack of a transaction.

Many, if not all, of these issues will need to be addressed as Freeman's surviving claims move forward.

HOLLENHORST

J.

LEXSEE 2002 OCC CB LEXIS 16


Comptroller of the Currency
Washington, DC 20219


OCC ADVISORY LETTER


AL 2002-3


*2002 OCC CB LEXIS 16*


March 22, 2002

 [*1]
Guidance on Unfair or Deceptive Acts or Practices


**TO:** Chief Executive Officers of All National Banks and National Bank Operating Subsidiaries, Department and Division Heads, and All Examining Personnel.

**PURPOSE**

The Office of the Comptroller of the Currency (OCC) is issuing this advisory letter to inform national banks and their operating subsidiaries about the risks present in engaging in lending and marketing practices that may constitute unfair or deceptive acts or practices and to help national banks avoid being placed in jeopardy of penalties, judgments, and harm to their reputations that can result from such practices. The OCC may become aware of issues regarding unfair or deceptive acts or practices during the course of a regular safety and soundness or compliance examination, through consumer complaints, or through referrals from state agencies.

Generally, a deceptive act or practice involves a representation or omission that is likely to mislead a reasonable consumer in some material way. Whether particular conduct constitutes an unfair act or practice would depend on the particular facts and circumstances presented, but generally would involve acts or practices [*2] that are unscrupulous, unconscionable, or contrary to public policy, and that harm consumers.

The consequences of engaging in practices that may be unfair or deceptive under federal or state law can include litigation, enforcement actions, monetary judgments, and harm to the institution's reputation. The OCC is issuing this guidance to assist national banks to ensure that management and staff throughout their organizations are aware of these significant risks and of the practices that could place the bank in any jeopardy of liability or other adverse consequences. Therefore, this advisory letter provides detailed guidance to help OCC-supervised institutions avoid such practices,

and also describes the type of activities that pose the greatest risk of being viewed as unfair or deceptive. The advisory:

. Describes applicable legal standards the OCC uses to evaluate whether an act or practice violates applicable law prohibiting unfair or deceptive acts or practices;

. Provides general guidance on the types of activities that examiners should scrutinize;

. Describes other laws that may be implicated in connection with a supervisory review for unfair or deceptive acts or practices;  [*3]  and

. Provides guidance on how banks and their operating subsidiaries can prevent reputation, compliance, and legal risks posed by certain practices.

## BACKGROUND

One consequence of increasing competition among lenders has been the aggressive marketing of various forms of secured and unsecured consumer credit, along with credit-related products. Often this marketing takes place through large direct mail and telemarketing campaigns. Advances in information technology, increased access to information on customers, and sophisticated use of credit bureau information have fueled the rise of "preapproved" solicitations for credit cards and other consumer credit. These efforts have been enhanced by amendments to the Fair Credit Reporting Act that loosened restrictions on obtaining prescreened mailing lists from credit reporting agencies that are used in this form of targeted marketing. Finally, banks and their subsidiaries also increasingly rely on independent agents, such as telemarketers, to market and offer services on behalf of the bank or subsidiary. n1

> n1 The OCC will treat arrangements in which a third party provides services on behalf of the bank, including marketing services, to bank customers as subject to the provisions of the Bank Service Company Act, *12 USC 1867*(c). Therefore, the OCC has authority to examine the performance of these services by the third party to the same extent as if the bank itself were performing the services on its own premises. Such examinations would evaluate potential supervisory and reputation risks and compliance with applicable law, including prohibitions on engaging in unfair or deceptive acts or practices. Pursuant to 12 CFR 8.6(a), the OCC may assess a national bank a special examination or investigation fee when the OCC examines or investigates the activities of a third-party service provider.

 [*4]
The OCC has found that these developments create increased risk that the institution may engage in practices, including unfair or deceptive acts or practices, that cause customer dissatisfaction, harm to the company's reputation, and even litigation and government enforcement actions. Engaging in practices that harm customer relations can undermine the institution's reputation and its ability to retain customers. The OCC encourages national banks and their operating subsidiaries to review their practices to guard against activities that pose risks of the sort described in this advisory or that could undermine customer trust in the institution, and to take corrective action where needed.

2002 OCC CB LEXIS 16, *

## COMPLIANCE AND LEGAL RISKS

Banks and their operating subsidiaries should exercise diligence to ensure that, in marketing their products and services, they avoid violating applicable standards concerning unfair or deceptive acts or practices. Failure to comply with statutory and regulatory requirements may lead to administrative actions, including enforcement actions to address violations and to ensure appropriate corrective action; lawsuits; and civil penalties.

### Key Statutory and Regulatory  [*5]   Standards

Federal Trade Commission Act Prohibitions on Unfair or Deceptive Acts or Practices

Unfair or deceptive acts or practices are unlawful under federal and State law. n2 Section 5 of the Federal Trade Commission Act (FTC Act), *15 USC 45*(a)(1), prohibits "unfair or deceptive acts or practices in or affecting commerce." Under section 8 of the Federal Deposit Insurance Act, *12 USC 1818,* the OCC may take appropriate enforcement actions against national banks and their subsidiaries for violations of *any* law or regulation, which necessarily includes section 5 of the FTC Act. n3 Certain unfair or deceptive acts or practices by banks and their subsidiaries have been specifically prohibited by regulation. Other acts or practices may be determined to be unfair or deceptive on a case-by-case basis, under the standards set forth in the FTC Act. *Section 5 of the Federal Trade Commission Act*

   n2 A number of state laws prohibit unfair or deceptive acts or practices, and such laws may be applicable to insured depository institutions. *See, e.g.*, Cal. Bus. Prof. Code 17200 *et seq.* and 17500 *et seq.* Operating subsidiaries, which operate effectively as divisions or departments of their parent national bank, also may be subject to such state laws. Congress explicitly acknowledged that national bank operating subsidiaries engage "solely in activities that national banks are permitted to engage in directly and are conducted subject to the same terms and conditions that govern the conduct of such activities by national banks." *12 USC 24a*(g)(3). Pursuant to 12 CFR 7.4006, state laws apply to national bank operating subsidiaries to the same extent that those laws apply to the parent national bank, unless otherwise provided by federal law or OCC regulation. The OCC has authority under, *inter alia, 12 USC 1818*(b)(3), 12 CFR 5.34(e)(3), and *12 USC 484* to enforce state laws against national bank operating subsidiaries.
   [*6]

   n3 *See 12 USC 1818.*

. Deceptive acts or practices.

2002 OCC CB LEXIS 16, *

Practices may be found to be *deceptive* and thereby unlawful under section 5 of the Federal Trade Commission Act (FTC Act) if the following three factors, derived from principles applied by the Federal Trade Commission, are present: n4

-- There is a representation, omission, act or practice that is likely to mislead.

> Practices that can be misleading or deceptive include false oral and written representations; misleading claims about costs of services or products; use of bait-and-switch techniques; and failure to provide promised services or products. For example, there is an implied representation that a product or service is fit for the purposes for which it is sold or marketed. In addition, the focus of this inquiry is on whether a practice is *likely to* mislead, rather than on whether it actually misleads. The OCC will consider the entire advertisement, transaction, or course of dealing in determining whether practices are misleading.

-- The act or practice would be deceptive from the perspective of a reasonable consumer.

> The totality of the circumstances and [*7] the net impression that is made will be evaluated in making this determination. Failure to provide information also may be a deceptive act or practice and will be evaluated from the perspective of whether a reasonable consumer is likely to have been misled by the omission. A consumer's reaction to an act or practice may be reasonable even if it is not the only reaction that a consumer might have. For example, if marketing conveys more than one meaning to reasonable consumers, one of which is false, it may be deceptive. In addition, an interpretation may be reasonable even if not shared by the majority of consumers who received the marketing. Thus, a practice that misleads a significant minority of consumers may be deceptive. In addition, the OCC will evaluate the act or practice from the perspective of any specific audience to which it was targeted or which was reasonably foreseeable.

> Depending on the circumstances, subsequent written disclosures containing accurate information about the benefits or material limitations of a product or service may be insufficient to correct a misleading representation. For example, a misleading representation *may not* have been corrected if the [*8] consumer is directed away from the importance of language that qualifies or contradicts the prior representation or if it is unreasonable to expect that a consumer will read the entire document containing the qualifying language. Generally, the OCC does not view a disclosure as unfair or deceptive simply because material information is contained in "fine print." However, information in fine print may be insufficient to

2002 OCC CB LEXIS 16, *

modify a statement, made conspicuously elsewhere in the communication, that would be false or misleading without that modification. This could cause the communication as a whole to be deceptive in violation of the FTC Act.

-- The representation, omission, act, or practice is material.

A material misrepresentation or practice is one that is likely to affect a consumer's choice or conduct concerning a product or service. Consumer injury is likely if inaccurate or omitted information is important to the consumer's decision. Generally, information about costs, benefits, or significant limitations related to the product or service would be material.

n4 These principles are derived from the Policy Statement on Deception, issued by the Federal Trade Commission on October 14, 1983.

[*9]
. Unfair acts or practices.

A practice may be found to be *unfair* and thereby unlawful under section 5 of the FTC Act if: n5

-- The practice causes substantial consumer injury.

Generally, monetary harm, such as when a consumer pays a fee or interest charge, or incurs other similar costs to obtain a bank product or service as a result of an unfair practice, will be deemed to involve substantial injury. An injury may also be substantial if it does a small harm to a large number of consumers or if it raises a significant risk of specific harm.

-- The injury is not outweighed by benefits to the consumer or to competition.

To be unfair, a practice must be injurious in its net effects. Generally, an analysis of the net effects includes not only the costs and harm to the consumer, but also consideration of the costs and regulatory burdens to banks, and the potential restrictions on competition and the availability of credit that may result from a finding of unfairness.

2002 OCC CB LEXIS 16, *

-- The injury caused by the practice is one that consumers could not reasonably have avoided.

> For example, the injury could reasonably have been avoided if the consumer had sufficient information [*10] to make an informed choice. The OCC will not find a practice unfair solely on the grounds that a consumer could have obtained a more appropriate or satisfactory product or service elsewhere. Rather, consumer harm caused by a practice that is coercive or that otherwise effectively inhibits the consumer from making an informed choice would be considered not reasonably avoidable.

Established public policies may be considered as evidence, to be considered with all other evidence, in determining whether an act or practice is unfair. Such public policy considerations may not, however, serve as a primary basis for such a determination.

> n5 These principles are derived from the Policy Statement on Unfairness, issued by the Federal Trade Commission on December 17, 1980.

. Examples of practices that may violate the FTC Act.

The OCC has taken enforcement action in situations where it concluded that a national bank's practices were deceptive. In each instance, the practice at issue involved a representation or omission about a material aspect of a product or service that was misleading, including:

-- Failure to provide sufficient information to allow consumers to understand [*11] the terms of the product or service being offered without being misled.

> The OCC concluded that materials used to market a credit product misled consumers because they suggested particular features and benefits that did not in fact apply to the credit product the consumers received.

-- Failure to adequately disclose when significant fees or similar material prerequisites applied in order to obtain the particular product or service being offered.

> The OCC concluded that consumers were misled when they were offered a credit product on which a fee was imposed and were not made aware that the fee would attach until after they accepted the product.

-- Failure to adequately disclose material limitations affecting the product or service being offered.

> The OCC concluded that consumers were misled by materials used to market a credit-related product that did not disclose that numerous exceptions applied to the material benefits that were promised.

Relation to Other Laws

A number of specific compliance laws may also apply to practices that are unfair or deceptive. The following describes some of the related issues that can arise under certain compliance laws:

[*12] . Truth in Lending Act

> Under the Truth in Lending Act (TILA) and Regulation Z, a creditor that extends consumer credit must make certain disclosures "clearly and conspicuously" that describe the cost and terms of that credit. Depending upon the totality of the circumstances, failure to comply with certain TILA provisions may also involve conduct that constitutes an unlawful, unfair, or deceptive act or practice. Moreover, depending upon the totality of the circumstances, an institution may be engaged in unfair or deceptive acts or practices for marketing or other practices even if the transaction is otherwise in technical compliance with applicable TILA and Regulation Z provisions. For example, advertising a "guaranteed" or "lifetime" interest rate could be misleading when the institution makes the representation despite an intention to increase the rate. Such an institution could face reputation or litigation risks if consumers are not provided information that the institution may unilaterally change the contract terms -- *whether or not* the institution's disclosure of a fixed interest rate satisfies the technical requirements of TILA.

. Equal Credit Opportunity Act

> [*13]
> The Equal Credit Opportunity Act (ECOA) and Regulation B prohibit discrimination in any aspect of a credit transaction against persons on the basis of race, color, religion, national origin, sex, marital status, age, and the fact that an applicant's income derives from any public assistance program. Depending upon the totality of the circumstances, an institution that engages in unfair or deceptive acts or practices may also violate the Equal Credit Opportunity Act (ECOA) -- particularly if such acts or practices affect or are targeted at consumers based on their age, race, gender or other prohibited factor.

2002 OCC CB LEXIS 16, *

. Privacy Regulations

12 CFR 40, the OCC's regulations implementing Title V of the Gramm-Leach-Bliley Act (Privacy regulations), among other things, prohibit the disclosure to a nonaffiliated third party, other than to a consumer reporting agency, of an account number or similar access code for a credit card, deposit, or transaction account of a consumer for use in marketing. n6

Depending upon the totality of the circumstances, an institution that does not comply with these requirements may be also engaging in unfair or deceptive acts or practices -- for example, in [*14] connection with the unlawful disclosure of account numbers in connection with marketing of a third party's products or services.

n6 See OCC Interpretive Letter 910.

. Fair Debt Collection Practices Act

The Fair Debt Collection Practices Act (FDCPA) prohibits unfair, deceptive, and abusive practices related to collection of consumer debts. Although the bank itself may not be subject to the FDCPA when a third party collects debts on its behalf, it nevertheless faces reputation risk -- and potential legal risk for approving or assisting in an unfair or deceptive act or practice in violation of the FTC Act -- if the third party violates the FDCPA by engaging in deception, harassment, or threats in the collection of the bank's loans.

**GUIDELINES FOR MANAGING RISK**

The following general guidelines illustrate the types of actions that could be taken by bank management to manage the risks identified in this advisory letter and to improve consumer information and customer service:

. Verify that information provided to consumers is complete and accurate and is not likely to mislead or deceive a reasonable consumer. This includes a review to ensure that customers receiving [*15] the information can reasonably be expected to understand the information about products or services -- including any material limitations -- without having to do "detective" work.

. Avoid the use of claims such as "guaranteed," "pre-approved," and "lifetime rates," if there is a significant possibility that consumers will not receive the terms that have been advertised, and this possibility is not described adequately.

. Provide a clear, up-front disclosure of any contract provision that permits a change in the terms of the products or services that are offered.

. Avoid engaging in promotions of a product or service that highlight a particular benefit, if that benefit will be negated by another aspect of the transaction. For example, a product should not be promoted as having "no annual fees" if the product requires the consumer to pay annual premiums for another linked product, such as mandatory credit life insurance, or if the agreement would permit imposition of such a fee at any time, and this possibility is not described adequately.

. Review telemarketing scripts used to market products to bank customers for accuracy and to ensure that they fairly and adequately describe [*16] the terms, benefits, and material limitations of the product or service being offered.

. Clearly notify consumers in connection with "free trial periods" for services -- at the time of an initial solicitation and subsequently -- if the consumer will be required to affirmatively act to cancel the service at the end of the trial period to avoid being billed for service past the trial period. Get clear and affirmative consent to terms and billing arrangements.

. Follow the guidance relating to due diligence in selecting a third-party vendor, monitoring vendor performance, and maintaining proper documentation about vendor management in OCC Advisory Letter 2000-9, "Third Party Risk," issued August 29, 2000, and in OCC Bulletin 2001-47, "Third Party Relationships," issued November 1, 2001. Appropriate due diligence includes a review of the competence and business practices of the third party, as well as the financial capacity of the third party.

. Ensure that contractual arrangements with third-party service providers protect the bank against risk. For example, a bank should carefully consider whether a contract with a telemarketer contains any financial incentive that could lead [*17] the telemarketer to mislead consumers. As another example, if a telemarketer's compensation is based on initial sales, and is unaffected by whether a consumer subsequently cancels the product or service, the telemarketer may have an incentive to mislead the consumer regarding the nature or benefits of the product or service.

. Ensure that promotional or other information in a solicitation or other communication does not conflict with or contradict required consumer disclosures, such as TILA and Privacy notices. Such conflict or contradiction could result in the disclosures not being "clear and conspicuous," as required by those laws, as well as the communication as a whole being deceptive in violation of the FTC Act.

. Institute appropriate procedures to ensure that consumer complaints and other communications are reviewed for indications that the institution's marketing or solicitations might have misled a consumer.

2002 OCC CB LEXIS 16, *

. Maintain procedures that ensure that payments are promptly posted.

. Monitor loan collection activities, including collection calls, of any third party on be-
half of the institution.

Questions concerning this advisory letter may be directed to the Community [*18]  and Consumer
Law Division at (202) 874-5750, or the appropriate supervisory office.

Julie L. Williams
First Senior Deputy Comptroller and Chief Counsel

Emory W. Rushton
Senior Deputy Comptroller and Chief National Bank Examiner