1  STROOCK & STROOCK & LAVAN LLP
2  JULIA B. STRICKLAND (State Bar No. 083013)
   STEPHEN J. NEWMAN (State Bar No. 181570)
3  2029 Century Park East, Suite 1800
   Los Angeles, California  90067-3086
4  Telephone: 310-556-5800
   Facsimile: 310-556-5959
5  lacalendar@stroock.com

6  Attorneys for Defendants
7    CHASE BANK USA, N.A.,
     erroneously sued as CHASE
8    MANHATTAN BANK USA,
     N.A., and JPMORGAN CHASE & CO.
9

10              **UNITED STATES DISTRICT COURT**

11             **NORTHERN DISTRICT OF CALIFORNIA**

12

13  DAVID J. LEE and DANIEL R.          )  **Case No. CV-07-4732  MJJ**
    LLOYD, individually and on behalf of )
14  all others similarly situated,       )
                                         )  THE HON. MARTIN J. JENKINS
15           Plaintiffs,                 )
                                         )  **REPLY BRIEF IN SUPPORT OF**
16       vs.                             )  **DEFENDANTS' MOTION TO**
                                         )  **DISMISS**
17  CHASE MANHATTAN BANK U.S.A., )
18  N.A., a Delaware corporation, CHASE )  DATE:   December 4, 2007
    MANHATTAN BANK U.S.A., N.A.   )  TIME:   9:30 a.m.
19  d.b.a. CHASE BANK U.S.A., N.A.,  )  PLACE:  Courtroom 11
    JPMORGAN CHASE & CO., a        )           19th Floor
20  Delaware corporation; and DOES 1 )           450 Golden Gate Ave.
    through 100, inclusive,          )           San Francisco, CA 94102
21                                       )
22           Defendants.               )
                                         )
23                                       )
                                         )
24  _____ )

25

26

27

28

LA 51011227v3

1

## <u>TABLE OF CONTENTS</u>

2

<u>Page</u>

3

I.  INTRODUCTION AND SUMMARY OF ARGUMENT....................................... 1

4

II.  ARGUMENT ........................................................................................................ 2

5

6
     A.    Plaintiffs Have Not Met Their Burden Of Showing That They Have Standing To Maintain This Action ................................................. 2

7
     B.    Plaintiffs Fail To State A Claim Under the CLRA ................................. 8

8
     C.    The Complaint Does Not Meet The Specificity Requirements Of Federal Rule of Civil Procedure 9(b) ..................................................... 12

9

10
     D.    All Of Plaintiffs' Claims Are Barred By The Statute of Limitations .............................................................................................. 13

11

12
     E.    Plaintiffs' Claims Are Preempted By The National Bank Act. ............. 15

13
          1.    Plaintiffs' State-Law Claims Are Preempted Under 12 C.F.R. § 7.4008(d)(2)................................................................ 15

14

15
          2.    Plaintiffs' Argument That Defendant JPMorgan Chase & Co. Is Not Entitled To The Benefit Of Preemption Is Frivolous .................................................................................... 20

16

III.  CONCLUSION .................................................................................................. 21

17

18

19

20

21

22

23

24

25

26

27

28

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East, Suite 1800
Los Angeles, California 90067-3086

LA 51011227v3

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East, Suite 1800
Los Angeles, California 90067–3086

# **TABLE OF AUTHORITIES**

**Page(s)**

## **CASES**

In re Ameriquest Mortgage,
No. 05-CV-7097, 2007 WL 1202544 (N.D. Ill. Apr. 23, 2007) ..................10

Austin v. Provident Bank, No. Civ.A.4:04 CV 33 P B,
2005 WL 1785285 (N.D. Miss. July 26, 2005)......................................18, 19

Barnett Bank v. Nelson,
517 U.S. 25, 116 S. Ct. 1103, 134 L. Ed. 2d 237 (1996) ............................17

Beneficial National Bank v. Anderson,
539 U.S. 1, 123 S. Ct. 2058, 156 L. Ed. 2d 1 (2003) .................................16

Berry v. American Express Publishing, Inc.,
147 Cal. App. 4th 224, 54 Cal. Rptr. 3d 91 (2007) ........................ 1, 8-10, 17

Berryman v. Merit Property Management, Inc.,
152 Cal. App. 4th 1544, 62 Cal. Rptr. 3d 177 (2007) ..................................11

Binetti v. Washington Mutual Bank,
446 F. Supp. 2d 217 (S.D.N.Y. 2006) .........................................................17

Board of Trade v. Commodity Futures Trading Cmm'n,
704 F.2d 929 (7th Cir. 1983) .........................................................................3

Bowen v. First Family Finance Services,
233 F.3d 1331 (11th Cir. 2000) .....................................................................4

Civil Services Employees Insurance Co. v. Superior Court of San Francisco,
22 Cal. 3d 362, 149 Cal. Rptr. 360 (1978) ..................................................11

Colbert v. City of Cleveland,
99 Ohio St. 3d 215, 790 N.E.2d 781 (2003)..................................................15

Daghlian v. DeVry University, Inc.,
461 F. Supp. 2d 1121 (C.D. Cal. 2006)......................................................4, 7

Davis v. Chase Bank U.S.A., N.A., et al.,
Case No. CV 06-04804 DDP (PJWx) (C.D. Cal.) ..........................................8

Edwards v. Marin Park, Inc.,
356 F.3d 1058 (9th Cir. 2004) .....................................................................12

LA 51011227v3

Flintkote Co. v. General Acc. Assur. Co. of Canada,
    480 F. Supp. 2d 1167 (N.D. Cal. 2007) ..........................................................14

Franklin National Bank v. New York,
    347 U.S. 373, 74 S. Ct. 550, 98 L. Ed. 767 (1954) ......................................17

Freeman v. Mattress Gallery,
    Nos. E039614, E039615, 2007 WL 3300717 (Cal. Ct. App. Nov. 8,
    2007) .................................................................................................................4

Hernandez v. Hilltop Financial Mortg., Inc., No. C 06-7401 SI,
    2007 WL 3101250 (N.D. Cal. Oct. 22, 2007) ..........................................10, 11

Hitz v. First Interstate Bank,
    38 Cal. App. 4th 274, 44 Cal. Rptr. 2d 890 (1995) ......................................10

Hogar Dulce Hogar v. Community Development Commission,
    110 Cal. App. 4th 1288, 2 Cal. Rptr. 3d 497 (2003) ....................................14

In Re Late Fee And Over-Limit Fee Litigation,
    No. C 07-0634 SBA (N.D. Cal. Nov. 16, 2007) .......................................8, 19

Jefferson v. Chase Home Finance LLC,
    2007 WL 1302984 (N.D. Cal. May 3, 2007) ..........................................10, 11

Lozano v. AT&T Wireless Services, Inc.,
    Nos. 05-56466, 05-56511, 2007 WL 2728758 (9th Cir. 2007) ................. 4-7

Kagan v. Gibraltar Sav. Loan Assn.,
    35 Cal. 3d 582 (1984) .......................................................................................4

Mass. Mutual Life Insurance Co. v. Super. Ct.,
    97 Cal. App. 4th 1282, 119 Cal. Rptr. 2d 190 (2002) ..................................13

McKell v. Washington Mutual, Inc.,
    142 Cal. App. 4th 1457, 49 Cal. Rptr. 3d 227 (2006) ..................................11

People v. Arnold,
    145 Cal. App. 4th 1408, 52 Cal. Rptr. 3d 545 (2006) ..................................15

People v. Wesson,
    138 Cal. App. 4th 959, 41 Cal. Rptr. 3d 883 (2006) ....................................15

Posern v. Prudential Securities, Inc.,
    No. C-03-0507 SC, 2004 WL 771399 at *8 (N.D. Cal. Feb. 18, 2004)..........4

Ruckelshaus v. Monsanto Co.,
    467 U.S. 986, 104 S. Ct. 2862 (1984) ..............................................................3

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East, Suite 1800
Los Angeles, California 90067-3086

- iii -

Ryman v. Sears, Roebuck and Co.,
    No. 06-35630 (9th Cir. Oct. 12, 2007) ..............................................................9

SPGGC, LLC v. Blumenthal,
    No. 05-4711 (2d Cir. Oct. 19, 2007) ...............................................................18

Smiley v. Citibank (South Dakota), N.A.,
    517 U.S. 735, 116 S. Ct. 1730, 135 L. Ed. 2d 25 (1996) ......................16, 18

State ex rel. Metz v. CCC Information Services, Inc.,
    149 Cal. App. 4th 402, 57 Cal. Rptr. 3d 156 (2007) ....................................14

Tamplenizza v. Josephthal & Co., Inc.,
    32 F. Supp. 2d 702 (S.D.N.Y. 1999) ...............................................................3

Television Adventure Films Corp. v. KCOP Television, Inc.,
    249 Cal. App. 2d 268, 57 Cal. Rptr. 526 (1967) ..........................................13

Walton v. Mead, No. C 03-4921 CRB,
    2004 WL 2415037 (N.D. Cal. Oct. 28, 2004) ...............................................12

Watters v. Wachovia Bank, N.A.,
    127 S. Ct. 1559, 167 L. Ed. 2d 389 (2007) ............................................. 18-20

Wilens v. TD Waterhouse Group, Inc.,
    120 Cal. App. 4th 746, 15 Cal. Rptr. 3d 271 (2003) ......................................5

## **STATUTES**

12 C.F.R. § 7.4001 ......................................................................................................16

12 C.F.R. § 7.4008(d)(2).......................................................................... 1, 14-18

California Civil Code § 1770(a)(19)...................................................5, 6, 9, 10

## **RULES**

California Rules of Court, Rule 8.1115 ....................................................................4

Federal Rule of Civil Procedure 9(b)........................................................................12

LA 51011227v3

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East, Suite 1800
Los Angeles, California 90067-3086

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East, Suite 1800
Los Angeles, California 90067–3086

## I.    INTRODUCTION AND SUMMARY OF ARGUMENT

Plaintiffs[1] do not allege that they have ever attempted to arbitrate a dispute with Chase over their Agreements, or that they were forced to arbitrate against their will or under unfair conditions.  They merely assert that some day they may want to enforce the arbitration provision, but to date they have not taken any steps to do so.  Thus, Plaintiffs' alleged injury lies in the future, if at all, and cannot meet the requirements of concreteness and immediacy for Plaintiffs to have standing under Article III of the United States Constitution, the California Unfair Competition Law, the California Consumers Legal Remedies Act, or for the fraud claim.  All claims, therefore, are barred for lack of standing.

The CLRA claim also is barred under Berry v. American Express Publishing, Inc., 147 Cal. App. 4th 224, 54 Cal. Rptr. 3d 91 (2007).  Plaintiffs' novel and unsupported notion that a "convenience service" is a "service" under the CLRA is a transparent attempt to eviscerate the Berry decision, which is the controlling case on the inapplicability of the CLRA to "money or credit."  Plaintiffs are unable to cite a single CLRA case in support of their argument that the CLRA regulates the terms and conditions of credit card agreements.  Plaintiffs' desperate attempt to circumvent Berry should be rejected.

Moreover, Plaintiffs are unable to meet the heightened pleading requirements under the Federal Rules for averring fraud.  The "misrepresentations" they allege are based on no more than flimsy legal conclusions and questionable inferences.  Plaintiffs do not deny receiving the written agreements stating precisely how the cards function.  They also wholly fail to state the "time, place, and specific content of the false representations" upon which Plaintiffs allegedly relied at the time they obtained their credit cards, and they equally fail to reveal the identities of the makers of the alleged misrepresentations.

---

[1] All terms are used herein as defined in the Motion.

1    Plaintiffs also fail to advance any legitimate basis to overcome the applicable

2   statutes of limitations that apply to their UCL, CLRA and fraud claims.  If there is

3   standing, which Defendants deny, then those claims must have accrued in the late

4   1990s and in 2000, when Plaintiffs received their cards and card agreements.

5   Plaintiffs' admission that they received the cards and the agreements in the late

6   1990s and in 2000 means that they possessed the facts giving rise to their claims long

7   before the filing of the Complaint.  These claims therefore are time-barred.

8    Finally, Plaintiffs fail to show how their claims can survive federal preemption

9   under the National Bank Act.  Plaintiffs' claims are defeated because state law

10   theories may not be used to mount a facial attack on the terms of a national bank's

11   credit card agreement.  By their claims, Plaintiffs attempt to do precisely what the

12   NBA and its regulations forbid.  Plaintiffs' claims against Chase are preempted in

13   their entirety and must be dismissed.

14    The defects in the Complaint are numerous and incurable.  Accordingly, the

15   motion to dismiss should be granted in its entirety, and without leave to amend.

## II.    ARGUMENT

**A.    Plaintiffs Have Not Met Their Burden Of Showing That They Have Standing To Maintain This Action.**

19    Plaintiffs' Opposition does not advance their argument for standing.  Plaintiffs

20   have failed to take their alleged "injury" beyond the realm of hypothetical abstract

21   rights and into the realm of injuries in fact, as required by law.

22    Plaintiffs' own statement of the issue betrays their inability to demonstrate

23   standing.  Plaintiffs state:

24         1.    In paying their annual (or other) fee for their Chase
          cards, Plaintiffs purchased or acquired the contractual right
25         to mandatory arbitration of all claims they had against
          Defendants and the merchants from whom they purchased
26         goods or services with their Chase cards;
27         …

S T R O O C K   &   S T R O O C K   &   L A V A N   L L P
2029 Century Park East, Suite 1800
Los Angeles, California  90067–3086

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East, Suite 1800
Los Angeles, California 90067–3086

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

4.      Plaintiffs want to but cannot, as a matter of law, enforce the unenforceable and illegal arbitration provision in order to exercise the right to mandatory arbitration for which they paid;

5.      Plaintiffs thus got less than that for which they paid—i.e., they did not get the full value of their contract— and, as a result, lost money (the pecuniary value of the contractual right to mandatory arbitration).

Opposition, at 2-3 (citations omitted).

This is the gist of Plaintiffs' argument for standing, and plainly it fails.  The fact that Plaintiffs allegedly "want" to enforce the arbitration provision but supposedly cannot does not state an injury sufficiently concrete and measurable to pass the standing test.  They do not say what, specifically, they do or do not want to arbitrate about.  Nowhere in their Complaint or Opposition do Plaintiffs allege that they have attempted to arbitrate a dispute with Chase over their Agreements, or conversely that they were forced to arbitrate against their will or under unfair conditions.  Plaintiffs' alleged injury, therefore, is <u>purely hypothetical</u>, since they have not shown that they have attempted to vindicate their alleged contractual right to arbitrate and were thwarted.  Abstract injuries of this sort are not legally cognizable injuries.  Plaintiffs' injury is purely hypothetical, based on Plaintiffs' conjectures about what <u>might</u> happen if they were to attempt to arbitrate, or if someone were to attempt to arbitrate against them.

Courts universally reject similar arguments, recognizing that arbitration agreements may not be challenged outside the context of a concrete, specific and substantive dispute.  <u>See</u> <u>Ruckelshaus v. Monsanto Co.</u>, 467 U.S. 986, 1019, 104 S. Ct. 2862 (1984) (no standing where plaintiff  "did not allege or establish that it had been injured by actual arbitration under the statute"); <u>Board of Trade v. Commodity Futures Trading Cmm'n</u>, 704 F.2d 929, 932-34 (7th Cir. 1983) (same); <u>Tamplenizza v. Josephthal & Co., Inc.</u>, 32 F. Supp. 2d 702, 703, 704 (S.D.N.Y. 1999) (refusing to

1    invalidate arbitration provision where no pending or imminent arbitral proceeding);

2    Posern v. Prudential Secs., Inc., No. C-03-0507 SC, 2004 WL 771399 at *8 (N.D.

3    Cal. Feb. 18, 2004) (same); Bowen v. First Family Fin. Servs., 233 F.3d 1331, 1341

4    (11th Cir. 2000) (same).

5        Rather than address the above clear authorities, Plaintiffs stake their claim for

6    standing solely on two cases, Lozano v. AT&T Wireless Services, Inc., Nos. 05-

7    56466, 05-56511, 2007 WL 2728758 (9th Cir. 2007), and Daghlian v. DeVry

8    University, Inc., 461 F. Supp. 2d 1121 (C.D. Cal. 2006).[2]  Neither of these cases are

9    of any help to them.

10       Plaintiff in Lozano is a customer of AT&T who brought a class action based

11   on AT&T's disclosures relating to its billing practices for cellular services.  Lozano

12   asserted various claims, including under the CLRA and UCL.  Lozano based these

13   claims on allegations that AT&T billed its customers for cellular telephone calls

14   during a billing period other than the billing period in which the calls were made, an

15   industry practice known as "out-of-cycle billing."  Lozano contended that by doing

16   this, AT&T assessed charges for cellular telephone calls that would not have been

17   assessed if the calls had been billed during the billing period in which the calls were

18

19   [2] In a footnote, Plaintiffs also cite to Freeman v. Mattress Gallery, Nos. E039614,
     E039615, 2007 WL 3300717 (Cal. Ct. App. Nov. 8, 2007) for the proposition that
20   the mere allegation of a violation of the CLRA confers standing.  Plaintiffs'
     argument is without merit.  First, Freeman is unpublished and noncitable, and
21   therefore has zero persuasive or precedential value.  See Cal. Rules of Court, Rule
     8.1115 ("[A]n opinion of a California Court of Appeal or superior court appellate
22   division that is not certified for publication or ordered published must not be cited or
     relied on by a court or a party in any other action.").  Second, Freeman was wrongly
23   decided.  As Judge Hollenhorst stated in dissent:  "While plaintiffs do not have to
     allege monetary loss to have standing under the CLRA, they must suffer some
24   damage as a result of defendants conduct. In other words, despite the fact that a
     plaintiff has alleged a violation of the CLRA, which, according to [Kagan v.
25   Gibraltar Sav. Loan Assn., 35 Cal. 3d 582 (1984)], would be sufficient to confer
     standing, the fact that he or she did not sustain any tangible loss precludes him or her
26   from bringing claims. Thus, in my opinion, damage requires something more than a
     mere allegation of an infringement upon a right protected by Civil Code section
27   1770."  Id. at *18.

28

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East, Suite 1800
Los Angeles, California 90067-3086

LA 51011227v3

1    made.  AT&T, according to Lozano, did not fully and adequately disclose its billing

2    practices to its customers at the time they entered into contracts with AT&T.

3        Plaintiffs latch on to two quotes from <u>Lozano</u> that, they claim, support their

4    position.  Neither does.  The first is the following:

> Any class certified under subsection (a)(19) necessitates a
> class definition that includes individuals who sought to
> bring class actions in California, but were precluded from
> doing so because of the class action waiver in AWS's
> arbitration agreement, and suffered some resulting damage.
> <u>See</u> <u>Wilens v. TD Waterhouse Group, Inc.</u>, 120 Cal. App.
> 4th 746, 15 Cal. Rptr. 3d 271, 276-77 (2003) (holding a
> court may not presume damages based on the mere
> insertion of an unconscionable clause in a contract).

<u>Lozano</u>, 2007 WL 2728758, at *10.  Plaintiffs desperately try to wring "the requisites

for standing" out of this passage, which (as is facially obvious) deals not with

standing, but rather with the issue of class certification of claims asserted under

California Civil Code section 1770(a)(19), assuming standing already is shown to be

present.  The Plaintiffs, in their eagerness to salvage an argument for standing, have

confused class certification with standing.  In any event, <u>Lozano</u>'s citation to <u>Wilens</u>

supports Defendants' position:  absent pleading and proof of resulting pecuniary

damages, merely inserting an allegedly unconscionable provision in a contract does

not confer standing.

    The issue of standing did arise in <u>Lozano</u> in connection with Plaintiff's UCL

claim, but Plaintiffs fail to address the Court's discussion of it.  The court stated:

> The parties do not dispute that Lozano suffered <u>pecuniary
> loss</u> as a result of his alleged unawareness of AWS's
> [AT&T's] out-of-cycle billing practices. Shortly after
> contracting with AWS for cellular service, <u>Lozano received
> an invoice stating that he had been charged fees</u> as a result
> of out-of-cycle minutes from his previous invoice. The
> record also supports a finding that, during the course of his

<div style="writing-mode: vertical">STROOCK & STROOCK & LAVAN LLP<br>2029 Century Park East, Suite 1800<br>Los Angeles, California 90067–3086</div>

- 5 -

1

2

> contract with AWS, <u>AWS would occasionally charge</u>
> <u>Lozano an overage fee</u> based on out-of-cycle billing.

3

4

<u>Lozano</u>, 2007 WL 2728758, at *11 (emphasis supplied).  The court also based its

finding that Lozano had standing on the fact that "Lozano contracted for 400 free

5

'anytime' minutes.  Yet, due to out-cycle-billing, he reserved, and therefore lost, a

6

certain number of those minutes each billing period to account for the late-billed

7

roaming calls."  <u>Lozano</u>, 2007 WL 2728758, at *12.  Thus, the court found that

8

Lozano, unlike the Plaintiffs here, had standing based on <u>concrete</u>, <u>measurable</u>,

9

<u>pecuniary</u> injuries, namely, he was charged unnecessary fees by AT&T and he lost at

10

least some of his 400 free "anytime" minutes, which had financial value because they

11

needed to be replaced with purchased minutes.  It is this finding as to standing that

12

underlies the <u>Lozano</u> court's treatment of class certification.  Thus, Plaintiffs ignore

13

the discussion of standing in <u>Lozano</u>, and pin their hopes on the court's class

14

definition under California Civil Code section 1770(a)(19).  However, even facially,

15

the passage the Plaintiffs quote does not help their argument because it specifies

16

"individuals who <u>sought</u> to bring class actions in California" (emphasis added).

17

Plaintiffs here fail to allege that they have actually sought arbitration under their

18

Agreements, or that they had arbitration forced upon them on unfair terms.

19

Therefore, they lack standing.

20

      Plaintiffs next cite the following in support of their claim for standing:  "[W]e

21

find that Lozano has properly stated an injury that he did not receive the full value of

22

his contract … and that this injury is redressable under the UCL."  <u>Lozano</u>, 2007 WL

23

2728758 at *13.  However, this is disingenuous.  Plaintiffs neglect to quote the two

24

immediately preceding sentences, which clearly show that the injury in question is

25

both the actual charging of fees and also the loss of some of the 400 free anytime

26

minutes to which Lozano was entitled—again a concrete, measurable injury with

27

concrete, easily measurable economic value by reference to the actual price charged

28

for paid anytime minutes.  The full passage reads as follows:

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East, Suite 1800
Los Angeles, California 90067–3086

- 6 -

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East, Suite 1800
Los Angeles, California 90067–3086

> Here, Lozano has a vested interest in 400 free anytime minutes. Due to out-of-cycle billing, however, Lozano found it necessary to reserve, and therefore lose, a certain number of those minutes each billing period. Accordingly, we find that Lozano has properly stated an injury that he did not receive the full value of his contract with AWS due to its alleged failure to disclose out-of-cycle billing, and that this injury is redressable under the UCL.

Lozano, 2007 WL 2728758, at *13.

Plaintiffs also cite to Daghlian, but it likewise is inapplicable.  In Daghlian, a student brought an action against a private university under the Private Postsecondary and Vocational Education Reform Act and other statutes, alleging that the university failed to inform him that academic units earned at the university probably would not transfer to other educational institutions; in other words, that what was purchased lacked economic value.  Prior to enrolling, Daghlian met with a university recruiter, who represented that the university was an accredited institution where students were able to obtain degrees.  Id. at 1125.  The recruiter told Daghlian that unlike technical colleges that give students certificates that cannot be used toward advanced degrees, academic credits from the university were transferable to a wide variety of other academic institutions, in other words, that what was purchased had specific economic value in the form of tuition dollars that would not need to be paid at the other institution.  Id.  Defendants argued that Daghlian's § 17500 and § 17200 claims must be dismissed because he had not established standing to prosecute the claims as required by Proposition 64.  The court disagreed and found that the fact that the plaintiff incurred $40,000 in educational debt based on the recruiter's promises was sufficient to bestow standing on the plaintiff.  Again, the plaintiff was actually out-of-pocket by reason of a specific disclosure violation.

Daghlian does not support Plaintiffs' position here.  Unlike Plaintiffs, Daghlian's injury was not conjectural:  he was promised an accredited degree with

- 7 -

1    transferable credits but actually received a degree of far less value.  Daghlian's

2    degree, for which he paid, was less valuable than it would have been but for the

3    defendant's misrepresentations.  This is very different from the case here where

4    Plaintiffs' alleged "injury" is to some <u>future</u> right to arbitrate.  Daghlian's injury

5    springs from the education (or perceived education) he received at defendants'

6    university and the concrete symbol of that education, <u>i.e.</u>, the degree.  Plaintiffs'

7    "injury" here, by contrast, is to something hypothetical in the future that has no value

8    until actually exercised.  Therefore, Plaintiffs lack standing to maintain their causes

9    of action under Article III of the Constitution, the UCL, the CLRA or for common-

10    law fraud.[3]

11    **B.    Plaintiffs Fail To State A Claim Under the CLRA.**

12        In their Opposition, Plaintiffs simply seek to re-litigate <u>Berry</u>, a case that is the

13    controlling decision here, as judges of this Court have recognized over and over

14    again, including as recently as Friday, November 16, 2007.[4]  In <u>Berry</u>, the plaintiff

15    _____

16    [3] Plaintiffs claim, without any elaboration, that "Defendants are bound by the final
      order and unappealed order issued in <u>Davis v. Chase Bank U.S.A., N.A., et al.</u>, Case
17    No. CV 06-04804 DDP (PJWx) (C.D. Cal.) (in which all present defendants were
      defendants), that California law is controlling with regards to issues of
18    unconscionability and that, indeed, the arbitration provision is unconscionable as a
      matter of law."  Opposition, at 2 n.2.  First, the order in <u>Davis</u> to which Plaintiffs
19    refer is <u>not</u> final and in fact <u>is</u> under appeal.  Chase and Circuit City Stores, Inc., the
      other defendant in that case, timely appealed on April 19, 2007, and the matter has
20    been assigned Ninth Circuit Case No. 07-55561.  Moreover, the <u>Davis</u> court
      recognized that Chase has a possibility of prevailing in the appellate proceedings,
21    and for that reason stayed all proceedings pending resolution of the appeal, and
      recently denied a motion to lift the stay.  Second, this case and <u>Davis</u> are factually
22    dissimilar, which probably explains why Plaintiffs did not press this argument.
      Plaintiffs here do not have the same kind of credit card as does the Davis plaintiff.
23    The <u>Davis</u> litigation relates to how Chase assesses finance charges on Circuit City
      Rewards Card credit card accounts, which is not an issue in this case at all.  The
24    underlying agreements at issue are completely different in each case, with two of the
      agreements in <u>Davis</u> not having been issued by Chase at all, but instead by
25    predecessor banks who are not parties to the present litigation with Plaintiffs here.
26

27    [4] <u>In Re Late Fee And Over-Limit Fee Litigation</u>, No. C 07-0634 SBA (N.D. Cal.
      Nov. 16, 2007) (order granting motion to dismiss), the court dismissed the plaintiffs'
28    CLRA claims, which were based on allegations that the defendant banks charged

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East, Suite 1800
Los Angeles, California 90067-3086

1    asserted a single cause of action for violation of the CLRA, contending that his credit

2    card agreement contained an allegedly "unconscionable" arbitration agreement in

3    violation of Civil Code section 1770(a)(19):  essentially the same theory asserted

4    here by the same plaintiff counsel.

5        The <u>Berry</u> plaintiff contended that his credit card agreement was subject to the

6    CLRA because a credit card supposedly constitutes a "good" or "service" as defined

7    by Civil Code section 1761.  Following the plain text of the statute, and relying on a

8    close analysis of its legislative history, the <u>Berry</u> court flatly rejected plaintiff's

9    argument, finding that an extension of credit is neither a "good" nor a "service"

10   under the CLRA because the California Legislature intended to exclude transactions

11   for "money or credit" from the CLRA.  The California Supreme Court denied review

12   in <u>Berry</u>, and also denied multiple requests to depublish the opinion.  Plainly, the

13   California courts have construed the CLRA definitively, and federal courts are

14   obliged to apply the same interpretation.  <u>See</u> <u>Ryman v. Sears, Roebuck and Co.</u>,

15   No. 06-35630 (9th Cir. Oct. 12, 2007) (copy attached as Exhibit B).

16       Plaintiffs attempt to circumvent the <u>Berry</u> decision by arguing that when one

17   pays the annual fee for a charge card, for example, one purchases a "convenience

18   service."  Plaintiffs do <u>not</u>, however, say what specific "convenience service" they

19   bargained for was not provided.   Plaintiffs do not address the <u>Berry</u> court's

20   recognition that the California Legislature expressly excluded transactions for

21   "money or credit" from coverage under the CLRA, and that post-<u>Berry</u> rulings read

22   <u>Berry</u> (correctly) to exclude financial services generally from the CLRA.  Plaintiffs'

23   positing of an ill-defined "convenience service" in a transparent attempt to

24   circumvent the inapplicability of the CLRA to extensions of credit cannot stand in

25   light of <u>Berry</u>'s clear holding that an extension of credit is neither a "good" nor a

26   _____

27   excessive late fees and/or over-limit fees, on the ground that credit-card accounts are
     not "goods or services" subject to the CLRA under <u>Berry</u>.  The court noted that

28   "[e]very federal court addressing the issue has followed [the <u>Berry</u>] precedent."  <u>Id.</u>
     at 16.  A copy of the decision is attached hereto as Exhibit A.

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East, Suite 1800
Los Angeles, California 90067-3086

- 9 -

1    "service" under the CLRA.  The use of any plastic card in lieu of cash involves a

2    transaction for "money or credit" that <u>Berry</u> excludes from the CLRA.  Plaintiffs'

3    argument must therefore be rejected.

4        Plaintiffs fail to cite a single case in support of their claim that a "convenience

5    service" is a "service" within the meaning of the CLRA.  There is none.  Plaintiffs

6    extensively quote from <u>Hitz v. First Interstate Bank</u>, 38 Cal. App. 4th 274, 286-87,

7    44 Cal. Rptr. 2d 890 (1995), particularly for the proposition that credit cards may

8    provide not only extensions of credit but also certain convenience features that

9    constitute "services."  However, <u>Hitz</u> is unavailing because it arose in the context of

10   not the CLRA, but a different statute, California Civil Code section 1671, which

11   governs only the enforceability of liquidated damages provisions.  Section 1671 is

12   irrelevant to this litigation.

13       The other cases cited by Plaintiffs in support of their position are from the

14   residential-mortgage context.  <u>Hernandez v. Hilltop Financial Mortg., Inc.</u>, No. C 06-

15   7401 SI, 2007 WL 3101250, at *6 (N.D. Cal. Oct. 22, 2007), is not on point.  In

16   <u>Hernandez</u>, "plaintiffs did not seek just a loan; they sought defendants' services in

17   developing an acceptable refinancing plan by which they could remain in possession

18   of their home.  Thus, unlike in <u>Berry</u>, the situation in the present case involves more

19   than the mere extension of a credit line."  <u>Id.</u>  And unlike the ephemeral

20   "convenience service" Plaintiffs posit, "the circumstances here deal not just with the

21   mortgage loan itself, but also with the services involved in developing, securing and

22   maintaining plaintiffs' loan."  <u>Id.</u>  Similarly unhelpful to Plaintiffs is <u>Jefferson v.</u>

23   <u>Chase Home Finance LLC</u>, 2007 WL 1302984 (N.D. Cal. May 3, 2007).  In

24   <u>Jefferson</u>, the court held that the CLRA applied to certain services connected with

25   mortgages, specifically to a program under which debtors were able to prepay their

26   mortgages without penalty.  However, the claim under the CLRA was not aimed at

27   the extension of credit itself.  Rather, it was directed at the defendant's prepaid

28   mortgage practices, a financial service provided to debtors.  (<u>Jefferson</u> also predated

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East, Suite 1800
Los Angeles, California 90067-3086

the denial of review in <u>Berry</u>.)  Finally, Plaintiffs cite <u>In re Ameriquest Mortgage</u>, No. 05-CV-7097, 2007 WL 1202544, *6 (N.D. Ill. Apr. 23, 2007), for the general proposition that "it is not inconceivable that . . . plaintiffs could prove the existence of tangential 'services' associated with their residential mortgages and establish that these transactions were covered by the CLRA."  Indeed, this is not inconceivable at all, since <u>Jefferson</u> and <u>Hernandez</u>, notably also residential mortgage cases, similarly held that the CLRA may apply where "the circumstances … deal not just with the mortgage loan itself, but also with the services involved in developing, securing and maintaining plaintiffs' loan."  <u>Hernandez</u>, 2007 WL 3101250, at *6.  But the services at issue in these cases are a far cry from a "convenience service."

Plaintiffs also fail to address cases in the mortgage and real estate context where the court found the CLRA inapplicable.  For example, in <u>Berryman v. Merit Property Management, Inc.</u>, 152 Cal. App. 4th 1544, 62 Cal. Rptr. 3d 177 (2007), homeowners filed a putative class and representative action against the managing agent for a homeowners association, alleging violations of the Davis-Stirling Common Interest Development Act, the UCL and CLRA, and other claims.  The homeowners' claims were based on allegations that the agent wrongfully charged homeowners document and transfer fees upon the purchase or sale of homes.  The California Court of Appeal held that the homeowners failed to state a claim against the agent for violations of the CLRA.  Also, in <u>McKell v. Washington Mutual, Inc.</u>, 142 Cal. App. 4th 1457, 49 Cal. Rptr. 3d 227 (2006), the plaintiffs claimed that the defendants overcharged them "for underwriting, tax services, and wire transfer fees in conjunction with home loans."  <u>Id.</u> at 1465.  Finding that the defendants' "actions were undertaken in transactions resulting in the sale of real property," rather than "the sale or lease of goods or services," the court held the CLRA inapplicable to the facts of the plaintiffs' case.  <u>Id.</u> at 1488.  Even though these cases involved services ancillary to a real estate transaction, because the particular real estate transaction was not regulated by the CLRA, neither did the CLRA regulate the related services.

- 11 -

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East, Suite 1800
Los Angeles, California 90067–3086

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East, Suite 1800
Los Angeles, California 90067-3086

<u>Berry</u>, as well as many other cases cited in the Motion to Dismiss, simply develop the basic principle recognized in <u>Civil Services Employees Ins. Co. v. Superior Court of San Francisco</u>, 22 Cal. 3d 362, 376, 149 Cal. Rptr. 360 (1978), that the CLRA only regulates those things that are "technically" goods or services, as traditionally understood. The payment cards at issue here indisputably involve transactions for "money or credit," as traditionally understood, and therefore are excluded from the CLRA. A "convenience service" is not a "service" within the meaning of the CLRA, and Plaintiffs fail to present any authority to the contrary. Plaintiffs' CLRA claims should be dismissed without leave to amend.

## C.    The Complaint Does Not Meet The Specificity Requirements Of Federal Rule of Civil Procedure 9(b).

A plaintiff who alleges fraud must meet the heightened pleading requirements of Federal Rule of Civil Procedure 9(b), which provides that, "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." To avoid dismissal for inadequacy under Rule 9(b), Plaintiffs must state the "time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation." <u>Walton v. Mead</u>, No. C 03-4921 CRB, 2004 WL 2415037, *7 (N.D. Cal. Oct. 28, 2004) (citing <u>Edwards v. Marin Park, Inc.</u>, 356 F.3d 1058, 1066 (9th Cir. 2004)).

Plaintiffs assert in their Complaint that Chase made misrepresentations to Plaintiffs and other cardmembers concerning the terms contained in Chase's Agreements and that these representations were made not only in the Agreements themselves but also in <u>direct</u> communications between Plaintiffs and Chase. (Comp. ¶ 76.) However, neither in their Complaint nor in the Opposition do Plaintiffs describe the alleged (mis-) representations, much less state the "time, place, and specific content of the false representations" upon which Plaintiffs relied at the time they obtained their credit cards. The "misrepresentations" Plaintiffs allege are non-

specific, and therefore non-compliant with Rule 9(b).  The fraud claim should be dismissed.

**D.     All Of Plaintiffs' Claims Are Barred By The Statute of Limitations.**

Plaintiffs' claims also are barred by the applicable statutes of limitations (four years for the UCL claims, and three years for the CLRA and fraud claims).  If somehow there is standing to assert these claims, then the claims would have accrued when Plaintiff Lee obtained a Chase card in the late 1990s and Plaintiff Lloyd obtained his Chase card in 2000, as Plaintiffs admit in the Complaint and the Opposition.  See Comp. ¶¶ 25-26 and Opposition at 11-12.  According to Plaintiffs, the allegedly offending provisions were present in the Agreements from inception.  Thus, not later than 2000, both Plaintiffs possessed all the relevant facts giving rise to their UCL, CLRA and fraud claims and yet, for nearly seven years, chose to do nothing.  Their claims, thus, are time-barred.

Plaintiffs' attempts at extricating themselves from this bind are unavailing.  Plaintiffs claim that Defendants periodically amended the Agreement and thus perhaps accrual started later.  Not so.  Plaintiffs fail to allege that the 2007 card agreement, from which they quote extensively in their Complaint, is materially different from the card agreements Plaintiffs Lee and Lloyd received in the late 1990s and in 2000, respectively.  (Compl. ¶¶ 48-49.)  Thus, the amendments to Plaintiffs' Agreements fail to explain Plaintiffs' delay in pressing their claims in a timely fashion.

Next, although Plaintiffs correctly identify the rule of accrual, this rule clearly shows why Plaintiffs' claims are barred.  Essentially, the rule is that the time starts to run from the discovery by the aggrieved party of the facts giving rise to the cause of action.  See Mass. Mut. Life Ins. Co. v. Super. Ct., 97 Cal. App. 4th 1282, 1295, 119 Cal. Rptr. 2d 190 (2002); Television Adventure Films Corp. v. KCOP Television, Inc., 249 Cal. App. 2d 268, 279, 57 Cal. Rptr. 526 (1967).  Plaintiffs contend that the "[injury] occurs at the time each payment of the annual fee was made, and/or at the

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East, Suite 1800
Los Angeles, California 90067–3086

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

time of the 2005 (and each post-2000) amendment to the arbitration provision was made….," among others.  Opposition at 13-14.  Plaintiffs further allege that the "delayed discovery" rule applies, with each payment of the annual fee triggering a new limitations period.  Opposition at 14.  In support of their position, Plaintiffs quote the following from <u>Hogar Dulce Hogar v. Community Development Commission</u>, 110 Cal. App. 4th 1288, 1295, 2 Cal. Rptr. 3d 497 (2003):  "[w]hen an obligation or liability arises on a recurring basis, a cause of action accrues each time a wrongful act occurs, triggering a new limitations period."

But this is not a case of <u>recurring</u> wrongs.  Plaintiffs allege only one supposed wrong:  the inclusion of certain terms primarily dealing with arbitration and class action waiver in the original agreements they received in the late 1990s and in 2000.  Plaintiffs do <u>not</u> allege that the subsequent amendments to the agreements materially changed these agreements, and thus the supposed amendments (not described in the Complaint with any particularity) constitute a new injury sufficient to restart the limitations clock.  The fact that Plaintiffs made several annual payments has no bearing whatsoever on when their causes of action accrued.  Those causes of action accrued in the late 1990s and in 2000 – when, by their own admission, Plaintiffs received their credit cards and agreements.  The alleged wrongs in the credit agreement do not sprout anew every time Plaintiffs pay their fees.  <u>See, e.g.</u>, <u>State ex rel. Metz v. CCC Information Services, Inc.</u>, 149 Cal. App. 4th 402, 418, 57 Cal. Rptr. 3d 156 (2007); <u>Flintkote Co. v. General Acc. Assur. Co. of Canada</u>, 480 F. Supp. 2d 1167, 1178 (N.D. Cal. 2007).

Therefore, all of Plaintiffs' claims are time-barred and should be dismissed without leave to amend.

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East, Suite 1800
Los Angeles, California 90067–3086

**E.     Plaintiffs' Claims Are Preempted By The National Bank Act.**

**1.     Plaintiffs' State-Law Claims Are Preempted Under 12 C.F.R. § 7.4008(d)(2).**

Plaintiffs' arguments against NBA preemption of their claims lack merit. Defendants argued that an OCC regulation, 12 C.F.R. § 7.4008(d)(2), forbids the states from regulating national banks with respect to the terms of credit set forth in credit card agreements (12 C.F.R. § 7.4008(d)(2)(iv)) and the disclosure and advertising related to such agreements (12 C.F.R. § 7.4008(d)(2)(viii)).  In fact, with respect to these categories, the regulation expressly states that the national bank may act "without regard to state law limitations."  <u>See</u> 12 C.F.R. § 7.4008(d)(2).  Thus, pursuant to 12 C.F.R. § 7.4008(d)(2)(iv) and (viii), Plaintiffs' attempt to use California law to rewrite the terms of their Agreements must fail and their claims should be declared preempted.

Plaintiffs allege that because 12 C.F.R. § 7.4008(d)(2)(iv) defines "terms of credit" as "including" certain "financial 'loan' or fee information," it does not cover the disputed terms in the Agreements relating to the arbitration provision and class waiver, among others.  Opposition, at 18.  Plaintiffs allege that terms relating to arbitration, class waivers, consolidation of claims, and the like, are not "of the same kind" as the ones expressly included in 12 C.F.R. § 7.4008(d)(2)(iv), and, therefore, must be deemed excluded.  <u>Id.</u>   This interpretation of 12 C.F.R. § 7.4008(d)(2)(iv) falters for two reasons.  First, it is well-established that "the words 'include' and 'including' are ordinarily words of enlargement, and not of limitation."  <u>People v. Wesson</u>, 138 Cal. App. 4th 959, 968, 41 Cal. Rptr. 3d 883 (2006); <u>People v. Arnold</u>, 145 Cal. App. 4th 1408, 1414, 52 Cal. Rptr. 3d 545 (2006) (noting that "[t]he 'statutory definition of a thing as 'including' certain things does not necessarily place thereon a meaning limited to the inclusions.'") (citations omitted); <u>Colbert v. City of Cleveland</u>, 99 Ohio St. 3d 215, 217-218, 790 N.E.2d 781 (2003) (recognizing that "[e]xamples are typically intended to provide illustrations of a term defined in the

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East, Suite 1800
Los Angeles, California 90067–3086

- 15 -

statute, but not act as limitations on that term"). Plaintiffs fail to present any authority in support of their contention that the OCC intended 12 C.F.R. § 7.4008(d)(2)(iv) to be interpreted so narrowly.

Second, even if "Terms of credit" is limited to things in the "same class as those listed in the regulation," which Plaintiffs contend are "payment terms and money-related matters" (Opposition at 19), the dispute here, at least as framed by Plaintiffs, is about "money-related matters." Plaintiffs allege that the presence of the arbitration agreement means that they overpaid their annual fees. (Compl. ¶ 1 and passim) This is the gravamen of Plaintiffs' Complaint: that they did not receive sufficient consideration for the annual fees they paid. Plainly, this is a dispute over the terms of credit under 12 C.F.R. § 7.4008(d)(2)(iv), even if this provision is narrowly construed as Plaintiffs allege. "The term 'interest' as used in 12 U.S.C. § 85 ... includes, among other things ... late fees, not sufficient funds (NSF) fees, overlimit fees, annual fees, cash advance fees, and membership fees." 12 C.F.R. § 7.4001 (emphasis added). Sections 85 and 86 of the NBA exclusively govern the amount of fees that a national bank may impose and provide the exclusive remedy for claims against a national bank based on allegedly excessive interest; no state-law theories may be asserted at all to challenge the amount of a national bank's annual fees. See Smiley v. Citibank (South Dakota), N.A., 517 U.S. 735, 745-47, 116 S. Ct. 1730, 135 L. Ed. 2d 25 (1996); Beneficial Nat'l Bank v. Anderson, 539 U.S. 1, 10-11, 123 S. Ct. 2058, 156 L. Ed. 2d 1 (2003). The U.S. Supreme Court has expressly recognized preemption in this field, stating: "Because §§ 85 and 86 provide the exclusive cause of action for such claims, there is, in short, no such thing as a state-law claim of usury against a national bank." Beneficial, 539 U.S. at 11. Plaintiffs' argument that the presence of the arbitration provision caused them to overpay their annual fees, as a matter of state law, is barred by controlling United States Supreme Court authority and should be rejected.

- 16 -

LA 51011227v3

STROOCK & STROOCK & LAVAN LLP / 2029 Century Park East, Suite 1800 / Los Angeles, California 90067-3086

1    Plaintiffs' claims are also preempted under 12 C.F.R. § 7.4008(d)(1), which

2   states:  "Except where made applicable by Federal law, state laws that obstruct,

3   impair, or condition a national bank's ability to fully exercise its Federally authorized

4   non-real estate lending powers are not applicable to national banks."  This catch-all

5   preemption provision is limited by 12 C.F.R. § 7.4008(e), which holds that Section

6   7.008(d)(1) does not apply to state laws that "only incidentally affect the exercise of

7   national banks' non-real estate lending powers."  Plaintiffs nowhere explain how

8   requiring a national bank to use a completely different form of credit card agreement

9   as opposed to in all other states would have only an "incidental" effect on the bank's

10  nationwide operations, and therefore the OCC's general preemption regulation also

11  bars Plaintiffs' claims.  See also Barnett Bank v. Nelson, 517 U.S. 25, 33, 116 S. Ct.

12  1103, 134 L. Ed. 2d 237 (1996) ("Congress would not want [the] States to forbid, or

13  to impair significantly," national banks' powers.).[5]

14    Plaintiffs cannot deny that a key goal of this litigation is to attempt to rewrite

15  the terms of the Agreements that govern Chase's relationships with its cardmembers.

16  Plaintiffs claim that they are not seeking to include any specific information or

17  content to the Agreements (in contravention of 12 C.F.R. § 7.4008(d)(2)(viii)), but

18  merely to exclude certain allegedly unconscionable terms therefrom.  Opposition, at

19  19-20.  This argument lacks merit.  The distinction is illusory:  Inclusion and

20  exclusion are two sides of the same coin.  Under federal law, state laws imposing

21  requirements on the content of a credit agreement (12 C.F.R. § 7.4008(d)(2)(viii)) or

22  terms of credit generally (12 C.F.R. § 7.4008(d)(2)(iv)) are preempted by the NBA.

23  See Franklin Nat'l Bank v. New York, 347 U.S. 373, 377-79, 74 S. Ct. 550, 98 L.

24

25  ───────────────────
    [5] Binetti v. Washington Mutual Bank, 446 F. Supp. 2d 217 (S.D.N.Y. 2006), relied
26  upon by Plaintiffs, is not to the contrary.  Even when considering the NBA's
    underlying purpose, see Binetti, 446 F. Supp. 2d at 221, it is clear that the federal
27  purpose (uniform nationwide standards for national bank lending operations), would
    be impaired if each state could require or prohibit particular terms in credit card
28  agreements or if each state could require unique disclosures.

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East, Suite 1800
Los Angeles, California 90067-3086

- 17 -

LA 51011227v3

1   Ed. 767 (1954) (state statute prohibiting national banks from using the word "saving"

2   or "savings" in advertising was preempted by the NBA).[6]

3          Plaintiffs do not dispute that they are attempting to use state-law theories to

4   dictate the content of credit-card agreements between Chase and its cardmembers.

5   Plaintiffs have alleged that class-action waivers and provisions forbidding

6   consolidation of claims are unconscionable under California law, and, therefore,

7   should be severed from such agreements.  Alternatively, if Plaintiffs'

8   inclusion/exclusion argument is taken at face value, Plaintiffs would use California

9   law to compel national banks to include express authorization in their credit card

10  agreements for class-action and consolidation mechanisms.  Regardless of the

11  formulation, Plaintiffs are endeavoring to impose requirements on the content, and

12  thus to dictate the terms, of the Agreements at issue.  This is in direct contravention

13  of the NBA.  See Watters v. Wachovia Bank, N.A., 127 S. Ct. 1559, 1567, 167 L.

14  Ed. 2d 389 (2007) (recognizing, "the States can exercise no control over [national

15  banks], nor in any wise affect their operation, except in so far as Congress may see

16  proper to permit.  Any thing beyond this is an abuse, because it is the usurpation of

17  power which a single State cannot give.") (citation omitted).  Therefore, Plaintiffs'

18  state-law claims are preempted and should be dismissed.

19         Plaintiffs contend that 12 C.F.R. § 7.4008(d)(2) only preempts state laws that

20  "affirmatively" require the inclusion of certain terms, and that "no such 'affirmative'

21  requirement exists relative to the terms which Plaintiffs here challenge."  Opposition,

22

23  [6] Plaintiffs argue that Defendants' position regarding the preemption of the CLRA is
    inconsistent with the position that the CLRA is inapplicable to financial services.
24  Opposition, at 17 n.9.  This is nonsense.  California courts recognize (under the
25  Berry rule) that the CLRA does not apply to financial services, but if the CLRA were
    construed to regulate financial services, it still could not regulate financial services
26  offered by national banks (because of the NBA).  Indeed, the strong federal interest
    expressed in the NBA of protecting national banks from state intrusion is yet one
27  more reason why the CLRA must be construed to exclude financial services (i.e., all
28  transactions for "money or credit").

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East, Suite 1800
Los Angeles, California 90067–3086

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East, Suite 1800
Los Angeles, California 90067–3086

1    at 21.  But plainly this is not a principled distinction.  Whether the states

2    "affirmatively" dictate the content of an agreement or do it indirectly, through the

3    unconscionability provisions of the UCL or the CLRA, for example, ought not to

4    make any difference.  Regulation is regulation whether done under the cloak of

5    darkness or in broad daylight.[7]

6         Allowing Plaintiffs' claims to proceed would result in a great deal of

7    uncertainty as to how national banks, such as Chase, should structure and operate

8    their lending programs.  Moreover, cardmembers in each of the 50 states would be

9    able to demand state-specific language and terms in each cardmember agreement.

10   See Watters, 127 S. Ct. at 1568 ("Congress did not intend, . . . 'to leave the field

11   open for the States to attempt to promote the welfare and stability of national banks

12   by direct legislation .... [C]onfusion would necessarily result from control possessed

13   and exercised by two independent authorities.'" (citation omitted)).  This would

14   fundamentally undermine a key purpose of the NBA:  to establish a national banking

15   system free from excessive state regulation.  Application of the UCL and CLRA to

16   set requirements and substantive standards on credit agreements opens the door to

17   similar efforts in other states, and thus would have more than an incidental impact on

18   the lending activities of national banks, interfering with the NBA's plan and

19   impairing the efficiency of national banks to discharge their duties.

20

21   _____

22   [7] Plaintiffs simply ignore cases cited in the Motion that do not support their position.
     See SPGGC, LLC v. Blumenthal, No. 05-4711 (2d Cir. Oct. 19, 2007) (holding seller

23   does set forth a valid preemption challenge against Connecticut Gift Card Law
     prohibiting the imposition of an expiration date on a gift card); Austin v. Provident

24   Bank, No. Civ.A.4:04 CV 33 P B, 2005 WL 1785285, at *5-6 (N.D. Miss. July 26,
     2005) (fraud claim predicated on state contract and tort law more than incidentally

25   affected national bank's lending powers, and thus was completely preempted by the
     NBA).  Also, Plaintiffs' claim that state deceptive practices acts, such as the UCL,

26   are not subject to NBA preemption is belied by case law.  See, e.g., Smiley, 517 U.S.
     at 738 & n.1, 744, 747; see also In Re Late Fee And Over-Limit Fee Litigation, No.

27   C 07-0634 SBA (N.D. Cal. Nov. 16, 2007) (order granting motion to dismiss)
     (attached hereto as Exhibit A).

28

- 19 -

1    Plaintiffs' state-law claims, if allowed to proceed, would fundamentally

2  change national bank credit card lending operations.  For that reason the claims are

3  expressly preempted under the NBA, and therefore the Motion should be granted

4  without leave to amend.

5
           2.    **Plaintiffs' Argument That Defendant JPMorgan Chase & Co. Is
6                 Not Entitled To The Benefit Of Preemption Is Frivolous.**

7    Plaintiffs argue that Defendants' preemption argument fails in part because

8  JPMorgan Chase & Co., one of the named Defendants, is not a national bank.  As set

9  forth in the Motion, however, Plaintiffs only have accounts with Chase Bank USA,

10  N.A., and thus JP Morgan Chase & Co. (in addition to Chase Manhattan Bank

11  U.S.A., N.A.) was erroneously sued.  JPMorgan Chase & Co. is a bank holding

12  company and does not issue credit cards.  There is no valid claim against this

13  defendant at all.  Moreover, under Watters, 127 S. Ct. at 1570-73, a corporate

14  affiliate of a national bank is entitled to the same preemption as the national bank

15  itself.  In Watters, the United States Supreme Court held that a non-bank operating

16  subsidiary of a national bank did not need to be licensed by state authorities to

17  engage in mortgage lending activities.  Id. at 1564-65.  A national bank may choose

18  to use whatever corporate structure it wishes to exercise the lending powers

19  conferred upon it by its federal charter, without its corporate affiliates' losing the

20  NBA's protection against state-law challenges to their conduct.  Id. at 1570-71.  If

21  the affiliates lost the NBA's protection, the bank itself improperly would have to

22  cope with indirect attacks on bank operations that are no less threatening to a bank's

23  federal powers than a direct attack.  Id.  Because the credit card issuing function at

24  issue in this case is indisputably regulated by the OCC through its powers under the

25  NBA, all particular corporations alleged to be involved in the banking function at

26  issue are similarly entitled to the benefits of federal preemption.  Plaintiffs' argument

27  to the contrary should be rejected because it is barred by recent, controlling authority

28  of the United States Supreme Court.

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East, Suite 1800
Los Angeles, California 90067–3086

LA 51011227v3

1

## III.    CONCLUSION

2

For the foregoing reasons, Chase respectfully requests that this Court grant the

3

Motion and dismiss the Complaint in its entirety, and without leave to amend.

4

Dated:  November 20, 2007          STROOCK & STROOCK & LAVAN LLP

5                                                           JULIA B. STRICKLAND
                                                              STEPHEN J. NEWMAN

6

7                                                           By:    s/Stephen J. Newman

8                                                                     Stephen J. Newman

9                                                           Attorneys for Defendants
                                                                 CHASE BANK USA, N.A.,
10                                                              erroneously sued as CHASE
                                                                 MANHATTAN BANK USA, N.A.,
11                                                              and JPMORGAN CHASE & CO.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East, Suite 1800
Los Angeles, California 90067–3086

- 21 -

**EXHIBIT A**

**EXHIBIT A**

1

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

2

3

4     IN RE LATE FEE AND                                   No. C 07-0634 SBA
      OVER-LIMIT FEE LITIGATION                            **ORDER**

5

6

7     ─────────────────────────────────

8          Before the Court is the defendants'[1] joint motion to dismiss [Docket No. 91] the plaintiffs'[2]

9     consolidated complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). After reading and

10    considering the complaint and the arguments presented by the parties, the Court finds this matter

11    appropriate for resolution without a hearing. *See* FED. R. CIV. P. 78. For the reasons that follow, the

12    Court GRANTS the defendants' motion to dismiss.

13

14                                       **BACKGROUND**

15         The plaintiffs represent a putative class of "credit cardholders who have paid excessive late fees

16    and/or over-limit fees ("Penalty Fees")" to the defendants, most of the large credit card issuers in the

17    United States. Docket No. 63 (Compl. ¶ 1). The plaintiffs allege that "these excessive Penalty Fees

18    violate[] the National Bank Act's ("NBA") and the Depository Institutions Deregulation and Monetary

19    Control Act of 1980's ("DIDA") prohibitions against overcharging consumers. In addition, defendants

20    have conspired to fix prices and maintain a price floor for late fees in violation of §1 of the Sherman

21    Act." *Id.* According to the plaintiffs, when credit card holders are late in making payments or go over

22    their credit limits, the cardholders are charged up to $39 dollars in late fees and over-limit fees by the

23    ─────────────────────────────────

24    [1]     The defendants are Bank of America, N.A.; Bank of America Corporation; N.B. Holdings;
              MBNA America Bank, N.A.; Capital One Bank; Capital One F.S.B.; Capital One Financial
25            Corporation; Chase Bank USA, N.A.; JPMorgan Chase & Co.; Bank One Corporation; Bank
              One; Citibank South Dakota, N.A.; Citigroup, Inc.; Washington Mutual Bank; Providian;
26            Washington Mutual, Inc.; Wells Fargo & Company; Wells Fargo Bank, N.A.; Wells Fargo
              Financial Bank; and Wells Fargo Financial National Bank.

27    [2]     The plaintiffs are Andrew T. Piñon, Betty Simm, Cathy Simm, Sara Prentiss-Shaw, Audree
              Halasz, David V. Brotman, Gwen Martin, Celeste Brackley, Marilyn Foster-Nemec, Aaron
28            González, and Elizabeth Young.

1  defendants. The plaintiffs seek to represent nationwide and California classes of persons holding credit

2  cards issued by the defendants and are requesting injunctive relief and damages on behalf of all holders

3  of credit cards issued by the defendants. *See* Docket No. 63 (Compl. ¶¶ 38-41).

4      The complaint contends that the defendants together control over seventy percent of the U.S.

5  credit card market. *See* Docket No. 63 (Compl. ¶ 86). In general, the complaint's substantive

6  allegations refer to the defendants in collective terms and do not advance individualized allegations

7  about particular defendants.[3]

8      The plaintiffs assert multiple causes of action based on allegedly high late and over-limit fees

9  that the defendants charged on credit card accounts. They assert two primary federal causes of action

10 (constitutional due process claims and antitrust claims) and several causes of action under California

11 state law. Counts One through Four of the complaint allege the defendants' charging of late and over-

12 limit fees violates the National Bank Act (12 U.S.C. §§ 85, 86) and the Depository Institutions

13 Deregulation and Monetary Control Act of 1980 (12 U.S.C. § 1831d). Count Five asserts the defendants

14 are transgressing the antitrust provision of section 1 of the Sherman Act. Counts Six through Ten put

15 forward claims under California law: the Unfair Competition Law, the Consumers Legal Remedies Act,

16 the Cartwright Act, breach of covenant of good faith and fair dealing, and unjust enrichment,

17 respectively.

18

19                                    **LEGAL STANDARDS**

20      Federal Rule of Civil Procedure 12(b)(6) provides that a pleading may be challenged and

21 dismissed for failing to "state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). The

22

23 _____

24 [3]  Each plaintiff claims to have paid at least one late or over-limit fee in the four years preceding the filing of the complaint. *See* Docket No. 63 (Compl. ¶¶ 12-22.) No plaintiff identifies which of the defendants (if any) issued a credit card to him or her, no plaintiff specifies which type of fee (*i.e.*, late fee or over-limit fee) he or she has paid, and no plaintiff pleads to which of the defendants (if any) he or she paid that unspecified fee. The plaintiffs do not allege that the defendant holding companies issued their credit cards, imposed late or over-limit fees on them, or otherwise took any action in connection with the conduct that the complaint raises.

25

26

27

28                                    2

1   minimum pleading requirement is set by Rule 8(a), requiring a complaint to include "a short and plain

2   statement of the claim showing that the pleader is entitled to relief" in order to "give the defendant fair

3   notice of what the plaintiff's claim is and the grounds upon which it rests." *Swierkiewicz v. Sorema*

4   *N.A.*, 534 U.S. 506, 512 (2002); *see also Erickson v. Pardus*, 127 S. Ct. 2197, 2200 (2007) (per curiam).

5   While a complaint "does not need detailed factual allegations," the "[f]actual allegations must be enough

6   to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1964-

7   65 (2007). A complaint must allege "enough facts to state a claim to relief that is plausible on its face."

8   *Id.* at 1974.

9       When considering a motion to dismiss under Rule 12(b)(6), the plaintiff's complaint is liberally

10  construed and all well-pleaded facts are taken as true. *Syverson v. IBM Corp.*, 472 F.3d 1072, 1075 (9th

11  Cir. 2007). However, conclusory allegations of law, unwarranted deductions of fact, or unreasonable

12  inferences are insufficient to defeat a motion to dismiss. *See Fields v. Legacy Health Sys.*, 413 F.3d 943,

13  950 n.5 (9th Cir. 2005); *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

14      Courts generally do not look outside the pleadings, including any attachments thereto, in

15  deciding a motion to dismiss. *See United States v. LSL Biotechs.*, 379 F.3d 672, 699 (9th Cir. 2004).

16  A document is not considered outside the complaint if it is "incorporated by reference," *i.e.*, the

17  complaint specifically refers to the document and if its authenticity is not questioned. *See Knievel v.*

18  *ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005); *Cooper v. Pickett*, 137 F.3d 616, 622-23 (9th Cir. 1997).

19  If dismissal of the complaint is warranted, it is generally without prejudice, unless it is clear that the

20  complaint can not be saved by any amendment. *See Sparling v. Daou*, 411 F.3d 1006, 1013 (9th Cir.

21  2005), *cert. denied*, 126 S. Ct. 1335 (2006); *Gompper v. VISX, Inc.*, 298 F.3d 893, 898 (9th Cir. 2002).

22

23

24                                          **ANALYSIS**

25  **A.    Counts One Through Four**

26      The plaintiffs' principal claim in this case is that the defendants impose late and over-limit fees

27

28                                              3

1    up to $39, and that such fees significantly exceed any actual damages that the defendants incur as a

2    result of cardholders' making late payments or exceeding their credit limits.  On this basis, plaintiffs

3    assert that the defendants' late and over-limit fees are excessive "punitive damages" subject to limitation

4    under the Due Process Clause as interpreted in *State Farm Mutual Automobile Ins. Co. v. Campbell*, 538

5    U.S. 408 (2003), and other recent Supreme Court decisions.  In *State Farm*, the Supreme Court

6    addressed "the measure of punishment, by means of punitive damages, *a State may impose* upon a

7    defendant in a civil case." *Id.* at 412 (emphasis supplied).  The Court reiterated prior holdings that

8    "there are procedural and substantive constitutional limitations on these awards [State imposed punitive

9    damages]." *Id.* at 416.  The Court declared that "few awards exceeding a single-digit ratio between

10   punitive and compensatory damages, to a significant degree, will satisfy due process." *Id.* at 425.

11   "Single-digit multipliers are more likely to comport with due process, while still achieving the State's

12   goals of deterrence and retribution, than awards with ratios in range of 500 to 1 . . . ." *Id.*

13        The plaintiffs contend that the Court must interpret federal banking statutes, principally the

14   National Bank Act (NBA),[4] to incorporate *State Farm*'s Due Process limits on credit card late and over-

15   limit fees, as the plaintiffs equate such fees as "punitive damages."  They also assert that the remedial

16   provisions of the banking statutes, such as 12 U.S.C. § 86, provide them with a cause of action for such

17   allegedly excessive fees.

18        Section 85 of the NBA allows the defendants to "take, receive, reserve, and charge . . . interest

19   at the rate allowed by the laws of the State, Territory, or District where the bank is located . . . ." 12

20

21   [4]          The plaintiffs assert claims under the NBA with respect to all defendants except
     Washington Mutual Bank, which they allege is subject to the Depository Institutions
22   Deregulation and Monetary Control Act, 12 U.S.C. § 1831d.  The defendants maintain that
     Washington Mutual Bank is in fact subject to 12 U.S.C. § 1463.  Because the parties do not
23   dispute that the various provisions are virtually identical, the Court will refer solely to the
     NBA.
24
          The NBA authorizes a national bank to charge whatever rates are allowed by the laws
25   of the state where the bank is located.  Here, in the states where the defendant banks are
     located, the state laws allow any rates agreed to in the contracts between the banks and their
26   customers. *See* DEL. CODE, tit. 5, §§ 943-945, 950; NEV. REV. STAT. § 99.050; S.D. CODIFIED
     LAWS § 54-3-1.1; VA. CODE ANN. § 6.1-330.63(A).
27

28                                            4

1   U.S.C. § 85.  Section 86 of the NBA provides the remedy for overcharges of amounts allowed under

2   section 85:

3           The taking, receiving, reserving, or charging a rate of interest greater than is allowed by
            section 85 of this title, when knowingly done, shall be deemed a forfeiture of the entire

4           interest which the note, bill, or other evidence of debt carries with it, or which has been
            agreed to be paid thereon.  In case the greater rate of interest has been paid, the person

5           by whom it has been paid, or his legal representatives, may recover back, in an action
            in the nature of an action of debt, twice the amount of the interest thus paid from the

6           association taking or receiving the same . . . .

7   12 U.S.C. § 86.

8           Despite the language of section 85 allowing interest rates to be set at a rate consistent with the

9   laws of the home states of the defendants, the plaintiffs argue that the Court should construe section 85

10  to implicitly constrain the late and over-limit fees to amounts not excessively disproportionate to the

11  actual losses suffered by the credit card issuers.  The plaintiffs contend that it is necessary to interpret

12  section 85 as containing an "implicit" interest limitation other than that set by state law in light of *State*

13  *Farm* and the canon of statutory construction of constitutional avoidance.[5]  In other words, the plaintiffs

14  are arguing that the Court should construe the NBA as allowing the "exportation" of only those home

15  state penalty fees that are not excessively disproportionate to the actual losses incurred by the defendants

16  from late payments because such penalty fees are excessive "punitive damages" prohibited by *State*

17  *Farm*.  In order to save the NBA from this constitutional infirmity, the Court must read section 85 as

18  containing a limitation not provided for in its text.  And once section 85 is thus "construed," the

19  defendants' actions are then in violation of section 86 and the plaintiffs have a viable cause of action

20  for damages.  These factual gyrations are flawed, however, and when unwound and examined, fail to

21  state a claim.

22          Counts One through Four fail as a matter of law to state claims upon which relief can be granted.

23

24  ─────────────────

25  [5]     Based upon the doctrine of constitutional avoidance, "where an otherwise acceptable
        construction of a statute would raise serious constitutional problems, the Court will construe the
        statute to avoid such problems unless such construction is plainly contrary to the intent of

26      Congress."  *Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council*,
        485 U.S. 568, 575 (1988) (citing *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 499-501,

27      504 (1979)).

28                                              5

1    First, the defendants' late and over-limit fees are not "punitive damages" subject to the Due Process

2    Clause. The punitive damages at issue in *State Farm* and similar Supreme Court decisions are damages

3    that a court, *i.e.*, the state, levies against a defendant to "punish reprehensible conduct and . . . deter its

4    future occurrence" for the benefit of society generally. *International Bhd. of Elec. Workers v. Foust*,

5    442 U.S. 42, 48 (1979) (citation omitted). Such damages "serve the same purposes as criminal

6    penalties," *State Farm*, 538 U.S. at 416, by punishing and deterring conduct that is deemed particularly

7    reprehensible and "pose[s] a substantial risk of harm to the general public." *Philip Morris USA v.*

8    *Williams*, 127 S. Ct. 1057, 1064 (2007).

9         The plaintiffs have not shown that the defendants' late and over-limit fees fit within this rubric.

10   The fees are not imposed by a court and they are not in any sense penalties "advanc[ing] governmental

11   objectives," *Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 47 (1991), to protect against behavior that

12   harms the "general public." *Phillip Morris USA*, 127 S. Ct. at 1064. Rather, they are paid by one party

13   to another pursuant to private contract.

14        The Supreme Court also has explained that punitive damages implicate the Due Process Clause

15   because their discretionary, case-variable nature can contravene "'[e]lementary notions of fairness

16   enshrined in our constitutional jurisprudence'" which "'dictate that a person receive fair notice not only

17   of the conduct that will subject him to punishment, but also of the severity of the penalty that the State

18   may impose." *State Farm*, 538 U.S. at 417 (citation omitted). Thus, "the fundamental due process

19   concerns to which [the Supreme Court's] cases refer" are "risks of arbitrariness, uncertainty, and lack

20   of notice." *Phillip Morris USA*, 127 S. Ct. at 1063. None of these considerations apply to the

21   defendants' late and over-limit fees. The fees are not uncertain in amount, nor do cardholders lack

22   notice regarding the amount or existence of the fees. To the contrary, the parties establish the fees in

23   advance in the written credit-card contract.

24        The plaintiffs rely on common law doctrines that characterize excessive contract damages as

25   "punitive" in nature or as "penalties." But the use of that terminology does not mean that the contract

26   damages they describe are therefore "punitive damages" subject to the Due Process Clause. Private

27

28                                                          6

1   contractual fees, regardless of whether they are "punitive" in a contractual sense, bear no resemblance

2   to the court-imposed awards that the Supreme Court has subjected to constitutional scrutiny.  The

3   plaintiffs cite no authorities suggesting that the Supreme Court's punitive damages jurisprudence applies

4   to privately set contractual fees.  And any claims that the defendants' fees violated the contractual

5   doctrines of liquidated damages or the like are pre-empted. *See Smiley v. Citibank (S.D.), N.A.*, 517 U.S.

6   735, 744 (1996).

7          Second, even if the defendants' fees could be regarded as some kind of private "punitive

8   damages," the fees still would not implicate the Constitution.  The Due Process Clause constrains

9   government action; it does not restrain or protect against "private conduct." *Blum v. Yaretsky*, 457 U.S.

10  991, 1002 (1982).  The defendants' late and over-limit fees are not set by governmental mandate; their

11  imposition and amount are the product of private contract between bank and borrower.  The mere fact

12  that federal banking statutes allow the defendant banks and the plaintiffs to enter into private contracts

13  allowing for such fees does not transform the charging of those fees into state action. *See id.*  The "mere

14  availability of a remedy" and the "subtle encouragement . . . which inheres in the [government's]

15  creation or modification of any legal remedy" do not "so significantly encourage[ ] the private activity

16  as to make the [government] responsible for it." *American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40,

17  53 (1999).  Indeed, the plaintiffs' argument runs counter to the principles animating the Due Process

18  Clause.  That Clause serves to restrain government encroachment upon private parties' liberty and

19  property interests.  Congress does not offend the Due Process Clause by legislating to permit parties

20  freedom in arranging their private credit arrangements.  To the contrary, that governmental objective

21  is entirely rational and constitutional. *See United States v. Carolene Prods. Co.*, 304 U.S. 144, 152

22  (1938) ("regulatory legislation affecting ordinary commercial transactions is not to be pronounced

23  unconstitutional unless . . . it is of such a character as to preclude the assumption that it rests upon some

24  rational basis . . . .").

25         Finally, there is no basis for the plaintiffs' assertion of a damages claim under the NBA.  The

26  plaintiffs' theory is that, pursuant to the doctrine of constitutional avoidance, this Court should construe

27

28                                                  7

1  the usury provision of the NBA, 12 U.S.C. § 85, to incorporate Due Process Clause limits on "punitive

2  damages," as articulated in *State Farm* and similar decisions. The theory fails on two grounds. Initially,

3  for the reasons described above, the plaintiffs have not shown the existence of any "'grave and doubtful

4  constitutional questions'" that the Court should seek to avoid through statutory construction. *Rust v.*

5  *Sullivan*, 500 U.S. 173, 191 (1991) (citation omitted). In addition, the doctrine of constitutional

6  avoidance applies only where statutory text is "susceptible of two constructions," *Pennsylvania Dep't*

7  *of Corr. v. Yeskey*, 524 U.S. 206, 212 (1998) (citation omitted), based on "ordinary textual analysis."

8  *Clark v. Martinez*, 543 U.S. 371, 385 (2005). That is not the case with section 85 of the NBA. That

9  provision allows banks to charge "interest at the rate allowed by the laws of the State . . . where the bank

10  is located." There is nothing ambiguous about that text, nor is there any term therein that could be

11  construed to express the Due Process Clause limit the plaintiffs seek to have written into the statute.

12  It is undisputed that late and over-limit fees are "interest" within the meaning of the statute, *see* 12

13  C.F.R. § 7.4001(a)[6]; *Smiley v. Citibank (S.D.), N.A.*, 517 U.S. 735, 745 (1996), and the laws of the states

14  in which defendant banks are located expressly allow banks to charge fees at any amount specified in

15  their credit card contracts. The plaintiffs therefore cannot recover damages under section 86 of the

16  NBA.

17

18  **B.    Counts Five and Eight**

19       In Counts Five and Eight, the plaintiffs claim that the defendants conspired to fix the terms and

20  pricing of late fees in violation of section 1 of the Sherman Act and California's Cartwright Act,

21

22  _____

23  [6]  Title 12 C.F.R. § 7.4001(a) defines "interest" as used in 12 U.S.C. § 85 as including: "any payment compensating a creditor or prospective creditor for an extension of credit, making available of a line of credit, or any default or breach by a borrower of a condition upon which

24  credit was extended. It includes, among other things, the following fees connected with credit extension or availability: numerical periodic rates, late fees, creditor-imposed not sufficient

25  funds (NSF) fees charged when a borrower tenders payment on a debt with a check drawn on insufficient funds, overlimit fees, annual fees, cash advance fees, and membership fees. It does

26  not ordinarily include appraisal fees, premiums and commissions attributable to insurance guaranteeing repayment of any extension of credit, finders' fees, fees for document preparation

27  or notarization, or fees incurred to obtain credit reports."

28                                        8

1  respectively. Section 1 of the Sherman Act, 15 U.S.C. § 1, prohibits "[e]very contract, combination in

2  the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States,

3  or with foreign nations." To state a claim under section 1, a plaintiff must allege that "(1) there was an

4  agreement, conspiracy, or combination between two or more entities; (2) the agreement was an

5  unreasonable restraint of trade under either a per se or rule of reason analysis; and (3) the restraint

6  affected interstate commerce." *American Ad Mgmt., Inc. v. GTE Corp.*, 92 F.3d 781, 784 (9th Cir.

7  1996); *see also Tanaka v. University of S. Cal.*, 252 F.3d 1059, 1062 (9th Cir. 2001) (same).

8       The plaintiffs do not identify any actual agreement among the defendants. Rather, the plaintiffs

9  allege that some of the defendant banks, at some times during the last decade had late fee terms on some

10 credit card accounts that were in part parallel behavior, or "lockstep pricing" of late fees. The plaintiffs

11 also allege that there were opportunities and incentives for the defendant banks to enter into agreements

12 about pricing, even if the plaintiffs cannot identify any such agreement. The plaintiffs contend that

13 alleging such opportunities and incentives, together with the partially parallel conduct, states a claim

14 on which relief can be granted under the Sherman Act.

15       Relying to a large extent on the Supreme Court's recent decision in *Bell Atlantic Corp. v.*

16 *Twombly*, 127 S. Ct. 1955 (2007), the defendants move to dismiss Count Five on the ground that the

17 plaintiffs have not adequately alleged the first element of a section 1 claim—an "agreement, conspiracy,

18 or combination." *Twombly* dealt with the "question of what a plaintiff must plead in order to state a

19 claim under § 1 of the Sherman Act." *Twombly*, 127 S. Ct. at 1964. In that case the Supreme Court

20 stated:

21          Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation
            of agreement at some unidentified point does not supply facts adequate to show
22          illegality. Hence, when allegations of parallel conduct are set out in order to make a § 1
            claim, they must be placed in a context that raises a suggestion of a preceding agreement,
23          not merely parallel conduct that could just as well be independent action.

24 127 S. Ct. at 1966. Based upon the pleading standards set forth by *Twombly*, the Court concludes that

25 the plaintiffs' complaint fails as a matter of law to state a claim on which relief can be granted under

26 section 1 of the Sherman Act.

27

28
                                                    9

1    The heart of the plaintiffs' antitrust allegations is paragraph 86 of the complaint, containing a

2    chart of allegedly current late-fee levels of the six defendant banking organizations, and the surrounding

3    paragraphs which discuss late-fee levels at other times.[7]   The chart alleges that, at present, three

4    defendants have late fees for at least some credit cards at the following levels: they charge $15 for late

5    payment if the customer's balance is up to $100; $29 for a late payment if the customer's balance is

6    $100 to $250; and $39 for a late fee if the customer's balance is higher.   This allegation is the plaintiffs'

7    centerpiece, but it does not suggest a "preceding agreement" rather than "merely parallel conduct that

8    could just as well be independent action."   The same chart shows that the three other alleged co-

9    conspirators have *different* late-fee price levels. The complaint further explains that the defendants' fee

10   levels have all followed different pricing paths at different times, not even roughly in parallel.   For

11   example, Citibank implemented its three-tier late-fee billing structure in 2001, while Capital One and

12   Washington Mutual did not adopt any kind of tiered late fees until three years later and even then

13   adopted different tiered structures.

14       As the Supreme Court explained in *Twombly*, this kind of pricing pattern is "just as much in line

15   with a wide swath of rational and competitive business strategy unilaterally prompted by common

16   perceptions of the market," 127 S. Ct. at 1964, as it is with an agreement on pricing.   *See In re Baby*

17   *Food Antitrust Litig.*, 166 F.3d 112, 131-32 (3d Cir. 1999) (holding that time lags of three to six months

18   between pricing moves "refute rather than support" allegations of conspiracy).   To survive the motion

19   to dismiss, the plaintiffs are required to allege some "further circumstance pointing toward a meeting

20   of the minds." *Twombly*, 127 S. Ct. at 1966.   Those circumstances must be enough to make the claim

21   of conspiracy not merely "conceivable" but in fact "plausible." *Id.* at 1974.   The plaintiffs have not met

22   this standard.

23       The complaint does include several conclusory allegations that the defendants agreed to increase

24   late fees, but it provides no details as to when, where, or by whom this alleged agreement was reached.

25

26   _____

27   [7]      The chart lists seven card issuers, but two are controlled by defendant Bank of America.

28                                                    10

1    *See* Docket No. 63 (Compl. ¶¶ 72, 123-24). In *Twombly*, the Supreme Court dismissed as insufficient

2    similar "stray statements" about agreements, when unsupported by concrete allegations about the

3    content and circumstances of any actual agreement. 127 S. Ct. 1971 n.10.

4         Moreover, as in *Twombly*, the complaint itself provides an alternative explanation for the

5    increases in late fees, namely that they were the result of a "rational and competitive business strategy

6    unilaterally prompted by common perceptions of the market." 127 S. Ct. at 1964. The complaint

7    alleges, for example, that the defendants all faced declining interest rate revenue (Compl. ¶ 62),

8    increased competition from new market entrants (*id.* ¶ 75), elimination of annual fees as a revenue

9    source (*id.* ¶ 74), and higher costs due to expanded reward and affinity programs (*id.*). Confronted with

10   that competitive environment, it would have been entirely rational for each defendant *independently* to

11   decide to increase late fees as a way to raise revenue, "expecting [its] neighbors to do the same thing."

12   *Twombly*, 127 S. Ct. at 1972.[8] And it would have been equally rational for the other defendants to

13   follow those increases, rather than seek to undercut them, since "surely they knew the adage about him

14   who lives by the sword." *Id.*

15        The plaintiffs suggest that it is somehow suspicious that the defendants increased late fees

16   contemporaneously with reducing what plaintiffs call "front end" features such as annual fees and

17   interest rates. Docket No. 63 (Compl. ¶ 88). But here, as in *Twombly*, the complaint fails to allege facts

18   showing that it would have been "potentially more lucrative," 127 S. Ct. at 1972, to compete by cutting

19   late fees. What the plaintiffs term "front end" features, *e.g.*, no annual fees, low interest fees for balance

20   transfers, cash back awards, are highly visible to prospective cardholders. Thus, the plaintiffs'

21   allegation that credit card issuers have competed vigorously for consumer business by focusing on "front

22   end" features suggests nothing more than a common recognition among issuers that those "front end"

23   features have the greatest marketing potential. *See* Docket No. 63 (Compl. ¶ 88).

24

25

26   [8]    The complaint also explains why late fees were lower before 1995: state regulatory provisions
27          constrained late fees until 1995, when the Comptroller of the Currency issued a regulation
            interpreting the NBA to preempt those laws. *See* Docket No. 63 (Compl. ¶¶ 3, 62-63).

28                                                    11

Therefore, as in *Twombly*, when viewing the entire complaint, the plaintiffs have not placed their allegations "in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Id.* at 1966; *see also In re Elevator Antitrust Litig.*, 502 F.3d 47, ---, 2007 WL 2471805, at *3 (2d Cir. 2007) (per curiam) (affirming dismissal of section 1 claim based in part on allegations of parallel pricing because "similar pricing can suggest competition at least as plausibly as it can suggest anticompetitive conspiracy").

In their brief, the plaintiffs rely on a variety of what they call "plus factors" to raise the inference of conspiracy set the price of late fees to the level of plausibility. *See* Docket No. 94 (Pl.'s Br. 19-23). The plaintiffs in *Twombly* alleged many of these same "plus factors," but here, as there, the factors, whether taken singly or together, are insufficient to plead a case. Following are the "plus factors" identified by the plaintiffs:

**1.    Opportunities to Communicate**

The plaintiffs argue that the defendants' membership in the Visa and MasterCard networks, their relationships with third-party processors and consultants that did business with many industry participants, and their membership in industry-wide trade associations, provided opportunities for them to communicate and agree to fix prices. *See* Docket No. 63 (Compl. ¶¶ 80-81, 87). The Supreme Court rejected similar allegations in *Twombly*, 127 S. Ct. at 1971 n.12, and other courts have consistently refused to infer the existence of a conspiracy from these kinds of averments. *See, e.g., In re Citric Acid Litig.*, 191 F.3d 1090, 1098 (9th Cir. 1999); *In re Ins. Brokerage Antitrust Litig.*, 2006 WL 2850607, at *12 (D.N.J. 2006); *In re Elevator Antitrust Litig.*, 2006 WL 1470994, at *11 (S.D.N.Y. 2006); *Yellow Page Solutions, Inc. v. Bell Atl. Yellow Pages Co.*, 2001 WL 1468168, at *13 (S.D.N.Y. 2001).

**2.    Market Concentration**

The complaint alleges that the defendants have a combined 70% share of the credit card market (Compl. ¶ 6), and the plaintiffs argue that such concentration is conducive to conspiracy. *See* Docket No. 94 (Pls.' Br. 22). But the relevant market in *Twombly*—where defendants were alleged to possess a 90% share—was more highly concentrated, and the Supreme Court nevertheless concluded that the

12

complaint there failed to state a claim under section 1. 127 S. Ct. at 1962 n.1. As the *Twombly* Court noted, parallel behavior in a concentrated market is insufficient to suggest a conspiracy because it is a "common reaction of firms in a concentrated market" to "recogniz[e] their shared economic interests" and to reach similar "price and output decisions" independently. *Id.* at 1964 (citation omitted, alteration in original). Thus, even if the alleged market were concentrated, this would not render the asserted conspiracy plausible.

### 3.     Motive to Conspire

The plaintiffs argue that "defendants had a strong motive to fix the prices of late fees at supra-competitive levels." Docket No. 94 (Pls.' Br. 22). But again, this simply mirrors the allegations in *Twombly*, 127 S. Ct. at 1971, and the Court there still found the complaint insufficient. As one court put it, if "a motive to achieve higher prices" were sufficient, every company in every industry could be accused of conspiracy because they all "would have such a 'motive.'" *In re Baby Food Antitrust Litig.*, 166 F.3d at 133. A leading antitrust treatise also states that "[m]otivation to enter a conspiracy is never enough" to show an agreement. VI Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 1411, at 68 (2d ed. 2003).

### 4.     Price Leadership

The plaintiffs also argue that a "tradition of following the price leadership" of one firm can suggest a conspiracy (Pls.' Br. 21), but the complaint does not allege such a tradition. *See* Docket No. 63 (Compl. ¶¶ 83-87). And even if there were a pattern of price leadership, "[a] section 1 violation cannot . . . be inferred from . . . an industry's follow-the-leader pricing strategy." *In re Citric Acid Litig.*, 191 F.3d at 1102.

### 5.     Similar Cost Structures

The plaintiffs also claim that similar cost structures are a plus factor that may support an inference of conspiracy. They acknowledge, however, that they "did not specifically allege that defendants have similar costs." Docket No. 94 (Pls.' Br. 21). And even if the plaintiffs had made such an allegation, it would not have been sufficient to infer a conspiratorial agreement. If anything, similar

13

cost structures would explain why the defendants' prices would naturally be similar without the need for any agreement. *See* Donald F. Turner, *The Definition of Agreement Under The Sherman Act: Conscious Parallelism and Refusals To Deal*, 75 HARV. L. REV. 655, 662 (1962) (explaining that where sellers have identical costs, no inference of conspiracy can be drawn from the fact that they charge identical prices).

### 6.     High Barriers to Entry

The plaintiffs also contend that a conspiracy is plausible because "entry in the payment card market is exceedingly difficult," so that a pricing conspiracy would generally be protected from competition. Docket No. 94 (Pls.' Br. 22). But the complaint does not allege that entry barriers are high. Moreover, the plaintiffs themselves acknowledge that the industry is in general "fiercely competitive." *Id.* at 16.

### 7.     Parallel Price Increases that Bear no Relationship to Costs

Finally, the plaintiffs argue that "rapid increases in price unjustified by changes in defendants' costs" are suggestive of a conspiracy. *Id.* at 20. Even if this were true when there is no independent explanation of the price increases, the complaint here provides just such an alternative explanation. It shows that late fees began increasing after the Comptroller of the Currency promulgated a regulation in 1995 providing that credit card issuers were not bound by state regulations concerning late fees, and that these increases provided a way for card issuers to recapture revenue they lost from other sources due to competition among the very companies here alleged to be conspiring. *See* Docket No. 63 (Compl. ¶¶ 3, 62-64). Given these "natural explanations" for the increases in late fees, those increases do not support any inference of conspiracy. *See Twombly*, 127 S. Ct. at 1972 (rejecting inference of conspiracy where there was "an obvious alternative explanation" for the allegedly parallel conduct).

The Court concludes that none of these allegations moves the claim of conspiracy from the realm of the "conceivable" to the "plausible" in light of the context here indicating that the defendants' "parallel conduct . . . could just as well be independent action."

For these reasons, the plaintiffs have failed to plead a case adequate under applicable law to state

14

a claim for relief under section 1 of the Sherman Act, and therefore Count Five is dismissed.  Count

Eight alleges the same claim under California's Cartwright Act.  Because "analysis under California's

antitrust law mirrors the analysis under federal law," Count Eight shall also be dismissed.  *County of*

*Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2001).

## C.    Counts Six, Seven, Nine, and Ten (California State Law Claims)

The plaintiffs assert four additional state law claims: violations of the California Unfair

Competition Law (UCL) (CAL. BUS. & PROF. CODE §§ 17200 *et seq.*); the Consumers Legal Remedies

Act (CLRA) (CAL. CIV. CODE §§ 1750 *et seq.*); breach of the covenant of good faith and fair dealing;

and unjust enrichment.  Each of these counts fails as a matter of law to state a claim on which relief can

be granted.

### 1.    Count Six (Unfair Competition Law Claim)

Count Six asserts that because the defendants' late and over-limit fees purportedly violate the

federal banking laws or the antitrust laws, they are also "unlawful" and "unfair" and that the

concealment of their illegality from cardholders is a "deceptive" practice in violation of California

Business and Professions Code sections 17200 *et seq. See* Docket No. 63 (Compl. ¶¶ 131-36).  Because

the plaintiffs' theories are explicitly premised on the assertion that the fees violate federal law and the

Court has determined that no such claim has been stated, the UCL claim is not cognizable.  Moreover,

the Supreme Court has held that challenges to the levels of a national bank's late fees under the UCL

are preempted by the NBA.  *Smiley*, 517 U.S. at 738 & n.1, 744, 747.  Finally, under the substantive

terms of the UCL, the defendant banks could not properly be deemed to have engaged in unfair or

deceptive practices under the statute by acting consistently with all existing legal interpretations of the

NBA and with the express disclosures of their contracts concerning late and over-limit fees.  *See, e.g.,*

*Olszewski v. Scripps Health*, 30 Cal. 4th 798, 828 (2003) (statute provided safe harbor from UCL claim

even though subsequently invalidated); *Byars v. SCME Mortgage Bankers, Inc.*, 109 Cal. App. 4th 1134,

1147-48 (2003) (where particular "conduct has been deemed lawful," it cannot provide the basis for a

1  section 17200 cause of action); *see also Evans v. Chase Manhattan Bank USA, N.A.*, 2006 WL 213740,

2  at *6 (N.D. Cal. 2006) (actions consistent with the "fully-disclosed terms of the contract . . . cannot

3  plausibly be labeled a deception").

4      **2.    Count Seven (Consumers Legal Remedies Act Claim)**

5      Count Seven alleges that the defendants' fees violate California Civil Code section 1750. *See*

6  Docket No. 63 (Compl. ¶¶ 137-42). The plaintiffs' theory again appears to be that illegality under the

7  federal claims gives rise to liability under this California statute. This count is accordingly dismissed;

8  the Court already has found no claim stated under federal law. Moreover, as with Count Six, the state

9  law claim is preempted by the NBA. *See Smiley*, 517 U.S. at 738 & n.1, 744, 747. Indeed, the plaintiffs

10  did not contest defendants' argument on preemption of the CLRA claim.

11      The plaintiffs' CLRA claim must also be dismissed because, as California appellate courts have

12  held, credit card accounts are not "goods or services" subject to that statute. *Berry v. Am. Express*

13  *Publ'g, Inc.*, 147 Cal. App. 4th 224 (2007) (discussing CAL. CIV. CODE § 1770(a)). Every federal court

14  addressing the issue has followed this precedent. *See Van Slyke v. Capital One Bank*, 503 F. Supp. 2d

15  1353, 1358 (N.D. Cal. 2007); *Augustine v. FIA Card Servs., N.A.*, 485 F. Supp. 2d 1172, 1175 (E.D. Cal.

16  2007).[9]

17      **3.    Count Nine (Good Faith and Fair Dealing)**

18      Count Nine contends the defendants' fees violate the implied contractual covenant of good faith

19  and fair dealing because the fees are punitive damages prohibited by the federal banking laws. *See*

20  Docket No. 63 (Compl. ¶¶ 146-48). This claim fails automatically with the dismissal of the underlying

21  federal banking law claims and because the plaintiffs do not contest its preemption. *See Smiley*, 517

22  U.S. at 738 & n.1, 744, 747. In addition, the plaintiffs concede that the fees under challenge are

23

24  _____

25  [9]    The plaintiffs have argued that credit card accounts are "goods or services" as that phrase is
used in other statutes, but those *different* statutes are inapposite, especially in light of the

26  particular legislative history of the CLRA making it clear that the legislature intentionally
excluded credit. *See, e.g., Van Slyke*, 503 F. Supp. 2d at 1358-59; *Augustine*, 485 F. Supp. 2d

27  at 1175.

28

explicitly provided for in cardholders' contracts, and therefore this claim independently fails under the well-settled principle that the implied covenant cannot prohibit that which the contract specifically permits. *See Carma Developers v. Marathon Dev.*, 2 Cal. 4th 342, 374 (1992). The plaintiffs' brief does not contest dismissal on these theories.

### 4.    Count Ten (Unjust Enrichment)

The plaintiffs' last claim, Count Ten, must also be dismissed. First, there simply "is no cause of action in California for unjust enrichment." *Melchior v. New Line Prods., Inc.*, 106 Cal. App. 4th 779, 793 (2003). "Unjust enrichment is a general principle, underlying various legal doctrines and remedies, rather than a remedy itself." *Id.* (citations and quotations omitted). Moreover, the plaintiffs' claim of "unjust enrichment," does not allege any distinct purported impropriety, but depends entirely on the allegation that the defendants benefitted from actions that are unlawful under other theories of liability in their complaint. *See* Docket No. 63 (Compl. ¶¶ 149-55). Accordingly, this claim must necessarily be dismissed when the other claims are dismissed.

CONCLUSION

Accordingly, the Court GRANTS the defendants' joint motion to dismiss [Docket No. 91]. The plaintiffs' consolidated complaint is DISMISSED without prejudice. The plaintiffs have the Court's leave to submit an amended complaint that would be viable under the law as stated in this order, if they can do so in good faith, within 20 days of the date of this order. Should the plaintiffs file an amended complaint, the defendants shall have 30 days to answer or otherwise respond.

IT IS SO ORDERED.

November 16, 2007                                   _____
                                                   Saundra Brown Armstrong
                                                   United States District Judge

17

# EXHIBIT B

# EXHIBIT B

# Westlaw.

--- F.3d ----                                                                                    Page 1
--- F.3d ----, 2007 WL 2964370 (C.A.9 (Or.)), 12 Wage & Hour Cas.2d (BNA) 1682, 07 Cal. Daily Op. Serv.
12,174, 2007 Daily Journal D.A.R. 15,667
**(Cite as: --- F.3d ----)**

**H**Ryman v. **Sears**, Roebuck and Co.
C.A.9 (Or.),2007.

United States Court of Appeals,Ninth Circuit.
Daniel **RYMAN**, Plaintiff-Appellant,
v.
**SEARS**, ROEBUCK AND COMPANY, Defendant-
Appellee.
No. 06-35630.

Submitted Sept. 25, 2007 FN*.
Filed Oct. 12, 2007.

**Background:** Former employee brought action
alleging that employer violated Oregon Family Leave
Act (OFLA) by penalizing him for allegedly
protected family leave absence. The United States
District Court for the District of Oregon, Anna J.
Brown, J., 2006 WL 1720534, entered summary
judgment in employer's favor, and employee
appealed.

**Holding:** The Court of Appeals, Silverman, Circuit
Judge, held that employee's absence did not
constitute protected leave under OFLA.

Affirmed.



**[1] Federal Courts 170B ⚷ 383**

170B Federal Courts
    170BVI State Laws as Rules of Decision
        170BVI(B) Decisions of State Courts as
Authority
            170Bk382 Court Rendering Decision
                170Bk383 k. Inferior State Courts.
Most Cited Cases
When (1) federal court is required to apply state law,
and (2) there is no relevant precedent from state's
highest court, but (3) there is relevant precedent from
state's intermediate appellate court, federal court must
follow state intermediate appellate court decision
unless federal court finds convincing evidence that
state's supreme court likely would not follow it.

**[2] Labor and Employment 231H ⚷ 356**

231H Labor and Employment
    231HVI Time Off; Leave
        231Hk353 Terms and Conditions of Leave
            231Hk356 k. Commencement, Duration,
and Termination of Leave. Most Cited Cases

**Labor and Employment 231H ⚷ 365**

231H Labor and Employment
    231HVI Time Off; Leave
        231Hk361 Rights of Employee; Violations
            231Hk365 k. Retaliation in General. Most
Cited Cases
Employee's absence did not constitute protected leave
under Oregon Family Leave Act (OFLA), and thus
employer's decision to terminate employee for
excessive absenteeism did not constitute unlawful
retaliation under OFLA, even though employee was
on family leave during three preceding days and was
honestly mistaken about when he was due back to
work, where employee was not assessed any
attendance points for days he was on family leave,
and there was no evidence that he was retaliated or
discriminated against in any way for exercising his
family leave rights. West's Or.Rev. Stat. Ann. §
659A.159.

Keith D. Karnes, Olsen, Olsen & Daines, and Jason
C. McBride, Salem, OR, for the plaintiff-appellant.
Michael T. Garone and Jean Ohman Back, Schwabe,
Williamson & Wyatt, Portland, OR, for the
defendant-appellee.

Appeal from the United States District Court for the
District of Oregon; Anna J. Brown, District Judge,
Presiding. D.C. No. CV-05-01106-BR.

Before FERDINAND F. FERNANDEZ, BARRY G.
SILVERMAN, and SUSAN P. GRABER, Circuit
Judges.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----          Page 2
--- F.3d ----, 2007 WL 2964370 (C.A.9 (Or.)), 12 Wage & Hour Cas.2d (BNA) 1682, 07 Cal. Daily Op. Serv.
12,174, 2007 Daily Journal D.A.R. 15,667
(Cite as: --- F.3d ----)

## OPINION

SILVERMAN, Circuit Judge:

*1[1] Today we reiterate the rule that when (1) a federal court is required to apply state law, and (2) there is no relevant precedent from the state's highest court, but (3) there *is* relevant precedent from the state's intermediate appellate court, the federal court must follow the state intermediate appellate court decision unless the federal court finds convincing evidence that the state's supreme court likely would not follow it.

## I. FACTS

Plaintiff Daniel Ryman was fired by Sears for excessive absences; at issue here is his absence from work on November 17, 2003. From November 14, 2003, through November 16, 2003, Ryman was on leave to care for his sick child, and this absence was not counted against him by Sears. Ryman had not received his upcoming work schedule before taking leave and did not know whether he was scheduled to work on November 17, 2003. He called a fellow employee, who incorrectly told Ryman that he was *not* scheduled to work on November 17. As a result, Ryman neither reported for work nor called in an absence that day. He accrued the corresponding number of demerits pursuant to Sears' attendance policy. This took him over the limit allowed by the policy and, shortly thereafter, he was fired. Ryman asserts that Sears violated the Oregon Family Leave Act ("OFLA"), O. R. REV. STAT. §§ 659A.150-659A.186, by penalizing him for an allegedly protected family leave absence.

The district court did not reach the merits of Ryman's claim, because it ruled that OFLA does not provide a cause of action for retaliation, or for anything other than an employer's denial of an eligible employee's request for family leave. In so ruling, the district court expressly declined to follow *Yeager v. Providence Health Sys. Or.,* 195 Or.App. 134, 96 P.3d 862, 865 (Or.Ct.App.2004), in which the Oregon Court of Appeals held that OFLA does indeed "create a civil remedy for retaliatory discharge...." The district court adopted the view that *Yeager* was incorrectly decided and reasoned that the decision was not binding on federal courts because it was the pronouncement of only an intermediate appellate court, not of Oregon's highest court. Analyzing the state-law question for itself, the district court ruled that OFLA does not provide a cause of action for an employee who has been penalized or discharged for pursuing rights under the statute. Consequently, the district court granted summary judgment for Sears.

## II. ANALYSIS

" '[W]here there is no convincing evidence that the state supreme court would decide differently, a federal court is obligated to follow the decisions of the state's intermediate appellate courts .' " *Vestar Dev. II, LLC v. Gen. Dynamics Corp.,* 249 F.3d 958, 960 (9th Cir.2001) (quoting *Lewis v. Tel. Employees Credit Union,* 87 F.3d 1537, 1545 (9th Cir.1996) (internal quotation marks omitted)). The district court did not cite any evidence that the Oregon Supreme Court would disaffirm *Yeager.*It merely disagreed with *Yeager.*[FN1] Because there is no evidence that the Oregon Supreme Court would have decided the OFLA issue differently, the district court erred in not applying the *Yeager* rule.[FN2]

*2[2] However, the record in this case does not contain any evidence that Sears violated OFLA, and "we may affirm the grant of summary judgment on any basis supported by the record."*Swirsky v. Carey,* 376 F.3d 841, 850-51 (9th Cir.2004). As Ryman was neither recovering from a serious health condition nor providing care to a family member on November 17, 2003, his absence on that day does not constitute protected leave under OFLA, *see*OR. REV. STAT. § 659A.159 (2005), regardless of the fact that he was on family leave during the three preceding days and was honestly mistaken about when he was due back to work. Ryman was not assessed any attendance points for the days he *was* on family leave, and he has adduced no evidence that he was retaliated or discriminated against in any way for exercising his family leave rights.

AFFIRMED.

> FN1. We note that the district court did cite opinions by other federal district judges expressing their disagreement with the *Yeager* rule. The opinions of other federal judges on a question of state law do not constitute "convincing evidence that the state supreme court would decide [an issue] differently,"*Vestar,* 249 F.3d at 960, nor do those opinions contain any relevant "convincing evidence."

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 3

--- F.3d ----
--- F.3d ----, 2007 WL 2964370 (C.A.9 (Or.)), 12 Wage & Hour Cas.2d (BNA) 1682, 07 Cal. Daily Op. Serv. 12,174, 2007 Daily Journal D.A.R. 15,667
**(Cite as: --- F.3d ----)**

FN2. Although not dispositive, we note that the Oregon Supreme Court declined to grant review of *Yeager.See Yeager v. Providence Health Sys. Or., 337 Or. 658, 103 P.3d 641 (Or.2004)* (table). 13903

FN* The panel unanimously finds this case suitable for decision without oral argument. *See*Fed. R.App. P. 34(a)(2).

C.A.9 (Or.),2007.
Ryman v. Sears, Roebuck and Co.
--- F.3d ----, 2007 WL 2964370 (C.A.9 (Or.)), 12 Wage & Hour Cas.2d (BNA) 1682, 07 Cal. Daily Op. Serv. 12,174, 2007 Daily Journal D.A.R. 15,667

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.